IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF GEORGIA
                       ATLANTA DIVISION

REBECCA RAMSEY,                )
                              )
        Plaintiff,            )
                              )  CIVIL ACTION FILE
vs.                           )  NO: 1:13-CV-03808-WSD
                              )
WALLACE ELECTRIC COMPANY,     )
and PHILLIP WALLACE, SR.,     )
                              )
        Defendants.           )



        The 30(b)(6) deposition of PHILLIP HOWARD WALLACE,

SR., ON BEHALF OF WALLACE ELECTRIC COMPANY, taken pursuant

to notice for discovery, cross-examination and all purposes

under the Federal Rules of Civil Procedure; all formalities

waived, excluding the reading and signing of the deposition;

before Micah Smith, Court Reporter in and for the State of

Georgia; commencing at 10:05 a.m., on Friday, May 2, 2014,

at 2200 Keys Ferry Court, McDonough, Georgia.



                Taken by Micah Smith, CCR
               on behalf of Susan E. McKoy,
              CCR
                   12659 Itaska Walk
                Milton, Georgia  30004
                (404) 388-3840 (cell)
                susanmckoy5@gmail.com

1                    A P P E A R A N C E S

2   ON BEHALF OF THE PLAINTIFF:

3           DELONG CALDWELL BRIDGERS & FITZPATRICK, LLC
            BY: CHARLES R. BRIDGERS, ATTORNEY AT LAW
4           3100 Centennial Tower
            101 Marietta Street
5           Atlanta, Georgia  30303
            (404) 979-3150
6           (404) 979-3170 (Facsimile)
            charlesbridgers@dcbflegal.com

7

8   ON BEHALF OF THE DEFENDANTS:

9           SMITH, WELCH, WEBB & WHITE, LLC
            BY: WILLIAM A. WHITE, ATTORNEY AT LAW
10          2200 Keys Ferry Court
            Post Office Box 10
11          McDonough, Georgia  30253-0010
            (770) 957-3937
12          (770) 957-9165 (Facsimile)
            wwhite@smithwelchlaw.com

13

14  ALSO PRESENT:

15          Rebecca Ramsey

16

17

18

19

20

21

22

23

24

25

1                     I N D E X

2                                         Page

3    Cross-examination by Mr. Bridgers . . . . .  7

4                   E X H I B I T S

5    Exhibit        Description          Page marked/identified

6     1   Notice of 30(b)(6)                        4/4
      2   Def. Initial Disclosure                   38/39
7     3   Def. Responses to 1st Req for Admissions  39/40
      4   Def. Responses to 1st Cont. Interrogatories  40/40
8     5   Deponent's Response to Discovery          41/42
      6   Time Tickets                              161/162
9     7   (No exhibit was marked or identified.)
      8   Copy of Pay Stubs                         69/69
10    9   Payroll Journal                           69/70
      10  Time Tickets                              162/162
11    11  Ramsey Application for Employment         57/57
      12  Ramsey Letter of Resignation              58/58
12    13  Copy of paycheck dated 12/13/13           60/60
      14  Ramsey Confidential Wage/Salary History   61/61
13    15  Ramsey list of duties                     51/51
      16  Ramsey list of duties - drafted by Ramsey 51/52

14

15

16

17

18

19

20

21                      Transcript codes

22
         --      interruption/change in thought
23       ...     incomplete thought
         (sic)   denotes word/phrase that may be strange or
24               incorrect, has been typed verbatim
         (ph)    phonetically spelled
25       (unintelligible) not capable of being understood

```
 1                    P R O C E E D I N G S

 2                                          10:05 a.m.

 3                    (Whereupon, Exhibit No. 1

 4            was marked for identification.)

 5            MR. BRIDGERS:  This will be the

 6    deposition of Wallace Electric Company, taken

 7    pursuant to notice and agreement of counsel.

 8    I've gone ahead and marked the deposition for

 9    actually Wallace Electric, as well as stapled to

10    the individual notice for Mr. Phillip Wallace,

11    Sr.  So we'll go ahead and mark that for the

12    record.

13                 If you would swear the witness in for

14    us.

15                 And we'll go ahead and take the

16    deposition pursuant to rules 32 and 36 of the

17    Federal Rules of Civil Procedure with the caveat

18    that we'll reserve all objections except to the

19    form of the question and the responsiveness of

20    the answer until first use.  Does that sound

21    okay?

22            MR. WHITE:  That's fine.

23            MR. BRIDGERS:  Very good.

24            (Witness sworn.)

25            MR. BRIDGERS:  Mr. Wallace, good
```

1       morning.  Again, my name is Charles Bridgers.  I

2       do represent Ms. Ramsey.  I'm going to be asking

3       some questions here of you today.  What is your

4       full legal name, sir?

5               THE WITNESS:  Phillip Howard Wallace.

6               MR. BRIDGERS:  Do you use the term

7       senior?

8               THE WITNESS:  From time to time.

9               MR. BRIDGERS:  Okay.  And you heard the

10      deposition of Ms. Ramsey yesterday.

11              THE WITNESS:  Uh-huh (affirmative).

12              MR. BRIDGERS:  Basically, I'm going to

13      go through and ask you a series of questions.

14      The difference this morning is that you are

15      speaking, at least to start off with here, in a

16      corporate representative fashion speaking for

17      the company.

18              THE WITNESS:  Okay.

19              MR. BRIDGERS:  You understand that?

20              THE WITNESS:  Sure.

21              MR. BRIDGERS:  Similarly, though, if you

22      need to take a break or if there's something you

23      just don't understand a question, just let me

24      know and we'll do our best to be clear.

25              THE WITNESS:  All right.

1           MR. BRIDGERS:  If you do answer the

2     question, though, the court and the jury will

3     assume that you understood it.  So just be

4     careful with that going forward, okay?

5           THE WITNESS:  Uh-huh (affirmative).

6           MR. BRIDGERS:  And that's probably the

7     next thing, is be -- in a conversation we have a

8     tendency to nod our head or go uh-huh

9     (affirmative) or huh-uh (negative).  But, for

10    instance, when you agreed a second ago and did

11    uh-huh (affirmative), --

12          THE WITNESS:  Right.

13          MR. BRIDGERS:  -- I understood exactly

14    what you meant, but it doesn't come off clearly.

15    We need you to be sure that you say what you

16    mean.

17          THE WITNESS:  Right.

18          MR. BRIDGERS:  Okay.  And if we're

19    talking and I look at you and go is that a yes,

20    is that a no, I'm not trying to be sarcastic or

21    anything, I just want to make sure that whatever

22    you're intending to say --

23          THE WITNESS:  Right.

24          MR. BRIDGERS:  -- gets down on the

25    record.  Very well.  And so we can take breaks

1          or anything like that, just let us know as we go

2          forward.  We'll probably try to take one every

3          hour, hour and a half or so.  You don't really

4          have the opportunity to ask too many more

5          questions, but do you understand the format of

6          the deposition?

7                    THE WITNESS:  Sounds pretty simple, yes.

8                    MR. BRIDGERS:  Okay.  Is there anything

9          going on in your health or in your life that

10         would prevent you from being able to hear,

11         understand and remember answers to questions

12         this morning?

13                    THE WITNESS:  No, sir.

14    Whereupon,

15                    PHILLIP HOWARD WALLACE, SR.

16    was called as a witness herein and, having been first duly

17    sworn, testified as follows:

18                         CROSS-EXAMINATION

19    BY MR. BRIDGERS:

20         Q.      Okay.  And I'm going to start off with a

21    little unusual for 30(b)(6), but so I don't have to cover it

22    later on in your own personal deposition, I'm going to ask

23    some background information about you particularly, okay?

24         A.      Uh-huh (affirmative).

25         Q.      Have you ever been known by any other names?

1    A.    No.

2    Q.    How old are you?

3    A.    56.

4    Q.    What's your date of birth?

5    A.    9/18/57.

6    Q.    And I'm going to do the same thing on the

7  Social Security number.  I'm just going to write it down but

8  ask the court reporter not to transcribe it.

9    A.    (Social Security number provided.)

10   Q.    Thank you.  Going back on transcription.  Do

11 you hold any State licenses, other than a driver's license?

12   A.    Yes.

13   Q.    What are those licenses?

14   A.    Georgia, Alabama, South Carolina and North

15 Carolina.

16   Q.    What?

17   A.    Electrical license.

18   Q.    Oh.

19   A.    Electrical contractor.

20   Q.    You hadn't said that part yet.

21   A.    Well, we're electrical contractors, so that's

22 why I've got a lot.  It's electric.

23   Q.    Okay.  So electrical contracting license for

24 those states?

25   A.    Correct.

1      Q.      Are they all current?

2      A.      Yes.

3      Q.      Have you ever had any of your electrical

4   contracting licenses suspended?

5      A.      No.

6      Q.      Any other licenses the State would give, other

7   than a driver's license?

8      A.      I do have a low-voltage license for the state

9   of Georgia.

10     Q.      Okay.  Anything else, any other licenses?

11     A.      No.  I guess that would be it, other than drag

12   racing license.

13     Q.      Okay.  Tell me about your educational

14   background, please.

15     A.      Went through tenth grade and had to end up

16   taking courses and getting a GED to get a diploma.  Other

17   than that, just various different electrical training,

18   electrical courses, taking it -- eight different, you know,

19   classes and different places.

20     Q.      Where did you grow up?

21     A.      In Metropolitan Atlanta.

22     Q.      And where did you go to high school?

23     A.      Therrell High School.

24     Q.      Which one?

25     A.      Therrell.

1      Q.      I'm not familiar with that.  Where is that?

2      A.      It's in Southwest Atlanta near Greenbriar

3  Mall.

4      Q.      Okay.  So it's my understanding that anything

5  after your GED would have been, basically, related to

6  electricity and learning to do that?

7      A.      Electrical training, plus I was a mechanic for

8  some time.

9      Q.      Okay.

10     A.      I worked at a few car dealerships.

11     Q.      Got a lot of car dealerships here.  Well, just

12  briefly, take us -- you lived in Metropolitan Atlanta.

13  Where did you live next?

14     A.      Well, I was born and raised in Ben Hill, which

15  is a little town outside of, like I say, in Southwest

16  Atlanta.

17     Q.      Uh-huh (affirmative).

18     A.      I think we moved from Ben Hill to College

19  Park, then to Riverdale, then to Jonesboro, then to Forest

20  Park, then to Conyers, and then here in McDonough.

21     Q.      How long have you been in McDonough?

22     A.      About 28 years.

23     Q.      Okay.  What's your address here?

24     A.      371 Pullin, P-u-l-l-i-n, Road, McDonough,

25  Georgia 30253.

1      Q.      Have you lived at that location for a while?

2      A.      28 years.

3      Q.      Who lives with you in that home?

4      A.      My wife and my child.

5      Q.      What's your wife's name?

6      A.      Deborah Diane Wallace.

7      Q.      And that's the same Debbie Wallace we

8   mentioned yesterday who works at the company?

9      A.      Correct.

10     Q.      Is your child over 18?

11     A.      No, not that one.  I have two others, but they

12  don't live there.

13     Q.      Okay.  Well, tell me the name of any of your

14  adult children, if you would.

15     A.      Nicholas Gary Wallace and Phillip Howard

16  Wallace, Jr.

17     Q.      Do either of them work at the company with

18  you?

19     A.      Phillip does.

20     Q.      What is Phillip's position at the company?

21     A.      He's an electrician's helper.

22     Q.      Okay.  Let's see.  Have you ever been married

23  before?

24     A.      Yes.

25     Q.      And what was the woman to whom you were

1    married, what was her name?

2          A.      Which one you want?

3          Q.      Very well.

4          A.      You want me to start at the first?

5          Q.      Sure.  Please.

6          A.      I believe her name was Beth.  That's about all

7    I can remember.

8          Q.      Do you recall her name?  Has that been a

9    while?

10         A.      Don't know.  Can't remember.

11         Q.      Second?

12         A.      That would have been the oldest boy's mother.

13   It's Robin, last name Babb.

14         Q.      B-a-b-b?

15         A.      Yeah.  And then there was a Shanda.

16         Q.      Do you recall Shanda's maiden name?

17         A.      Cochran.  And then my wife, Debbie.

18         Q.      How long have you been married to Debbie?

19         A.      I think 13 years.

20         Q.      Okay.  Does Ms. Babb and Ms. Cochran still

21   live in the area?

22         A.      Ms. Cochran has actually passed away.

23         Q.      I see.

24         A.      And Ms. Babb, I couldn't tell you.

25         Q.      And you heard some of the questions yesterday

1   to Ms. Ramsey for assuming -- can you give me the names, at

2   least last names, of any family members you might have in

3   the northern district of Georgia, so say from here to the

4   north, to the end of north Georgia?

5        A.      Well, the other end of Wallace, I mean other

6   than a Wallace.

7        Q.      Other than Wallace, yes, sir.

8        A.      That would be Howle, H-o-w-l-e.

9        Q.      Okay.  Any other family names out there?

10       A.      Not that I can tell you.  I don't know any

11   distant cousins or whatever.  You know what I'm saying.

12       Q.      Certainly; just major names.

13       A.      That's all I can tell you.

14       Q.      All right.  Other than perhaps divorces, have

15   you ever been parties to lawsuits, to a lawsuit?

16       A.      Yes.

17       Q.      All right.  What other?  And we'll keep the

18   divorces aside since they're theoretically lawsuits.

19       A.      Just a percentage owner of the company is my

20   oldest brother, and he has a lawsuit against us at this

21   point, wanting to get the percentage of Cobb County.

22       Q.      I think I saw that.  That had something to do

23   with minority shareholder rights.

24       A.      Yes.

25       Q.      And what's your brother's name?

1        A.        Dorsey Eugene Wallace.

2        Q.        Dorsey Eugene Wallace.  And when is the --

3   well, did Dorsey Eugene Wallace work at Wallace Electric?

4        A.        From '86 to '94, I believe it was, '85, '86 to

5   '94.

6        Q.        Okay.  So did he have any interaction with Ms.

7   Ramsey, to your knowledge?

8        A.        No, nothing that I -- no.

9        Q.        Okay.  I just didn't know.  I didn't know his

10  time frames, and that's why I was asking.

11       A.        Yeah.

12       Q.        Other than that, other than what we talked

13  about, any other lawsuits that you've been involved in?

14       A.        Other than a situation, which I don't know

15  that that would be company related or how you would want to

16  word it, but with a step-mother that was involved in the

17  business.

18       Q.        What was that?

19       A.        Or at least she thought she was.

20       Q.        What was that related to or what was the

21  allegation?

22       A.        Stock, company stock.  It was my father's

23  stock that got willed, which was not supposed to happen.  It

24  was supposed to roll -- only went into the estate and was

25  supposed to roll back to the company.  So that had to be

1    straightened out.

2         Q.      So is that kind of an ownership issue of --

3         A.      Yeah.

4         Q.      -- part of the company?

5         A.      That was all.  Yeah.

6         Q.      What was that woman's name?

7         A.      Lynn -- let's see.  Wait a minute.  Is it

8    Margaret Lynn, I think it is.  It's either Margaret Lynn or

9    Lynn Margaret, but I think it's Margaret Lynn Wallace.

10        Q.      And how long has that been resolved?

11        A.      Gosh, a couple of years now, I guess.

12        Q.      Uh-huh (affirmative).  While we're on this,

13   have you ever been arrested?

14        A.      Sure.  Yes, sure have.

15        Q.      Okay.  And what was the circumstances of that?

16        A.      It was one of the ex-wives, made a call of

17   domestic violence, which was incorrect, but the woman's

18   always right.  It doesn't matter.

19        Q.      About what time frame was that?

20        A.      Oh, gosh, that was back in, I mean, the early

21   2000s I guess.

22        Q.      And have you ever been convicted of a felony?

23        A.      No.

24        Q.      Have you ever given testimony in a deposition,

25   like, you know, in any kind of deposition before?

1        A.        With my oldest brother's situation, yes.

2        Q.        Okay.  Would that testimony have touched on

3    any of the duties of Ms. Ramsey or anybody else in the

4    office in terms of how they did their job?

5        A.        Only when my brother was working for us, about

6    what he did in his job.

7        Q.        Have you ever testified -- and is that the

8    only deposition you've testified at?  What depositions have

9    you given?

10       A.        Other than a divorce.

11       Q.        Okay.  Have you ever testified at trial or

12   anything like that?

13       A.        No.

14       Q.        Did you ever serve in the military?

15       A.        No.

16       Q.        Kind of similar to the questions about family,

17   do you belong to any kind of clubs or associations,

18   organizations in Georgia?

19       A.        Not currently.

20       Q.        Any kind of churches or social organizations?

21       A.        Not currently.

22       Q.        How long has it been since you've been -- I

23   mean when you say not currently, --

24       A.        It's probably been eight or ten years ago.  I

25   was a member of the Moose Lodge here in Henry County.

1        Q.        Any particular volunteer activities or other

2   places you interact with the public?

3        A.        Some with the churches.

4        Q.        Like what?

5        A.        Well, I mean we've had several get-together's

6   with the -- with the one they call the Country Church out

7   off Highway 20, Baptist church, and then we attended Avalon

8   Church in McDonough several times.

9        Q.        Okay.  And it's called the Country Church?

10       A.        Yeah.

11       Q.        Interesting.  How long have you worked for

12   Wallace Electric?

13       A.        Well, I guess you could say since I was 15

14   years old.  There was a few years I left to be a mechanic.

15   But consistently on the job every day, since the age of

16   about 24.

17       Q.        At Wallace Electric?

18       A.        Yes.

19       Q.        That's been some time ago, but you were a car

20   mechanic for a while?

21       A.        Yeah.

22       Q.        Where did you work?

23       A.        Greenbriar Dodge.

24       Q.        So that sounds like that was a better part of

25   35 years ago?

1    A.    Yeah.  Yeah, it was quite a while back.  It

2  was in the early 20s.

3    Q.    Going back to your work at Wallace Electric,

4  just kind of talk me through what your role has been since

5  you got started back at the age of 24?

6    A.    I was basically a lead foreman over multiple

7  projects and over anywhere from ten to 25 men, a supervisor,

8  you know, getting the jobs done.  And then started into

9  estimating, as well as doing that too at the same time, and

10  purchasing.

11    Q.    Excuse me.

12    A.    We've always been structured as a small

13  company, so my brother and I and my nephew, we wear many

14  hats.  We're purchasing agents, we're estimators, we're

15  project managers, we are foremen, and we actually will get

16  in the trenches with the guys if needed from time to time to

17  do whatever we have to do.  Basically, we do it all.

18    Q.    Okay.  Who is the -- I have not made this

19  connection.  Who is the nephew you're referencing?

20    A.    Shannon Whitener.

21    Q.    And tell us how you get to be his uncle?

22    A.    That's my brother's oldest child.  He -- Gary

23  Wallace's oldest child, --

24    Q.    Okay.

25    A.    -- my brother.  He ended up in a divorce

1  situation years ago his self.

2      Q.      Okay.  And how do you spell his last name,

3  please?

4      A.      Whitener?

5      Q.      Yes, sir.

6      A.      W-h-i-t-e-n-e-r.

7      Q.      All right.  Is he still with the company?

8      A.      Oh, yeah.

9      Q.      And what is his formal title, if he's got one?

10  What is he, a corporate officer --

11     A.      Other than -- well, no.  He's not a corporate

12  officer.  We will just refer to him as project manager, but

13  he still does all of the above that I mentioned myself that

14  I do.

15     Q.      Okay.  How long have you been a -- well, what

16  is your current corporate role?  What is your title in the

17  corporation?

18     A.      CFO.

19     Q.      You're CFO?

20     A.      CFO and Vice President.

21     Q.      Vice President.  Okay.  How long have you been

22  CFO and Vice President?

23     A.      I believe it was since 2000 when my dad passed

24  away.

25     Q.      And is there a president, or that's just --

1     A.     No, that would be my brother, the President

2  and CEO, Gary Wallace.

3     Q.     Sorry.  Does Gary remain in that corporate

4  title?

5     A.     Yes.

6     Q.     And just generally, y'all's dispute is over

7  the ownership of the company, the ownership of the stock?

8     A.     No, not that brother.

9     Q.     Okay.

10    A.     Me and that brother, we're good.  We're the

11  ones that run the place.

12    Q.     Okay.  So I was missing --

13    A.     The Dorsey Eugene Wallace brother --

14    Q.     I was missing some Dorsey's.  Okay.

15    A.     That's been gone for, like, quite a while.

16    Q.     I see.

17    A.     He has a small percentage.

18    Q.     Okay.  I'm going to ask you about that in a

19  second, as well.  Getting back to the corporate officers,

20  you're CFO and Vice President, been so since 2000?

21    A.     Uh-huh (affirmative).

22    Q.     Is that a yes?

23    A.     Yes.

24    Q.     Gary's President and CEO, been so since about

25  the same time frame?

1      A.      No, he's actually been President longer than

2  that.

3      Q.      How does Gary's role differ from yours, if it

4  is?

5      A.      He has less to do than I do because he's not

6  involved with the front office as much as far as the day-to-

7  day activities and looking over financial statements and

8  trying to make cost-cutting decisions with overhead and

9  things of that nature, that's my job.

10      Q.      So what does he generally do day to day?  He's

11  on the production side?

12      A.      Just like I said before, he's estimator, --

13      Q.      Okay.

14      A.      -- purchasing agent, you know, so on and so

15  on, project manager.

16      Q.      Okay.  But in general, your role is you've got

17  the management role in the company?

18      A.      Pretty much, yes.

19      Q.      Who is the current corporate treasurer?

20      A.      We actually don't have one listed, if I

21  remember right at this point, as current treasurer.  But

22  Debbie was to fall into that category if the paperwork's

23  been processed by now or not.  That's been a slow transition

24  from trying to get some things worked out through all these

25  other issues from the step-mom to the other brother to now.

1      Q.      Okay.  Well, and maybe I should -- a better

2  way to ask this is, who are the other corporate officers,

3  other than you and your brother currently?

4      A.      Would be the older brother, Phil, Gary and

5  Doss.  That's the three corporate officers.

6      Q.      Doss?

7      A.      Dorsey.

8      Q.      Dorsey.  Okay.  All right.  Does Dorsey have a

9  formal corporate role?

10      A.      No.

11      Q.      All right.  Currently, --

12      A.      He hadn't been involved for 20 years.

13      Q.      That's what I understood.  When you said that,

14  that's what confused me.  So Debbie is taking over formerly

15  as treasurer either now or sometime --

16      A.      She's the office manager, is her label at this

17  point.

18      Q.      Okay.  How long has she been office manager?

19      A.      I guess it's close to four years now or so.

20      Q.      Okay.  So she would have been office manager

21  the entire time Ms. Ramsey was there?

22      A.      Yes, ever since, I believe it was -- it was

23  right there at that time.  Yeah, it was.  It was, because

24  Debbie actually hired Rebecca.  Sure did.

25      Q.      All right.  Any other people in leadership

1   roles in the corporation, in the company, other than

2   yourself, Gary and Debbie?

3        A.        In leadership roles?  You mean in supervisory

4   positions or what?

5        Q.        Well, let me stick with just the corporation

6   for right now in terms of titles.

7        A.        That would be all, then.

8        Q.        Okay.  And in terms of -- just tell me briefly

9   how -- kind of -- when you say supervisory, who are you

10  referring to at that point?

11       A.        All the girls up front, when Rebecca was there

12  included.  They all --  They all managed a very vital area

13  of the business that was critical to the financial well-

14  being of the company.

15       Q.        Okay.  But when you use the term supervisor,

16  what do you mean by that?

17       A.        They had to make decisions downstream, people

18  under them had to get approval from them.  So they had to

19  report to them, and their say so is what stuck.

20       Q.        All right.  And I'll let you tell me all that

21  in a second.

22       A.        All right.

23       Q.        Just give me -- all right.  What do you call

24  the people who go out on a job and they're in charge of a

25  particular job onsite?

1       A.      That's called lead men.

2       Q.      Lead men.

3       A.      Uh-huh (affirmative).

4       Q.      How many lead men do you have over the last

5   three years, since Ms. Ramsey's been there?

6       A.      Probably 20.

7       Q.      Okay.  And a lead man would take a team of

8   other people, depending on the job, --

9       A.      Uh-huh (affirmative).

10      Q.      -- to work it out?

11      A.      Yes.

12      Q.      Not perhaps in a technical sense, but they'd

13  almost be like working foreman?

14      A.      Yes.

15      Q.      And so your lead men reports to who?

16      A.      The lead men would report as far as their work

17  duties, they would work -- they would report to Bo Babb and

18  Scott Tatum.

19      Q.      Okay.  And who is Bo Babb?

20      A.      He is one of the shop supervisors.

21      Q.      Okay.  How long has he been a shop supervisor?

22      A.      Oh, let's see.  That's been since about 2002.

23      Q.      And the other gentleman's name?

24      A.      Scott Tatum.

25      Q.      Scott Tatum; and Scott's title?

1       A.      Same as Bo's.

2       Q.      How long has he been there?

3       A.      He has been with us, I'm going to have to

4   guess at this one, --

5       Q.      As long as you've got a -- just give me an

6   approximation to --

7       A.      Eight years.

8       Q.      As general, we don't need you to guess, but if

9   you've got an estimation, just say it's about so in so.

10      A.      All right.  Okay.

11      Q.      That's fine.

12      A.      Right.

13      Q.      You know, I don't want you to guess at

14  something.  You're under oath.  So your lead men -- and does

15  Bo and Scott, do they have just different teams or they have

16  different areas of responsibility?

17      A.      Basically, they share the teams somewhat, but

18  Bo, his main focus was on service work that Rebecca would

19  dispatch to him and some smaller contract jobs, and Scott

20  Tatum's main focus was on the larger contract jobs.

21      Q.      Okay.  And who did Bo and Scott then report

22  to?

23      A.      As far as?

24      Q.      Well, I mean who did they go to for -- to be

25  supervised or give performance reviews or things like that?

1      A.      Well, various different people.  You know,

2  there's a big wide open area for your statement there.  As

3  far as any supervision, so to speak, on how the jobs would

4  need to be handled and all, that would have been from me.

5  Anything as far as information that they may need or

6  directions to be given from, you know, new-hire packages of

7  forms to be filled out, directions of how to fill them out,

8  insurance that they have to deal with with the men, their

9  time as far as getting recorded properly and turned in

10  properly, pay rates, all of that stuff was in Rebecca's

11  hands.

12      Q.      Okay.  And let's just get this on -- let me

13  kind of take just a step back to see where I've got to go.

14  From our conversation yesterday, I understand that the

15  company does not rely on the executive exemption in this

16  lawsuit as to Ms. Ramsey; is that still -- is the discovery

17  still accurate such that that is still a true statement?

18           MR. WHITE:  Why don't we have that

19      conversation at the end after I hear his

20      deposition testimony?  I don't know at this

21      point based on what he's saying.

22           MR. BRIDGERS:  Are you changing your

23      discovery responses?

24           MR. WHITE:  We may have to.  If we have

25      to, we will.

1          MR. BRIDGERS:  It's going to be a long

2      week.

3          MR. WHITE:  It might be.  It's going to

4      be for me anyway.

5          MR. BRIDGERS:  All right.  We'll do this

6      later.

7  BY MR. BRIDGERS:  (Resuming)

8      Q.      So is there any different -- so at least at

9  some point some topics, Mr. Tatum, Mr. Babb report to you;

10 is that right?

11     A.      Yes.

12     Q.      And tell me about who the people are in the

13 office area where Ms. Ramsey was.

14     A.      Just in that particular room?

15     Q.      Let's just say the support office, whoever did

16 support for the company.

17     A.      Okay.  Well, I don't understand the term

18 support, but I'll just tell you who all is across the whole

19 front office.

20     Q.      Please.

21     A.      You have Debbie Wallace, which was in accounts

22 payable and office manager.

23     Q.      Okay.

24     A.      You have Phyllis Allgood, which was

25 collections and obviously, being -- doing -- she's

1    collections, she makes sure that all the money that was

2    collected was allocated to the correct invoices for payment.

3    Melissa Babb, that was -- was with us, she's no longer with

4    us, and she basically would enter the accounts payable,

5    payables to the computer for Debbie to make payment on, and

6    she also answered the phone as far as just general calls.

7         Q.      Okay.  Anybody than Ms. Ramsey?

8         A.      Okay.  And then Rebecca, which basically, was

9    one of the main areas of all our day-to-day business from

10   morning to evening as far as taking in service calls,

11   pricing or purchasing, any property management calls that we

12   may have for various different buildings we did work for,

13   also permitting, calling in inspections, calling in locates,

14   entering invoices in the computer for job costs, keeping the

15   PO numbers straight, entering the time into the computer for

16   job costs, also collecting the time from the guys,

17   communicating with the guys on time errors to get it right

18   so that she could process them for payroll week to week, as

19   well as keeping up with their hourly rates.  Any requests

20   for vacations that came through, she would check, if they

21   were eligible she would automatically process it to be paid,

22   did not have to have any approval to do so, only if it was

23   questionable whether they were asking for it early or not

24   would she have to do so.

25             In the beginning, she was receiving materials

1    in the back before I hired Chuck Turner to do AutoCAD work.

2    The she trained Chuck Turner on all the receivables and

3    everything in the rear.

4         Q.      Okay.  And we're going to go through her

5    duties in detail, I'm just trying to find out --

6         A.      I'm trying to explain.  You asked.

7         Q.      All right.  Continue.

8         A.      You asked.

9         Q.      Continue.

10        A.      All right.  Then she would also, once she

11   would prepare all of the service billing and some of the

12   smaller contract jobs, since she would hand them off to

13   Angela to process invoices on, and -- let's see, because

14   Angela basically did the large contract work only on that

15   and did draws on contract jobs.  Rebecca did the rest.  And

16   let's see.  That pretty well describes Rebecca's position

17   for the most part, I think.  And then Angela, like I say,

18   she stayed buried just with processing invoices.

19        Q.      Did Angela and Rebecca have the same job?

20        A.      No.

21        Q.      Did all of those women report to Debbie, as

22   the office manager?

23        A.      They all did, yes.

24        Q.      Is there a formal organization chart for

25   Wallace Electric for any time that Ms. Ramsey's been working

1    there?

2          A.      As far as chain-of-command?

3          Q.      Right, a flowchart scene, org charts, anything

4    like that?

5          A.      No, not necessarily, other than that they were

6    -- because they were on the end where work came in permitted

7    and all.

8          Q.      That's fine.  I got it.  I think your answer -

9    - is there an org chart, is the answer no?

10         A.      Is there a chart?

11         Q.      Is there a chart, yes or no?

12         A.      I can't answer that question accurately,

13   because there is one that exists, but it's not out posted

14   for the employees to see, it's one that I drafted up several

15   times and that I've went over with with a couple of people,

16   but I've never actually put it out there.

17         Q.      Okay.  And I think that would have been

18   requested in discovery, but tell me about that document

19   then?

20         A.      It was just something that I --

21         Q.      When did you create it?

22         A.      When?

23         Q.      Yes, sir, about.

24         A.      Ten years ago.

25         Q.      All right.  When is the last time it's been

1    updated?

2         A.        Probably two years ago.  No, less than a year

3    ago.

4         Q.        Okay.  So where is it now if we needed to go

5    find it today?

6         A.         It's just a handwritten piece of paper that

7    I've got probably -- I think it's in the top drawer on my

8    desk.  I don't even work in my office anymore, I work in the

9    conference room.

10        Q.        Office that messy, huh?

11        A.        No, just I have to have more space --

12        Q.        I'm kidding.

13        A.        -- in order to bill contracting.

14        Q.        All right.  So there is an org chart that

15   covers part of the time Ms. Ramsey was there, and it is in

16   your desk at this instance?

17        A.        Uh-huh (affirmative).

18        Q.        All right.  I think -- and I guess that's a

19   yes?

20        A.        Yes, sir.  Yes.

21                  MR. BRIDGERS:  I think that was clearly

22            called for by discovery, so I'd ask y'all to

23            produce it.

24                  MR. WHITE:  If we get it, we'll give it

25            to you.  I'm sure he'll give it to me as soon as

1          we get done.  I just haven't seen it before.

2                  THE WITNESS:  Well, I'll have to go put

3          my hands on it, if you know what I'm saying.  I

4          mean if I'm supposed to be telling the truth,

5          the truth is one exists, I just got to put my

6          hands on it.  I hadn't seen it in quite a while.

7    BY MR. BRIDGERS:  (Resuming)

8          Q.     In about a year?

9          A.     Yeah, something like that, probably close, six

10   months, maybe.  I don't know.

11         Q.     Anything else written down that would detail

12   who reports to who and how the company is structured, other

13   than that handwritten chart?

14         A.     In writing, no, verbally, it's been discussed

15   to several people.

16         Q.     I mean, did you ever discuss that with Ms.

17   Ramsey?

18         A.     Yes.

19         Q.     All right.  Tell me about that discussion.

20         A.     Well, the discussion was, is that we hired

21   Susan Harrington to come and take over a portion of what

22   Phyllis Allgood does, because Phyllis Allgood's been

23   battling cancer for quite some time.  And since Phyllis

24   hasn't had a whole lot of duties on her, there was not

25   enough to justify hiring Susan for just what we were going

1    to have her learn from Phyllis, so we thought we might take

2    a couple of tasks off of Rebecca and put over onto Susan as

3    well.  So not only was Phyllis training Susan on some items,

4    Rebecca was also training Susan on how to do part of her job

5    as well --

6            Q.      Okay.

7            A.      -- so that we could take some load off.

8            Q.      All right.  And I understand, certainly, that

9    you would have talked to her about what her roles was.  What

10   I'm trying to find out is, did you have any discussion with

11   -- I mean did you formally tell Ms. Ramsey she reported to

12   anybody other than Debbie Wallace?

13           A.      Yes, I guess I could of said that in a certain

14   way because it was up to -- her and Angela work hand in

15   hand.  I mean she would ask Angela questions.  Angela would

16   obviously ask her plenty of questions because there's been a

17   lot since she's been gone that Angela hasn't known.

18           Q.      Right.  And did Ms. Ramsey do performance

19   reviews on anybody?

20           A.      Performance reviews?

21           Q.      Uh-huh (affirmative).  Yes.

22           A.      Other than telling us -- the review of how

23   much -- how many hours they had missed and how much they had

24   worked, yes, or the new people that was hired were doing,

25   yes.

```
 1        Q.        Okay.  Any of that written down?

 2        A.        I'm sure it is.

 3        Q.        Okay.  And that, tell me where that would be?

 4        A.        That would be a Debbie Wallace question.

 5        Q.        Okay.  Because that is also documents that

 6   would be responsive to discovery.  So we'll get to that.

 7        A.        And, obviously, I'll tell you this too;

 8   there's a lot of paperwork that's got missing out of Debbie

 9   Wallace's office.

10        Q.        Who are you blaming for that?

11        A.        I'm not blaming anyone.

12        Q.        All right.

13        A.        It got missing once.  The office was

14   rearranged and organized in a different manner.

15        Q.        Are you trying to refer that that is Ms.

16   Ramsey's fault?

17        A.        I am not.

18        Q.        Very well.  All right.  I'm trying to stay on

19   track here.  Going back, do you personally have any

20   ownership interest in any other companies that are related

21   to Wallace Electric?

22        A.        That are related to Wallace Electric?

23        Q.        Yes, sir.

24        A.        There's a Wallace Investment Company.

25        Q.        What does that do?
```

1        A.        It used to own the building that Wallace

2    Electric rents.

3        Q.        Is that still operational or still active?

4        A.        It's still active, but they no longer own the

5    building.

6        Q.        Okay.

7        A.        And there's also a P&G Investments, which is

8    my brother and I, which now owns the building.

9        Q.        Any other companies that are related to

10   Wallace Electric --

11       A.        No, sir.

12       Q.        -- or you have ownership over?

13       A.        No, sir.

14       Q.        And this may be complex because apparently,

15   there's a lawsuit ongoing, but who at least claims to have

16   an ownership interest in Wallace Electric at this point?

17       A.        Myself, Gary and Dorsey.

18       Q.        All right.  So at some point, some combination

19   of the three of y'all own all the stock and the shares of

20   Wallace?

21       A.        Yes.

22       Q.        All right.  Well, let's move on from our

23   introductory questions.  What I have done is, as mentioned

24   earlier, showed you a Plaintiff's Exhibit Number 1.  It's a

25   notice of deposition to you and -- well, it's just copied

1  together.  Can you tell us what this is, please?

2       A.       Notice of deposition pursuant to Federal

3  Court, I guess that's what that is.

4       Q.       Federal Rules of Civil Procedure --

5       A.       Yeah.

6       Q.       -- 30(b)(6).

7       A.       Okay.  That's attorney talk.  All right.

8       Q.       It is.  You are correct.  Let me ask you to

9  flip through there.  You see there's a list of topics there

10  at the back of it, or attached to it, I should say?

11       A.       Where are you referring to?

12       Q.       Certainly.  It's just this list.

13       A.       Okay.

14       Q.       It's a list of topics 1 through 50 something.

15       A.       Okay.

16       Q.       Have you ever seen this notice and that

17  attachment with the topics before today?

18       A.       I have seen it, yes.

19       Q.       All right.

20       A.       Do I remember it, no.

21       Q.       That's fine.  I'll ask you particularly.  The

22  technical part, are you here today to give testimony on

23  behalf of Wallace Electric as to these topics?

24       A.       Yes.

25       Q.       And do you understand that the testimony that

1    you're going to give today when we talk is on behalf of the

2    company?

3         A.    Yes.

4         Q.    If during the deposition I say you or anything

5    like that, I'll try to say the company, but if I say you,

6    we're going to -- if you have any question about whether or

7    not we're talking about Wallace Electric or you personally,

8    if you would just ask me.  I'll try to say the word company,

9    though.

10        A.    All right.

11        Q.    What did you do to prepare for the deposition

12   here today?

13        A.    Really nothing.

14        Q.    All right.

15        A.    I'm just here to tell the truth.

16        Q.    Did you look over any documents?

17        A.    Actually, the only thing I looked over was

18   just a list of her tasks.

19        Q.    Okay.  Is that one of the lists we saw

20   yesterday in the deposition?

21        A.    I believe it was.

22        Q.    All right.  Have you read this list of topics?

23        A.    Well, like I say, not in quite some time.

24        Q.    All right.  But did you talk to anyone other

25   than your attorney or people in your lawyer's office to

1    prepare to give testimony here today?

2         A.     No.

3         Q.     And apparently, the only document you looked

4    over was Ms. Ramsey's job duties; is that correct?

5         A.     Yes, sir.

6         Q.     And what do you think is the total time you

7    spent preparing to give your testimony here today on behalf

8    of the company?

9         A.     20 minutes.

10         Q.     Is there anybody at the company who knows more

11    about these topics than you?

12         A.     Well, no.  I mean, it would be between Debbie

13    and I, I guess.

14         Q.     Okay.  If we ever get to anything in here that

15    you think Debbie might know something, --

16         A.     Okay.

17         Q.     -- will you go ahead and tell me?

18         A.     Sure.

19         Q.     Did you participate in trying to locate

20    documents for this, responding to discovery in this lawsuit?

21         A.     No, sir.

22         Q.     Who did that?

23         A.     That would have been Debbie, and I believe

24    Phyllis Allgood.

25                          (Whereupon, Exhibit No. 2

1            was marked for identification.)

2    BY MR. BRIDGERS:   (Resuming)

3        Q.      Let me show you a couple of things so that you

4    can refer to.  Let me show you what's been marked as

5    Plaintiff's Exhibit Number 2.  Can you tell us what that

6    document is?

7        A.      It says Defendant's initial disclosures.

8        Q.      Have you ever seen that document before?

9        A.      Briefly, yes.

10       Q.      And have you read it before?

11       A.      No.

12       Q.      Do you understand that that's the company's

13   responses to certain questions required by the Federal Rules

14   of --

15       A.      Well, I did read through it.  Yes, sir.  I did

16   read through it.  As far as being actually thoroughly word

17   for word and understanding it, no, I do not understand it

18   totally.  No.

19       Q.      Do you believe that the facts in it are

20   accurate?

21       A.      To the best of my knowledge, yes.

22       Q.      And you helped prepare that document or at

23   least helped provide information for it?

24       A.      When asked, yes.

25                       (Whereupon, Exhibit No. 3

1                was marked for identification.)

2    BY MR. BRIDGERS:   (Resuming)

3        Q.      All right.  Well, let me show you what we're

4    going to mark as Plaintiff's Exhibit Number 3.  Can you tell

5    us what that is?

6        A.      Defendants Wallace Electric Company and

7    Phillip Wallace, Sr's. responses to Plaintiff's First

8    Request for Admission.

9        Q.      Have you ever seen this document before?

10       A.      Yes.

11       Q.      Do you understand that as part of the suit we

12   asked the company certain factual questions to which it

13   either admitted or denied?

14       A.      Yes.

15       Q.      Do you believe on behalf of the company that

16   all of this information is still accurate?

17       A.      Yes.

18                (Whereupon, Exhibit No. 4

19                was marked for identification.)

20   BY MR. BRIDGERS:   (Resuming)

21       Q.      Let me show you what has been marked as

22   Plaintiff's Exhibit Number 4.  Can you tell us what these

23   are?

24       A.      Defendant Wallace Electric Company's responses

25   to Plaintiff's First Continuing Interrogatories.

1      Q.      Very good.  Have you ever seen this document

2   before?

3      A.      I've seen it.

4      Q.      All right.  If you want to flip through it.

5   Did you help provide information to answer the questions in

6   this document?

7      A.      I would have -- I assisted in the ones that I

8   could answer.

9      Q.      Okay.

10      A.      The same goes for the rest of them.

11      Q.      Let me ask you to turn to the last page.  Is

12   that your signature on the verification?

13      A.      Yes.

14      Q.      Did you understand what this verification that

15   you were swearing to the factual responses here in the

16   document?

17      A.      Yes.

18      Q.      As far as you know, as of today, is all this

19   information still accurate?

20      A.      Yes.

21                    (Whereupon, Exhibit No. 5

22                    was marked for identification.)

23   BY MR. BRIDGERS:  (Resuming)

24      Q.      Let me show you what's been marked as

25   Plaintiff's Exhibit Number 5.  Can you tell us what this is?

1       A.      The same thing the other one is.

2       Q.      Actually, take a little closer look.  It's a

3   different document.

4       A.      Okay.

5       Q.      Are these responses your personal responses to

6   discovery?

7       A.      Oh, okay.  I see now.  Okay.  Yeah.

8       Q.      Have you seen this document before?

9       A.      Yes.

10      Q.      And the same question, is this your signature

11  here?

12      A.      Yes.

13      Q.      Back page here?

14      A.      Yes.

15      Q.      Okay.  Did you swear to this before or after

16  the document was prepared?

17      A.      Swear to what?

18      Q.      Well, the facts contained in the document.

19      A.      No, I didn't swear to it, I signed it.

20      Q.      You do understand that it is a verification

21  you stated under oath that the statements made are true --

22      A.      Right.  Yes, sir.

23      Q.      -- and correct?  All right.  As far as you

24  know, are these statements still true and correct in

25  this document?

1      A.      As far as I know.  Like I say, I haven't

2  looked through this stuff in quite a while.

3      Q.      All right.  But you don't know anything

4  different, is all I'm trying to find out?

5      A.      That's right.

6      Q.      Now, I didn't make a copy of it, but you

7  understood that we also asked for documents from the company

8  as part of the discovery process, right?

9      A.      Right.

10     Q.      And I think you said that you didn't

11  participate in that directly.

12     A.      No.

13     Q.      Do you know of any other documents at the

14  company, other than what you've already told us about, this

15  org chart or org piece of paper, that might be related to

16  Ms. Ramsey that the company has not given to its lawyer?

17  I'm sorry.

18     A.       Only some employee write-ups that we had on

19  Ms. Ramsey, which was filed in Debbie's office, which became

20  missing.

21     Q.      Go ahead.  Tell me about this.  What do you

22  mean employee write-ups?

23     A.      Write-ups on things that she had -- was

24  gathering for disciplinary action.

25     Q.      Okay.  I'm not sure I'm understanding you.

1  Are these write-ups for something that Ms. Ramsey was being

2  criticized for or something Ms. Ramsey was gathering?  I'm

3  just not sure what you mean.

4       A.     Rebecca did a very good job, but she had a

5  habit of always saying that she didn't make mistakes.  And

6  Debbie was just gathering some of that so that she could

7  point it out that hey, you know, this, this and this is some

8  things that we need to work on and this, that and another.

9  She gathers -- my wife, she does that.  She'll gather stuff

10 and maybe keep it for down the road, maybe not, you know.

11 And there was a file that was in her office that got

12 missing, and that's paperwork that you've requested, I

13 think.

14      Q.     When did it get missing?

15      A.     When they arranged and straightened up and

16 cleaned the office to get better organized on a new system

17 they were implementing and putting a file cabinet in.

18      Q.     Okay.  When you say they rearranged, who are

19 you referring to?

20      A.     Debbie and Rebecca, and there may have --

21 Melissa may have had a hand in it as well.

22      Q.     And just generally, when did that go missing,

23 to your --

24      A.     She could tell you that better than I could.

25 I can't keep up with dates.  I have another job I do.  I

1    can't remember.

2         Q.      When you said she, I think you looked over at

3    Rebecca; is that --

4         A.      That's correct.

5         Q.      Well, I mean you said it got missing.  Did it

6    get missing a year ago, two years ago, six months ago?

7         A.      No.  It was probably -- I'm going to guess

8    here because I can't be accurate.  I would say probably

9    about five or six months before she quit.

10        Q.      Ms. Ramsey quit?

11        A.      That's right.

12        Q.      Do you have indication, any evidence at all

13   that Ms. Ramsey disposed of that document?

14        A.      I would say I don't have any evidence that she

15   disposed of it, no.  It could still be in the building.  I

16   don't know, but nobody can find it.

17        Q.      All right.  And just generally, I've got a

18   topic on this later, but when you said there were -- they --

19   do you know what -- generally, what were the criticisms or

20   what were the problems that your wife was documenting?

21        A.      That's a Debbie Wallace question.  She makes

22   notes on all the girls like that.

23        Q.      Because she is their supervisor?

24        A.      She's the head office manager, yes.

25        Q.      Let me ask:  The way y'all are organized, does

1  your wife have supervisory responsibilities over the actual

2  electricians, the people who go out onsite, or does that

3  kind of flow up to Mr. Babb and Mr. Scott?

4       A.     Well, I mean, yes, all the girls up front have

5  a supervisor role of somewhat, whether it be on a particular

6  types of how the paperwork is being handled.  That's

7  something that they supervise, not the -- not the field

8  foremen.  Scott Tatum and Bo Babb, they handle service

9  calls, they coordinate the men, they handle safety meetings

10  and things like that.  But as far as permitting, insurance,

11  anything all the way down the line from Workmans' Comp

12  claims to, you know, everything, each -- each girl has a

13  responsibility in that area and supervise those areas.

14       Q.     All right.  If you would like to follow along

15  -- first, I'm going to leave these discovery responses here

16  in front of you.  So if you need to refer to them, you know,

17  you have them.

18       A.     Okay.

19       Q.     You may not have seen this very often, but

20  generally, I'm going to go down these lists of topics.

21       A.     Uh-huh (affirmative).

22       Q.     So you'll want to keep this one here in front

23  of you from the notice, not everything.  Hopefully, I can

24  skip a couple of things.  Not everything will be in

25  particularly exactly in order, but at least you'll have that

1    to refer to.  Can you just briefly describe the business

2    activities of Wallace Electric, Wallace Electric, as set

3    forth in Topic 2 here?  I mean, what does Wallace Electric

4    do?

5        A.      We're electrical contractors.  We do anything

6    from service work of changing a light bulb to multi-million-

7    dollar projects.

8        Q.      And what's your geographic reach, say, over

9    the last three or four years?

10       A.      Anywhere from Pennsylvania to Texas.

11       Q.      Okay.  How many states do you think Wallace

12   Electric has worked in over the last three or four years or

13   during the time Ms. Ramsey was there?

14       A.      I would say probably four or five.

15       Q.      How many employees do y'all have now?

16       A.      91.

17       Q.      And how has that changed?

18       A.      It fluctuates from about 50 to where we're at

19   now, depending on the size of the jobs that we have.

20       Q.      So as I'm understanding, over the last -- or

21   during the time Ms. Ramsey was there, the company had

22   between approximately 50 and 90 employees?

23       A.      Yeah.

24       Q.      And worked in four or five different states?

25       A.      Right.  Of course, 90 percent of the work is

Page 48

1    just here in Georgia.

2         Q.      Okay.  Is there a particular industry or --

3    that you're -- that you do -- you do work in I mean for,

4    like -- that's not a particularly good question.  But is

5    there a particular area or genre that Wallace Electric does?

6         A.      Well, commercial/industrial is our main focus,

7    if that's what you're saying.

8         Q.      Okay.  That was a better way of saying that.

9         A.      Okay.

10        Q.      Well, let's move on to Topic Number 3,

11   previous legal actions that involved the company.  Now, I

12   think you've already mentioned this ownership issue.

13        A.      Yeah.

14        Q.      Have there been any other employment-related

15   lawsuits filed against the company in the last five years or

16   so?

17        A.      Not that I can recall.

18        Q.      Okay.  Any kind of, like, Worker's

19   Compensation claims?

20        A.      Well, --

21        Q.      Other than that.

22        A.      Yeah.  I mean other than an insurance claim.

23        Q.      Okay.

24        A.      No.

25        Q.      Any investigation by the government,

1    Department of Labor, EEOC, anything like that?

2         A.       No, other than just, you know, having to do

3    tax reports for different states that you've done work in.

4    That would be it.

5         Q.       Okay.  Moving on to Topic Number 4, the

6    ownership interest and proportion of owner interest for

7    Wallace Electric, I believe you said that you and your two

8    brothers owned all the shares of Wallace?

9         A.       Yeah.  I, myself and Gary own roughly 34

10   percent each, and then the remaining percentage is Dorsey.

11        Q.       Yourself and Gary, 34 and 34, and then --

12        A.       Right.

13        Q.       -- Dorsey?  Okay.  And I think you told me

14   this, but that's all the owners of the company, isn't it?

15        A.       Right.

16        Q.       Moving onto Topic Number 5, the identity of

17   each and every business entity which is in any way legally

18   or has any kind of interlocking control, I think I've

19   covered this with some of the general.  You mentioned this

20   company that owned the building?

21        A.       Right.

22        Q.       And is there any other companies or businesses

23   that's related to Wallace Electric, kind of, you know, owned

24   by some of the same people, do the same type of work?

25        A.       No.

1       Q.      Okay.  Let's turn our attention to some stuff

2   particularly for Ms. Ramsey, turning to Topic Number 6, job

3   description, titles and position held by Plaintiff from

4   December 2010 through December 4th, 2013.  Did Ms. Ramsey

5   have a title when she was hired in 2010?  And if it's

6   helpful, I've got her application.  I don't know if it's in

7   there.  But was there an official title she was hired into?

8       A.      Official title, no, not official title that I

9   could say.  You know, I mean, she was described -- there was

10  a list of duties that she would handle because I mean, like

11  I say, she wore many hats just like the rest of us, so

12  there's not a big enough company to have to have a person

13  for every pencil.

14      Q.      I understand.  But there was no official title

15  when she was hired; is that -- that's correct?

16      A.      I don't really understand the question, I

17  guess I could say, because when you say official title, I

18  mean I don't know whether you're trying to say vice

19  president, assistant vice president.  What are you asking?

20      Q.      Exactly.  I mean exactly.  Is there a title, I

21  mean, chief --

22      A.      I don't have the other people in the building.

23      Q.      -- chief cook, bottle washer.

24      A.      Well, I mean other than -- other than

25  dispatcher and, you know, billing and -- well, no, I guess

Page 51

1    not.

2         Q.      Okay.

3         A.      You know, like I say, she'd have to have a

4    title over on the tablet to fill out.

5         Q.      All right.  Just so I understand, there was

6    really -- how about this:  Can you agree that there was  --

7    her title was never -- there was never a written title

8    for her in any kind of documents or anything like that?

9         A.      Nor there is for any of them.

10        Q.      Okay.  So nobody in the company has a written

11   title?

12        A.      No.

13        Q.      Did Ms. Ramsey have business cards?

14        A.      I don't know.  I don't think so, because I

15   don't believe any of the girls do.

16                    (Whereupon, Exhibit No. 15

17                    was marked for identification.)

18   BY MR. BRIDGERS:  (Resuming)

19        Q.      You mentioned a list of duties, and just for

20   reference, let me show you what's been marked as Plaintiff's

21   Exhibit Number 15.  Just, can you tell me what that is?  Is

22   that the list of duties you spoke about earlier?

23        A.      Yes.  That was one that she filled out.

24                    (Whereupon, Exhibit No. 16

25                    was marked for identification.)

1   BY MR. BRIDGERS:  (Resuming)

2        Q.      I understand.  Let me show you 16, as well.

3   Can you tell me what that is?

4        A.      That's a very short list of what it might have

5   took her an hour a day to do.

6        Q.      All right.  And we had a lot of conversations

7   --

8        A.      This is the correct list.

9        Q.      Well, now, I understand, Ms. Ramsey herself

10  drafted that.

11       A.      Right.

12               MR. WHITE:  When she drafted that, which

13       one?

14               MR. BRIDGERS:  Good question;

15       Plaintiff's Exhibit Number 15.

16  BY MR. BRIDGERS:  (Resuming)

17       Q.      Ms. Ramsey drafted this, correct?

18       A.      Yes.

19       Q.      Is that right?  And around the time it's

20  dated, July 27th, 2011?

21       A.      Right.

22       Q.      Prior to this, has there ever been a job

23  description for Ms. Ramsey's position?

24       A.      A list?

25       Q.      A list, a description, a document, anything

1    like that, prior to what she did?

2         A.      Other than what we've said in meetings that we

3    would have, and then we'd all jot down what each one should

4    be doing, and then this is the list of the things that she

5    did every day.

6         Q.      Okay.

7         A.      I mean, you know, as far as a list that --

8    each girl's got a list like this.

9         Q.      Fair enough.  What I'm trying to find out is,

10   is there any other list, other than what Ms. Ramsey -- has

11   there ever been any list written down, a document, a piece

12   of paper?

13        A.      I think she's done this more than just twice,

14   yes, sir.

15        Q.      All right.  When do you think she did it,

16   other than this, because I'll say this is all I have seen?

17        A.      I couldn't tell you.

18        Q.      All right.  When Ms. Ramsey was hired, did the

19   company have a list of her job duties?

20        A.      A verbal list was given to her at the time of

21   hire, and we told her, as we tell of them, we don't expect

22   you to learn this whole thing overnight, so I'm not going to

23   overwhelm you with everything, and we would hand it to you

24   in bits and pieces as you started to get and grasp what's

25   going on until we get you up to full speed of what your job

1    duties are.  But here is a list of things, and I read them

2    off, as well as Debbie sitting in the room as well, of all

3    the things that she was going to do, yes.

4         Q.      Okay.  And forgive me, but I think I heard you

5    just say two different things.  Did you mean when you said I

6    read them off, that you were reading a list or that you were

7    just telling her what her job was going to do?

8         A.      I was probably reading a list that I had

9    scratched down on a tablet of all of the things --

10        Q.      Okay.

11        A.      -- that she would be doing every day, because

12   like I say, she wears many hats back there.  You can't --

13   it's not a written title or description.

14        Q.      All right.  But that list or any list like it

15   --

16        A.      Okay.

17        Q.      -- that you jotted down, is it still is

18   existence?

19        A.      Maybe in a City dump somewhere.

20        Q.      All right.

21        A.      It was thrown in the trash can.

22        Q.      The company doesn't have it?

23        A.      No, not to my knowledge.

24        Q.      And to your knowledge, Ms. Ramsey was never

25   given that tablet, she was just told what she was going to

1    do?

2          A.      No, it was pushed across the table to her and

3    said this is the things, and it went down item for item that

4    would need to be done, and it was out there.  If she wanted

5    to pick it up and carry it with her, she could, and could --

6    and possibly could have.  I can't remember.  It's been quite

7    some time ago.

8          Q.      Okay.  All right.  Any other, other than that

9    tablet you jotted down and may have pushed across the table

10   to her, any other written lists, other than what we've seen

11   here on Plaintiff's 15 or 16 about her duties?

12         A.      That would be a Debbie Wallace question,

13   because I feel like there was probably one there as well.

14         Q.      All right.  Well, if there was a list, that

15   was also requested in discovery.  So if you find the list,

16   would you give it your attorney?

17         A.      Sure.

18         Q.      And just so I'm clear on this, Ms. Ramsey

19   would not have had a formal title the entire time she was at

20   Wallace Electric; is that a correct statement?

21         A.      Whatever you're calling formal, I'm not sure

22   of, but they all had a title, yes.

23         Q.      Okay.  And what was her title?

24         A.      Her title was dispatch for the most part,

25   because she took in all calls for service calls and got

1   permits and everything.  We still got customers calling for

2   her.

3           Q.      All right.  And I understand --

4           A.      She was the main thing coming into that place

5   as far as the phone lines coming in unless they answered it,

6   but then they got pushed right over to her because she

7   handled everything that came through that company.

8           Q.      All right.  And I understand that she did

9   dispatching.  I'm not trying to get us off track on that.

10          A.      Okay.  That's a title in my book.

11          Q.      Okay.  Well, truly, a title in my book is

12  something would be like dispatcher, perhaps.

13          A.      Well, she was that, as well as many things.  I

14  mean --

15          Q.      Okay.  So there was not one particular title

16  that she held at Wallace Electric?

17          A.      Yeah, there is a particular title that she

18  held.  As far as having a name for it, no, I do not have a

19  particular name for it, neither do I on the other ones, so

20  to speak.

21          Q.      Fair enough.  Let's --

22          A.      You got to remember, we came from a small

23  family business of about five employees, counting my mom and

24  my dad.

25          Q.      Listen.  You can -- the company can --

Page 57

1        A.        And, you know, as far as having anything built

2    as a large structured company that has, you know, eight or

3    900 employees, no, we're not structured that way.

4                  MR. BRIDGERS:  Let me go off the record

5          a second.

6                  (Off the record.)

7                      (Whereupon, Exhibit No. 11

8                  was marked for identification.)

9    BY MR. BRIDGERS:  (Resuming)

10       Q.        All right.  Getting back to it.  Let's turn

11   our attention to Topic 7, the relationship, terms,

12   conditions and status of Plaintiff's employment with

13   Defendants from December 2010 through December 4th, 2013.

14   Let me get you to identify a couple of documents.

15                  Let me show you what's been marked as

16   Plaintiff's Exhibit Number 11.  Can you tell us what that

17   is, please?

18       A.        Her application for employment.

19       Q.        Is this records for Wallace Electric?

20       A.        Yes.

21       Q.        Is this a typical new-hire packet?

22       A.        It may have been at that time.  It's acquired

23   a good bit more sentences now.

24       Q.        What else is in it now?

25       A.        Well, to be honest with you, for the office,

1    I'm not sure.  I have more to it for the guys to fill out,

2    just some forms to where they agreed to things.

3         Q.      Okay.  And just turning to the new-hire packet

4    contents, it looks like she filled this out approximately

5    June 16th of 2010; would you agree that's about the time she

6    was hired?

7         A.      Yes.

8                        (Whereupon, Exhibit No. 12

9                        was marked for identification.)

10   BY MR. BRIDGERS:   (Resuming)

11        Q.      And let me show you what's been marked as

12   Plaintiff's Exhibit Number 12.  Can you tell us what that

13   is, please, sir?

14        A.      (Witness reviews document.)  What was your

15   question?

16        Q.      If you could just tell us what that is for the

17   record?

18        A.      Her letter of resignation.

19        Q.      And what's that date?

20        A.      The date is December 4th, 2013, but I'm not

21   sure that's the date she left, because I know she sat on the

22   letter for over a week before she handed it to Debbie.

23        Q.      What makes you think she sat on the letter for

24   a week?

25        A.      She told her.

1      Q.      She and told her, who are those people?

2      A.      The two girls I just mentioned, that would be

3  Rebecca and Debbie.

4      Q.      I'm not sure I understood that.

5      A.      Rebecca sat on the letter for over a week

6  before she handed it to Debbie.

7              MR. WHITE:  You're saying Rebecca told

8          Debbie she sat on it a week?

9              THE WITNESS:  Yeah.  That's why the date

10         was incorrect in the beginning, I believe, and

11         had to re-do it.  I'm not sure.  I can't

12         remember that part, to be honest with you, to be

13         accurate.

14  BY MR. BRIDGERS:  (Resuming)

15     Q.      I see.  I mean do you -- was her last day on

16  or about December the 4th?

17     A.      I couldn't tell you that exactly.  It might

18  have been a week, about a week after that.

19     Q.      All right.  Somewhere in that general time

20  frame?

21     A.      Right.

22     Q.      Were there any breaks in her employment

23  between -- any long breaks in her employment?  I don't know

24  of any, but...

25     A.      Long breaks, other than when she was out with

1   her hand when she injured it from a horse, she was out for

2   quite a little while.

3       Q.     Other than that injury, she worked for Wallace

4   Electric the entire time from June of 2010 until December of

5   2013?

6       A.     Right.

7                  (Whereupon, Exhibit No. 13

8                  was marked for identification.)

9   BY MR. BRIDGERS:   (Resuming)

10      Q.     And before I forget this, let me show you

11  what's been marked as Plaintiff's Exhibit Number 13.   Can

12  you tell us what that is?

13      A.     It's a copy of her paycheck.

14      Q.     It looks like probably her last paycheck, just

15  given the fact it's dated December 13th of 2013.

16      A.     I didn't see that, but yeah, I guess it

17  probably is.

18      Q.     Do you know why -- we got this as a separate

19  check.  Do you know why, what's significant about it, other

20  than this may be her last paycheck?

21      A.     No.  I don't really understand the question

22  anyway.

23      Q.     I mean do you know of anything significant

24  about this check?

25      A.     I don't know of anything significant about it.

1   It's a paycheck.

2        Q.      Okay.  That's fine.  I mean it was just the

3   only one like that, is why I asked the question.

4        A.      Well, it looks like all the rest of them to

5   me.  You'll have to be a little more specific.  I mean we

6   only use those checks from the payroll account drawn from

7   SunTrust, so I don't understand the question.

8                          (Whereupon, Exhibit No. 14

9                          was marked for identification.)

10  BY MR. BRIDGERS:  (Resuming)

11       Q.      Let me show you what's been marked as

12  Plaintiff's Exhibit Number 14.  Can you tell us what that

13  is?

14       A.      No, I can't.

15       Q.      Is this a Wallace Electric document?

16       A.      I couldn't tell you.

17       Q.      Just for the identity here, does it say

18  confidential wage/salary history on top?

19       A.      Yes.

20       Q.      And does it reflect Rebecca Ramsey's, her

21  employment number at the top, kind of on the side there?

22       A.      No.  Oh, rotate it that way, yeah, it might.

23  Okay.

24       Q.      Is this familiar to you now?  Do you know what

25  this is?

1      A.      No.  I've never seen this.  That's not my end

2  of the business.

3      Q.      All right.  Well, let me just ask you about

4  some of the stuff internally.  I'm looking here at the date.

5  It looks like it says 6/16/10, which would be approximately

6  -- that may be a 6, but it looks like approximately the time

7  she was hired.

8      A.      Okay.

9      Q.      Well, that's when she was hired, right?

10      A.      Okay.  Yes, sir.

11      Q.      And it says salary $570 a week.  Was that

12  indeed the salary she was hired into?

13      A.      Yes, sir.

14      Q.      And it says work location, can you read that?

15  Does it say shop?

16      A.      Work location, oh, yeah, shop.  In other

17  words, she works the main office.

18      Q.      And then the next line is from August 27th,

19  dated August 27th, 2012.

20      A.      Right.

21      Q.      Yeah.  It says raise $620, was that -- did Ms.

22  Ramsey indeed receive a raise of $620 at some point?

23      A.      That's correct.

24      Q.      And would that have been approximately August

25  27th of 2012?

1      A.      I would say so.  That's what it says.

2      Q.      And over here it says reason for change okayed

3  by Phil.

4      A.      That's right.

5      Q.      Was it your practice or your job to okay

6  raises?

7      A.      Yes, it was.

8      Q.      All right.  And then over here it indicates

9  12/4/13 quit.

10      A.      Okay.

11      Q.      And that's about the time Ms. Ramsey quit?

12      A.      Roughly.

13      Q.      Do you think this might be a document from

14  Wallace Electric?

15      A.      Sure.

16      Q.      Let's turn our attention to Topic Number 8

17  regarding how Plaintiff's work schedule was set from

18  December 2010 through December 4th, 2013.

19      A.      Okay.

20      Q.      And I'll just -- I don't know if it matters,

21  but I'll just point out to you we'll be looking from

22  December 2010 because that's at least arguably the Statute

23  of Limitations in the case.  So I just wanted to point out

24  that different date.  That's not the entire time she was

25  there.

1          A.       All right.

2          Q.       What days is the -- you said Ms. Ramsey was

3     scheduled or hired into the shop?

4          A.       Uh-huh (affirmative).  She was hired in to

5     work --

6          Q.       At the shop?

7          A.       -- at the shop, yes.

8          Q.       Okay.  And the shop is what you refer to as

9     your main office?

10         A.       Correct.

11         Q.       And what days is the business -- well, would

12    you call her area -- what do you call her area?  Is it,

13    like, the Business Office or is there a name for it, I want

14    to use your name?

15                   MR. WHITE:  Hold on just a second.

16                   MR. BRIDGERS:  Let's just go off the

17         record just a second.

18                   (Off the record.)

19    BY MR. BRIDGERS:  (Resuming)

20         Q.       All right.  We're going back on the record

21    after a short break.  We are on Topic Number 8, how

22    Plaintiff's schedule was set.  I guess I was just asking you

23    the shop, the main office, whatever building you're

24    referring to, how -- what days was it open?  I mean, what

25    days did you have people working?

1      A.      Usually Monday through Saturday.  Oh, in the

2  office?

3      Q.      Let's stick with the office.  Do you call it

4  the office?  Is that what you call it?

5      A.      Well, I mean as far as on the front lines

6  where the girls were, the office was pretty much Monday

7  through Friday.  There was occasions where they had to come

8  in on Saturdays from time to time.

9      Q.      Okay.  So generally, the office is open Monday

10  through Friday.  And that's what I was -- I was trying to

11  differentiate from the guys who might be on the job.

12      A.      Well, I mean Gary and I are in the office as

13  well, but there's a lot of times where we're there six days

14  a week.

15      Q.      All right.  Well, let's just get back to the

16  women in the -- in the Business Office, generally, Monday

17  through Friday?

18      A.      Generally.

19      Q.      And did the company close for holidays?

20      A.      Yes.

21      Q.      What holidays?

22      A.      Oh, gosh.  I think there's like --

23      Q.      On New Year's?

24      A.      Oh, yeah, we can start with Christmas and New

25  Year's.

1     Q.    Exactly.  On Martin Luther King, big holidays?

2     A.    No.

3     Q.    Memorial Day?

4     A.    Yes.

5     Q.    Fourth of July?

6     A.    Yes.

7     Q.    Labor Day?

8     A.    Yes.

9     Q.    Thanksgiving?

10    A.    Yes.

11    Q.    Probably the day after Thanksgiving?

12    A.    Yeah, and the day before Christmas.  Well,

13 there's like seven or eight of them.  I don't remember how

14 many.

15    Q.    Okay.  Basic holidays?

16    A.    Yes.

17    Q.    And that was the same the entire time she

18 worked there?

19    A.    Oh, yeah.

20    Q.    Sorry.  Did Ms. Ramsey have a written

21 schedule?

22    A.    A written work time schedule?

23    Q.    Yes, sir.

24    A.    Yeah.  I mean when she was hired, it was told

25 to her what her hours were.

1      Q.      Well, I understand that, but was there, for

2  the women in the front office or the business Office, was

3  there something on the wall that said you need to be here

4  from here to there, any kind of a schedule like that?

5      A.      Not on the wall, but it was in writing when it

6  was handed to her on what the hours were to work from the

7  beginning, her and Debbie.  That was between her and Debbie,

8  I believe.  Whether that fell into that category or not, I

9  couldn't tell you.  I mean it was written for each girl to

10  have a certain work time and that each girl was to take a

11  different lunch time so that they weren't all gone at the

12  same time.

13      Q.      Where is that written down?

14      A.      I don't know.  That's a Debbie Wallace

15  question.

16      Q.      So I understand it, at the beginning of her

17  employment she was to work between 8:00 and 6:00?

18      A.      Right.

19      Q.      And then beginning around July of 2012 through

20  the end of her employment, her work hours were between 7:30

21  and 5:30?

22      A.      Right.  We moved it up because of specific

23  reasons.

24      Q.      Okay.  And I understand that she would have an

25  hour for lunch?

1      A.      Yes.

2      Q.      As you heard Ms. Ramsey testify yesterday, she

3  thinks she worked around five Saturdays.  Do you have any

4  reason to -- any reason to disagree with that?

5      A.      No.  That's probably correct, because I

6  remember the amount of -- a payment went out for those, yes.

7      Q.      Really?  What type of additional pay?

8      A.      There was additional paychecks that were

9  written to her for extra time that was worked, as well as at

10  the end of the year when you got a Christmas bonus, it

11  wasn't just for Christmas, it was for all the extra

12  activities and things that you did throughout the whole year

13  to help the company along.

14      Q.      Okay.  So the Christmas bonus was supposed to

15  compensate her for working on Saturdays?

16      A.      The Christmas bonus was not, no, sir.  I just

17  answered your question when I said that other checks were

18  given to her for Saturdays, and any other hour or two here,

19  there and another that may have been worked, that's what was

20  part of the Christmas bonus, as well as for Christmas,

21  because everybody didn't get a Christmas bonus, only the

22  people that showed the extra incentive.

23      Q.      So I mean is it the Company's position that

24  her Christmas bonus is part of her compensation?

25      A.      Why else would you get a Christmas bonus?  I'm

1    going to have to ask you that question.  Was it for

2    Christmas presents, I don't do that for everybody, nobody's

3    ever done it for me.  I mean you might get one.  I don't

4    know.

5         Q.     Okay.  So the Company considers the Christmas

6    bonus part of her compensation?

7                MR. WHITE:  Object to the form of the

8                question, but you can answer it if you know.

9    BY MR. BRIDGERS:  (Resuming)

10        Q.     Sounds like that's a yes.

11        A.     Yeah.  That's money.

12                    (Whereupon, Exhibit No. 8

13                was marked for identification.)

14   BY MR. BRIDGERS:  (Resuming)

15        Q.     Do you know how -- let me just show you this

16   in case it's helpful.  Excuse me.  Let me show you what's

17   been marked as Plaintiff's Exhibit 8.  Can you tell us what

18   that is?

19        A.     I'm assuming that is a copy of pay stubs.

20                    (Whereupon, Exhibit No. 9

21                was marked for identification.)

22        Q.     Okay.  And Plaintiff's Exhibit Number 9, can

23   you tell us what that is?

24        A.     No, I cannot.

25        Q.     I'm just trying to refresh your recollection.

1   Do you recall we talked about that the -- at the deposition

2   yesterday that the payroll journals were done differently in

3   different years?

4        A.      I do remember that, but I believe that's

5   provided by the payroll service.  Rebecca would know that

6   better than I.

7        Q.      Okay.  Does that refresh your recollection

8   whether or not Plaintiff's Exhibit Number 9 is a Wallace

9   Electric payroll journal?

10       A.      Yes, it is, but I don't know who it's produced

11  by.

12       Q.      Okay.  Take a look through it.  Does it look

13  like a company document?

14       A.      As I said, it has our name on it.  It refers

15  to payroll.  I don't know who produced it, so I can't say

16  it's a company document because I don't know if the company

17  produced it.

18       Q.      Okay.  How would these extra checks that you

19  reference for Saturday work be recorded on a payroll journal

20  or on the check?  How would that be differentiated that it's

21  for a Saturday?

22       A.      That's not my area.  I couldn't answer that.

23  For the office personnel, I couldn't answer that.  It may

24  have even been out on a separate check, separate account,

25  which is United Community account, not the actual payroll

1  account.  I'm not sure how that was handled.

2      Q.      Do you know what the amounts were, at least,

3  supposed to be paid for Saturday work?

4      A.      That's depending on how much time was put in.

5      Q.      I mean was it supposed to have been an hourly,

6  the person's hourly rate?  Was it any different than the

7  person's typical hourly rate?

8      A.      I couldn't answer that question.

9      Q.      So your understanding is there just was some

10  additional amount?

11      A.      I know there was additional pay, yes.

12      Q.      But you're just not sure --

13      A.      Because it was discussed, yes.

14      Q.      You're just not sure what it consists of?

15      A.      Not sure how much it consists of and not sure

16  -- I just know that Rebecca was good enough for and Angela

17  both to come in and help out because Phyllis was out with

18  cancer treatment and we tried to compensate them for the

19  best that we could to -- you know, for what things that they

20  had been doing, not only through the week but any extra on

21  Saturdays.

22      Q.      Okay.  You heard Ms. Ramsey in the deposition

23  mention that she did receive telephone calls and request for

24  information outside of work hours.  Do you remember hearing

25  her testimony to that effect?

1      A.      Oh, yeah, I do remember that.  Yes, sir, I do.

2      Q.      And do you agree that she did indeed receive

3  some calls after hours for work purposes?

4      A.      Only for a phone call to ask her where she

5  might have placed a document or something like that, which

6  might have involved about a minute or two of her time

7  because Debbie couldn't find it.  That would have been all.

8      Q.      Okay.  And did you ever make calls to her

9  after hours?

10      A.      Not to my knowledge.  If I did, it might have

11  been on that one incident where we had the Georgia Power

12  situation because she had -- she knew all the information

13  and the contact people, so I had asked her if she would

14  please handle that for us to get this fixed because there

15  was address problems.

16      Q.      And that was the -- where she testified

17  yesterday that Georgia Power, you were trying to get the

18  power turned on for a particular customer who --

19      A.      Yeah, they was losing product in their cooler.

20      Q.      Do you know -- I mean, is the company prepared

21  to be able to give us evidence today as to how many phone

22  calls Ms. Ramsey received after hours, or do you know?

23      A.      We don't have any evidence copied, but I just

24  know it was very rare.  There was a couple of times, because

25  I -- because I know a couple of times I had Debbie call her

1    to ask her a question and never got an answer, so.

2         Q.      Okay.  But sitting here, you don't know how

3    often other people might have called her?

4         A.      I would say you could count it on one hand for

5    the entire time she worked there.  And I guarantee you it

6    was never over a minute per phone call.

7         Q.      Okay.  All right.  Do you believe that you

8    know every phone call that she received?

9         A.      I would say 80 percent of them.

10        Q.      Well, let's turn our attention to her job

11   duties, Topic Number 9, job duties Plaintiff performed from

12   December 2010 through December 4th, 2013, including the time

13   Plaintiff's -- time spent by Plaintiff performing each duty.

14   Okay.  I think you've already testified that Ms. Ramsey had

15   certain predefined duties at Wallace Electric; that's

16   correct, right?

17        A.      Correct.

18        Q.      I'm going to ask you about her duties that the

19   company, that were most significant to the company, the most

20   valuable duties she did for Wallace Electric.  What did Ms.

21   Ramsey do that had the highest value to Wallace Electric?

22        A.      That I can't answer, because there's several

23   that fall under that category.

24        Q.      Okay.  So several that are the most valuable,

25   tell me those?

1        A.        Well, any time you're talking to a customer,

2    that's the most valuable, because without those you wouldn't

3    have any business.

4        Q.        Okay.

5        A.        And she would take in those calls, whether

6    they'd be service calls or whether there would be some

7    regular contractors that we've been working with for over 15

8    years.  I mean, you know, she handled those.

9        Q.        Okay.  So answering the phone and speaking

10   with customers and contractors?

11       A.        Concerning the actual business, whether it be

12   numbers that she was discussing, and when I say numbers, I'm

13   talking about the monetary numbers of the impact of the

14   well-being and financial standing of the company as far as

15   any numbers of the jobs, where we stand price-wise, what

16   were the price, confirm any contract information, as well as

17   entering these numbers.

18       Q.        All right.  Let's just -- can we, just for

19   purposes of discussion, those are preparing purchase orders?

20       A.        No.

21       Q.        Okay.  How would you summarize -- I mean --

22       A.        I mean some of it was purchase orders, yes.

23       Q.        Okay.  Let me go back.  Tell me then, and you

24   can go back, are you trying to --

25       A.        It's hard to simplify what she does, if that's

1  what you're trying to do there.  It's quite --  It's quite

2  in-depth and complicated.

3       Q.      Would you say that pricing out and billing for

4  jobs, getting that done, was one of the most significant

5  valuable things she did for Wallace Electric?

6       A.      One of many, yes.

7       Q.      Okay.  At least one?

8       A.      At least one.

9       Q.      All right.  So pricing out billing jobs, I'll

10  just keep that as one.

11       A.      Okay.

12       Q.      What would be the next most valuable thing

13  that she did for Wallace Electric?

14       A.      Okay.  Well, you got the first one.  Actually,

15  it was before that one.

16       Q.      Well, now, tell me what that -- talking to

17  people on the phone?

18       A.      Or discussing numbers with them and what --

19  what work needed to be done.  I mean the communication

20  factor on taking in a job and making sure it is handed off

21  to the right person, and if it needed to be priced, she

22  would either send me an e-mail or call me.

23       Q.      Okay.  And I just -- we'll get to exactly what

24  she did in a sec.  But communicating with the customer or

25  contractor, --

1        A.        Yes.

2        Q.        -- you say would be one of her most valuable

3   things that she did?

4        A.        Right, because our --

5        Q.        And then -- I'll get to the cause in a second.

6   But --

7                  MR. WHITE:  I'm going to object to the

8            extent that you're trying to simplify what he's

9            saying.  His answer is his answer as to what she

10           did that was the most important, and then what

11           you try to do after that is simplify it down

12           into a summary, I guess is what you're doing.

13           But I want the record to be clear that what is

14           important about her job is his answer and not

15           your summary of his answer.

16                 MR. BRIDGERS:  Well, if the summary is

17           accurate, --

18                 THE WITNESS:  And it won't be.

19                 MR. BRIDGERS:  -- then the summary is

20           accurate.

21   BY MR. BRIDGERS:  (Resuming)

22        Q.        Well, I understand that was the point of what

23   your lawyer just put on the record so you would know to say

24   that.

25        A.        Well, I already knew that.  That's why I was

1   telling you --

2        Q.        I get that.

3        A.        -- what I was telling you.

4                  MR. WHITE:  I made the objection because

5        he said earlier that you couldn't do that.

6                  MR. BRIDGERS:  Well, I'm just trying to

7        get areas.  I'm here all week.  I don't care.

8                  THE WITNESS:  Me either.

9   BY MR. BRIDGERS:  (Resuming)

10       Q.        Well, at least one of the areas that was most

11  significant, most valuable to the company, was communicating

12  with its customers and contractors?

13       A.        Right, because all of our business is not just

14  off the street, it is because it's all personal contacts.  I

15  don't let just anybody talk to our customers.

16       Q.        Another most valuable, most significant duty

17  to the company is then pricing out or billing jobs?

18       A.        Correct.

19       Q.        Any other significant valuable duties she did

20  for the company?

21       A.        Her acquiring the material tickets and time

22  tickets and enter them to the correct PO so that the correct

23  job cost was acquired on cost-plus projects.

24       Q.        Okay.  And truly, I kind of understood that

25  you meant that as part of getting pricing and billing out a

1   job?

2        A.        No, two different things.

3        Q.        All right.  Well, explain that other one to

4   me, then.

5        A.        Well, pricing and billing goes back to what we

6   talked about, how she would communicate with project  --

7   property management companies, she would find out what was

8   needed at say a store down at Tanger Mall, they would give

9   her a list of what was needed, she would call the nearest

10  supply house, she would get prices on it, she would call me

11  to verify how much markup that we should put on it for that

12  particular customer, she would then calculate it, along with

13  the amount of hours that we figured that it would take, and

14  she would call the customer back with a total.  And we would

15  do that in many, many cases.  That's one area.

16       Q.        Okay.  I mean -- all right.  Well, tell then

17  in order what's her next most significant duty she had?

18       A.        Well, the other things that she had was when

19  the time was turned in and the material tickets were turned

20  in, some on a daily basis, some on a weekly basis, it was

21  her job to make sure that that was put onto the job-costs

22  ledger and keep track of it, make sure none of it was

23  doubled up, verify the guys' time with them if necessary to

24  make sure that it was accurate and confirm with the lead-man

25  sheets.  And periodically through jobs like that I would

1  request that she give me an up-to-date job cost, which she

2  would do, to where we could let the customer know where they

3  stood on a cost-plus project.

4       Q.      Okay.  What's her next most significant duty?

5       A.      Would have been handling the -- was handling

6  part of the, I guess, insurance.  You know, it was a Human

7  Resource area.

8       Q.      Okay.  So insurance and Human Resources?

9       A.      Right.

10      Q.      What's her next most valuable, most

11 significant role to the company?

12      A.      Was the permit process.

13      Q.      Okay.

14      A.      Every city, county requires a different method

15 or means of permit, and she had gotten to know quite a good

16 bit of them and knew their particulars.

17      Q.      Okay.  And we'll come back to that

18 particularly.  Anymore?  What's the next most significant

19 duty she did for the company?

20      A.      Coordinate inspections for the jobs with the

21 guys in the field.

22      Q.      Okay.

23      A.      Letting them know when the inspections were

24 going to take place and whether they needed to be present or

25 not --

1       Q.      Okay.

2       A.      -- during those inspections and --

3       Q.      We'll come back to the specifics, but the next

4  --

5       A.      Okay.

6       Q.      -- most valuable thing she did for the

7  company?

8       A.      Well, let's see.  Since you keep cutting me

9  off from finishing each one of them, they all go hand in

10  hand.  So we can jump around to different topics like that,

11  I guess.  The receivables that she brought in as far as

12  warehouse deliveries, confirming material that came in the

13  door before she trained Chuck Turner on how to do so, she

14  was the one that was doing that in the beginning.

15      Q.      This is when she counted the toilet paper?

16      A.      No, sir, not toilet paper, the millions of

17  dollars' worth of inventory that comes in the back door.

18      Q.      Okay.  Receivables?

19      A.      Yes.

20      Q.      What else would be the next most significant

21  role for the company?

22      A.      Was returning any damage and handling any

23  claims that needed to be handled on damaged material or

24  requesting for returns on overages of material that was

25  purchased and returned back to the shop because they didn't

1    need it on the job site.  She would handle to make sure that

2    the pick-ups were -- that the suppliers were called and they

3    would come and pick them up and make sure that she got a

4    credit receipt to where she could apply it back to the job

5    costs.

6         Q.    So refunds, returns of those materials?

7         A.    Yeah.  I mean everything to do with what makes

8    this company work, money coming in and money going out.

9         Q.    Any other major areas you can think of?

10        A.    Other than assisting Angela from time to time

11   with any contract billing when she would get possibly

12   behind, on things like that.  She also assisted Debbie, like

13   I say, with many Human Resource areas and all.  So there's

14   another wide variety that Rebecca did with the company for

15   the company in the front office area that I'm not even aware

16   of.  That's just the ones that I would deal with her on.

17        Q.    Okay.  Well, we'll say that you're here to

18   testify on behalf of the company.  So --

19        A.    The other's a Debbie Wallace question.

20        Q.    Okay.  Well, we'll depose her next week.  All

21   right.  Let's go back and start talking.  What I'd like to

22   do is let's turn our attention to the process by which a

23   customer would call in and get a job started, okay?

24        A.    Okay.

25        Q.    And I'm going to try to ask you to kind of

1    work through it step by step.  At least for -- all right.

2    The phone rings.

3         A.      Okay.

4         Q.      We'll start there.  A call comes into the

5    company.  Would Ms. Ramsey have answered the main line for

6    the company?

7         A.      At times, yes.

8         Q.      Okay.  Would people generally call the main

9    line or would they call to speak to her directly, if you

10   know?

11        A.      They would call to speak to her directly for

12   the most part.

13        Q.      Did she have her own direct number?

14        A.      Direct extension, yes.

15        Q.      Okay.  But in addition to people calling her

16   directly, somebody might call, I just looked in the

17   phonebook, and I need something done?

18        A.      Occasionally, yes.

19        Q.      I called Wallace Electric.

20        A.      Uh-huh (affirmative).

21        Q.      She would answer the main number?

22        A.      Right, if Melissa wasn't in, which she was a

23   part-time girl, and that's why Rebecca would pick up the

24   call, when Melissa wasn't there.

25        Q.      Okay.  About how often did Melissa work?

1      A.      Well, she worked from, like, I don't know,

2   9:30 till about 2:30 every day.  And the main line, when it

3   rings, it goes straight to an automated line.  And only

4   would Melissa get the call if someone had mashed zero for

5   the operator.  Otherwise, they go straight to the

6   extensions.

7      Q.      Okay.  So the customer --

8      A.      So we don't have a receptionist, in other

9   words.

10     Q.      So the customer calls in, started talking with

11  Ms. Ramsey, what is Ms. Ramsey's role at that point?

12     A.      It depends on who the customer is, because we

13  have your off-the-street business, so to speak, and you have

14  your property management companies that we deal with, we

15  have our contractors we deal with, and we have our bid

16  process that we deal with.

17     Q.      All right.  Well, then how is it different?

18     A.      It's very different.

19     Q.      Tell me how.

20     A.      As I just said, --

21     Q.      No, tell me different people, tell me how it's

22  different what she does when she answers the telephone.

23     A.      Well, she would still say hello, okay.  That

24  part's the same.

25     Q.      Does she have any -- okay.  Go ahead.

1        A.      Okay.  Then from that point it depends on what

2   it is they needed depending on who it is.

3        Q.      Okay.

4        A.      Whether it's discuss anything that was having

5   to do with a contract amount on a contract job --

6        Q.      Well, let's take --

7        A.      -- or whether it was something that needed a

8   quote for a bid.

9        Q.      Okay.  And we'll get to that.  I just want to

10  start off with a new customer calls in.

11       A.      A new customer?

12       Q.      Let's call it a new customer.

13       A.      Huh?

14       Q.      We'll call it a new customer for now.

15       A.      Okay.  Fine.

16       Q.      So we have a new customer who calls in.

17       A.      Okay.

18       Q.      And the new customer says my front porch light

19  is out.

20       A.      Okay.  So that would have been a residential

21  customer, I'm assuming, the way you addressed that.

22       Q.      Sounds good.

23       A.      All right.

24       Q.      She would gather information from the

25  customer?

1       A.      Yes.

2       Q.      What type of information would she gather?

3       A.      What the problem is, whether they wanted a

4   quote, whether they just wanted us to come out and do it at

5   a time and material rate.

6       Q.      Okay.

7       A.      And then the method of payment.

8       Q.      What do you mean the method of payment?

9       A.      On residential customers, we usually don't

10  bill.  They're either going to give us a check, cash or

11  credit card on the spot.

12      Q.      Okay.  She would gather that information?

13      A.      Uh-huh (affirmative).

14      Q.      And then what would she do with that

15  information?

16      A.      She would -- well, I mean if they wanted to go

17  ahead and proceed with the work, then she would process the

18  PO.

19      Q.      What does that mean?

20      A.      Well, she would go into the PO ledger into the

21  computer, she would associate a number to that job.

22      Q.      Where did that number come from?

23      A.      I just told you, from the PO ledger that is in

24  the computer.  It's a structure -- our company's structure

25  is keeping up with jobs is PO's, purchase orders, okay?

```
 1       Q.       Okay.

 2       A.       Each one has a number.

 3       Q.       So a form comes up on the computer?

 4       A.       Yeah.

 5       Q.       It's numbered?

 6       A.       Right.

 7       Q.       She enters the problem, the issue and the

 8  other information she gathered --

 9       A.       Right.

10       Q.       -- into that?  She just types what the

11  customer tells her, right?

12       A.       Right.

13       Q.       And then what does she do with that?

14       A.       Okay.  She would -- if they wanted to proceed

15  with it, she would print it out, she would call me or Bo --

16  or Bo, let us know what the problem is so that if we had

17  somebody somewhere around Atlanta in that general area, --

18       Q.       Uh-huh (affirmative).

19       A.       -- we would make the call on who might go by

20  and do it.

21       Q.       Okay.  So you or Bo would tell her we got

22  somebody in that area, we can do it today or we can get to

23  it in the next couple of days or something like that?

24       A.       Right, or she would call him direct if need be

25  and have the person go do it.  If I was in a meeting or --
```

1  and something like that, I would tell her I think I've got

2  such in such in that area of town, why don't you just go

3  ahead and call him directly and have him take care of this,

4  and she would do so.

5       Q.      Okay.  But so you or Bo might call the service

6  person directly or you might tell her to call the service

7  person directly?

8       A.      Or she may just call the person directly if

9  she couldn't get a hold of either one of us and it was an

10  emergency call that needed to be handled.

11       Q.      Can you tell me any examples of when she

12  called the service person directly without first contacting

13  someone else in the company?

14       A.      There were several times that that took place.

15  Can I give you an exact example, --

16       Q.      Yes, please.

17       A.      -- probably not at this point, because it

18  happened multiple times and it's been quite some time ago.

19       Q.      How many times?

20       A.      Well, I mean I'm sure it happened probably

21  five or six times, because she couldn't get a hold of either

22  one of us.

23       Q.      Over the course of her three-and-a-half, five-

24  year employment, it happened five or six times; is that your

25  testimony?

1      A.      No, that's not my testimony.  My testimony is

2   as best I can remember over the last year or so, it was

3   probably five or six times.  There was probably more if you

4   want to go back that far, but I can't remember that far.  I

5   have a lot on my plate.

6      Q.      So approximately five times a year she might

7   call a service person directly?

8      A.      May have.

9      Q.      May have, you're not sure, correct?

10     A.      I'm sure of the first -- of the last year.

11     Q.      All right.  Okay.  Service person gets called,

12  and what is Ms. Ramsey's next role?  What's her next job in

13  this process?

14             MR. WHITE:  We're still talking about

15         the residential?

16             MR. BRIDGERS:  Sure.

17  BY THE WITNESS:  (Resuming)

18     A.      Well, the work would get done.  If the work

19  got done and if it was depending on what the agreement was

20  she made with the customer.

21     Q.      Well, now, tell me, what do you mean the

22  agreement she made with the customer?

23     A.      As far as whether it's going to be check, cash

24  or credit card.

25     Q.      Okay.  Could she give away your services?

1        A.        Could she give them away?

2        Q.        Yeah.   Could she tell the customer we're not

3   charging you today, you've been such a great customer?

4        A.        Does she have that liberty?

5        Q.        Uh-huh (affirmative).

6        A.        Well, yeah.

7        Q.        She did?

8        A.        She sure did.

9        Q.        Really?   How often did she give your services

10   away?

11        A.        I didn't say she did.   I said -- you said did

12   you say -- did you ask the question.   So repeat your

13   question.

14        Q.        I will.

15        A.        Repeat your question.

16        Q.        Did Ms. Ramsey have the authority to give away

17   the services of Wallace Electric?

18        A.        Did she have the authority, yes, she did.

19        Q.        Really?   But she never did that, would she --

20   did she?

21        A.        Not to my recollection.   We've discussed it a

22   few times since it was a good customer, and if that's what

23   needed to happen once the guy got out there, tell them it

24   was no charge, it will be just fine.

25        Q.        Because you told her to do that, right?

1        A.        I told her if that was the situation.  She

2    made that call after that.  She would make the call on

3    whether it was just to be let go or not.

4        Q.        How often did that happen?

5        A.        Probably very few --

6        Q.        All right.

7        A.        -- to anybody, even myself or Ms. Ramsey.

8        Q.        Okay.  All right.  So then, she would call

9    back to the customer to let the customer know when the tech

10   was going to be out there?

11       A.        Right.

12       Q.        The tech would go, say, do the job?

13       A.        Right.

14       Q.        What happened next that involved Ms. Ramsey?

15       A.        Well, after the tech did the job, he would

16   call Ms. Ramsey back, tell her how much time and material he

17   had, she would calculate it.

18       Q.        When you say calculate, she would put the time

19   into the computer?

20       A.        No.  She would calculate it out by hand just

21   like you're writing right now, how much the material was,

22   she would put the percentages in that she needed to that she

23   knew she was -- because she had already gave him the time

24   and material rates on how much markup was on the material

25   and what the hourly rate was, what the truck charge was, she

1    would calculate it out, create a total, then let them know

2    that that's what they owed.  If it was handled by credit

3    card, she would take the credit card information for

4    payment.  If it was a check, he would receive a check.  If

5    it was cash, he was paid cash.

6         Q.      So she would pass whatever total it was back

7    to the tech and the customer?

8         A.      That's correct.

9         Q.      And the time that she used, the service tech

10   told her how much time, right?

11        A.      Uh-huh (affirmative).

12        Q.      That's a yes?

13        A.      Yes.

14        Q.      And the --

15        A.      Well, I mean she knew what time, because she

16   knew what time they arrived.  So he didn't have to tell her

17   how much time it was.

18        Q.      Okay.  But I mean it was just the time the

19   service tech was onsite, right?

20        A.      No.

21        Q.      All right.

22        A.      Down to where he was dispatched from to get

23   there.

24        Q.      Okay.

25        A.      Because the only -- they would paid to, but

1    not from.

2        Q.      All right.  The time of the job would be part

3    of that calculation, correct?

4        A.      Yes.

5        Q.      And she would either know that time or receive

6    that time from the tech, right?

7        A.      Right.

8        Q.      And how much did Wallace Electric charge per

9    hour?

10       A.      It depends on the customer.  On residential

11   rates, she could tell you better than I.  I believe those

12   may have been at -- I don't know whether it was 48 an hour

13   or 55 an hour on that.

14       Q.      But there was an hourly rate for that?

15       A.      There was an hourly rate.

16       Q.      And she did not set that hourly rate, correct,

17   you set that hourly rate?

18       A.      We set that hourly rate together, yes,

19   depending on who the customer was because of the volume of

20   business that she told me that that customer gave us.

21       Q.      So any time she deviated from the standard

22   rate, did she need to speak with you or somebody else?

23       A.      Yes.

24       Q.      And Wallace had standard rates for different

25   types of customers, is what I'm understanding you say?

1        A.        Different customers, different type of work.

2        Q.        All right.  So we've got our hours, we've got

3    our hourly rates.

4        A.        Right.

5        Q.        We'll move onto materials.

6        A.        Uh-huh (affirmative).

7        Q.        How does she know what materials are used by

8    the tech?

9        A.        The tech would tell her.

10       Q.        The tech says I used A, B and C?

11       A.        Right.

12       Q.        And she would know that A, B and C's base cost

13    was --

14       A.        She would call the local supply house and get

15    the prices.  If she knew what supply house he picked those

16    items up from, she would call that supply house.  If she

17    didn't know because he may have had those items on his truck

18    already, then she would call the local supply house to see

19    what the -- today's going rate was for that item.

20       Q.        Okay.  And then Wallace Electric had a

21    standard markup for material?

22       A.        On residential, yes.

23       Q.        All right.  And then whatever percentage that

24    was --

25       A.        She had to put the sales tax and the markup on

1    them, yes.

2         Q.        Okay.   So assuming it was 20-percent markup

3    with a couple of cents sales tax, if it was $100, she would

4    put in $120 plus sales tax?

5         A.        Whatever it calculates out to, yes, sir.

6         Q.        Whatever it calculates out to, and then would

7    total that up.   And then truck charge, the truck charge

8    would be -- is there a typical truck charge for Wallace

9    Electric?

10        A.        It depends on the distance, but for the most

11   part, we'd use, like, a $40 an hour truck charge for that

12   first hour, and then it was just the hourly rate for every

13   hour after that.

14        Q.        Okay.   And she would either know that

15   information or get that information from the tech, as to how

16   long they were out there?

17        A.        No, they didn't know.   As far as what the

18   truck charges, the hourly rate?

19        Q.        Yeah.

20        A.        No, she knew the truck charges.   Our tech

21   don't know that information.

22        Q.        I see.   And then she would total all those up,

23   get a price, send it off, give it to the tech?

24        A.        Right.

25        Q.        Would you say 95 percent of the time that she

1    would pass back to the tech exactly what these factors just

2    calculated up to, what they added up to?  95 percent of the

3    time, is that what she should do?

4         A.      95 percent of the time?

5         Q.      Did she always --

6         A.      We only did ten percent residential work.

7         Q.      I'm sorry.

8         A.      So 95 percent, I don't understand.

9         Q.      Sure.  When you're dealing with residential,

10   would you say a hundred percent of the time she would just

11   pass back to the tech what these numbers calculated and what

12   they added up to?

13        A.      If it was that type of a residential call, I

14   believe so.  If it was a residential call that we do for

15   real estate companies, no.

16        Q.      We'll get to that.

17        A.      Okay.

18        Q.      So in --

19        A.      Your question is vague.

20        Q.      In the residential area, residential customer,

21   is your testimony then that if she changed --whatever that

22   should calculate out to, --

23        A.      Uh-huh (affirmative).

24        Q.      -- okay, whatever it adds up to, for her to

25   change that, she would need to get input from you or

1  somebody else?

2       A.      Not necessarily.  She knew what to charge.  If

3  it required a permit, she automatically knew what that was.

4  I mean she set those numbers herself.

5       Q.      Well, let me ask -- I mean that's what I'm

6  trying to --

7       A.      She was given the --  She was given basic

8  numbers, rates to use, she would structure them, she would

9  accumulate them -- she would accumulate them, she would

10 total them herself.

11      Q.      She would add them up?

12      A.      Yeah, she would total them herself.  If she

13 knew other factors that needed to be added because there was

14 a second trip or something like that, I mean she didn't have

15 to get approval for any of that.  She handled that.

16      Q.      Certainly.  But once she totaled it up for

17 whatever the company's standard practice is, --

18      A.      Okay.

19      Q.      -- whatever that number is, --

20      A.      Right.

21      Q.      -- she could not deviate from that unless she

22 talked with you, right, or somebody else at the company?

23              MR. WHITE:  Object to the form of the

24         question, asked and answered.

25 BY THE WITNESS:  (Resuming)

1          A.        I mean, you asked two questions at once just

2     then.  Once she totaled that up, she charged it out to

3     whatever it came up to.  Now, if she deviated, it would have

4     been her own discretion because of whatever factors there

5     were in play.  She did not have to get approval to do that,

6     if that's what you're getting at.  She made that call on her

7     own, and I would back her up a hundred percent on that,

8     okay.

9          Q.        So you're saying she could.  She did not have

10    to charge the customer whatever these numbers totaled up to?

11         A.        If there was a factor where we had an error

12    from a tech problem and she felt like she needed to knock

13    something off, she had liberty to do so.

14         Q.        When did she ever do that?

15         A.        Well, there was many discussions between her

16    and I she would tell me about later.

17         Q.        Tell me one.

18         A.        Tell you one.  Well, when the tech went out,

19    already had a repair made, it turned out he didn't, and had

20    to re-do it, didn't charge them, waived it, okay, I

21    understand, it's not a problem.

22         Q.        How many times did that happen?

23         A.        Believe it or not, that happens quite often in

24    the electrical business.  In the electrical business, you do

25    your best guess on a repair.  Electricity is something you

1   can't see.  So you have to do the best that you can or

2   trying to diagnose a problem and repair it.

3        Q.     I guess I'm asking how many times did she

4   waive charges to customers?

5        A.     I couldn't tell you.

6        Q.     The company doesn't know, does it?

7        A.     With research, probably could come up with

8   that, but don't know for a fact if the notes weren't made

9   along the way.

10       Q.     Okay.  So there's no way to know, is what

11  you're saying?

12       A.     Probably not.

13       Q.     All right.  Now, what's the next one, a real

14  estate company.  Tell me how that varies from the process we

15  just talked about, if a real estate agency calls in?

16       A.     Because she had a personal relationship, so to

17  speak, over the phone with some of these different

18  contractors or real estate companies, when they would sell a

19  house, we would go in and copper had been stolen and all, we

20  would just bill those on a net-30, you know and do a simple

21  process at a different rate as far as just, you know, going

22  out.  And some of them we had to quote, some of them they

23  just wanted fixed.  Some of it was time and material, some

24  of it we had to go out and look first, give them a price so

25  they could roll that into the real estate fee when they were

Page 99

1    trying to make the sale.

2         Q.      Okay.  But in general, I understand the rates

3    might have been different, you might have billed them

4    different, --

5         A.      Right.

6         Q.      -- but in general, she would gather

7    information from the customer, right?

8         A.      Yes.

9         Q.      Would she use the company's standard rates and

10   trip charges or whatever you charged and come up with a

11   number?

12        A.      Different structure on that, yes.

13        Q.      Okay.  But it's a structure?

14        A.      Yeah.

15        Q.      And then once she got that number, she would

16   pass that back -- once she calculated that number, she would

17   pass that back to the customer?

18        A.      Right.

19        Q.      And perhaps there's a different billing setup,

20   the company allowed different types of customers pay

21   differently, right?

22        A.      Right, based on volume of business.

23        Q.      Okay.  Yeah, you know people I understand.

24   Okay.  So we covered residential, we covered real estate

25   people.  What was the other, some of the other?

1      A.      Okay.  There's about another 96 percent of the

2  business out there now.

3      Q.      Which is?

4      A.      Commercial/industrial.

5      Q.      Right.

6      A.      Service and contract.

7      Q.      Okay.  And I understand it's different types

8  of jobs, but how did Ms. Ramsey's role, how was her role

9  different in dealing with commercial/industrial versus

10  residential?  What would she do differently?

11      A.      Well, as far as commercial/industrial on the

12  service side or any small jobs that were done on a T&M

13  basis, on a time and material basis and everything, her role

14  was different on how she would, I guess, -- I mean the way

15  it was structured as far as the percentages, she knew the

16  rates and the percentages, which were different than what we

17  would use for contract jobs when we were accumulating and

18  acquiring our job costs information.

19      Q.      But still in general, she would find out from

20  the tech or from somebody, perhaps in a bigger job, she'd

21  find out from somebody else about how many hours it should

22  take?

23      A.      If only if she was quoting one.

24      Q.      Okay.  Assuming she's --

25      A.      Only if she was trying to give a number for

1    one.

2         Q.       Okay.  So she would find out from somebody

3    else about an estimate of what the hours should be, right?

4         A.       Right.  Well, there was a few times that she

5    was trying to put her own estimate of time on something and

6    somebody would verbally tell her over the phone as far as a

7    customer.  And I told her, I said Rebecca, I said I can't

8    even do that.  I said, you know, you're relying on a

9    customer's information.  So you really don't need to do that

10   and neither do I.

11        Q.       Okay.  So she --

12        A.       All you can do in that situation, to not be

13   rude to the customer, is just tell them hey, here's what the

14   rates are, and if you are correct by what you're saying, it

15   should run you this much, but if it's more time than that

16   once we get out there, it's going to be more money.

17        Q.       Okay.

18        A.       And that was the way we had discussed for her

19   to handle it without getting us caught in the situation

20   where you said well, you know, it was only supposed to cost

21   this much money.

22        Q.       All right.  So you did not really want her

23   estimating that, because it's just hard to do?

24        A.       Yeah, I couldn't either.  Nobody can.

25        Q.       All right.

1     A.      You can't price what you can't see.

2     Q.      But at some point, you get the number of

3  hours, and she would take the number of hours the project

4  took, and then what, multiply that by the rate?

5     A.      Right.

6     Q.      And it was a standard rate for the company,

7  right?

8     A.      Right.  Well, like I say, it varied for

9  projects but, yeah.

10    Q.      Okay.  But she was given that rate by you or

11 somebody else?

12    A.      Right.

13    Q.      And then she would add in if there was extra

14 charges?

15    A.      Right.

16    Q.      She would take -- and again, the materials,

17 find out what the materials cost for the job, --

18    A.      Uh-huh (affirmative).

19    Q.      -- which -- she was told what -- you know, we

20 used one panel, three bales of wire, whatever.

21    A.      Right.

22    Q.      She was told that by somebody else, right?

23    A.      She would be told that just like I'm told

24 that, no different.

25    Q.      Exactly.  And then she would figure out what

1    that price should be.

2          A.       Right.

3          Q.       And then there was a standard up-charge that

4    the company used?

5          A.       Right.

6          Q.       And then she'd add all that stuff up together,

7    right?

8          A.       Yeah.

9          Q.       And then give it back to the customer and ask

10   them how they wanted to pay for it?

11         A.       More or less, yeah.  I mean it's a lot wider

12   variety than what you're saying, but I mean, yeah, somewhat.

13         Q.       Well, I mean she took the number that she

14   calculated and told the customer here's your number in some

15   way, right?

16         A.       No, not necessarily.

17         Q.       All right.  Then how not?

18         A.       Uh-huh (affirmative).  Sometimes the customer

19   said fine, bill it.  He didn't care how much it was.  So we

20   billed it.  Sometimes the customer wanted to know where --

21   how much it was where they could pay with their corporate

22   credit card, okay.  Sometimes he wanted to roll over into

23   another PO for another project we may have going on.  I mean

24   there's a million variables out there of what you're trying

25   to put this into, and I cannot answer you cut and dry point

1    blank like what you're asking.

2         Q.      Well, I guess, depending on how the customer

3    got it, like e-mails, text, whatever, at some point the

4    customer understood how much they were supposed to pay, is

5    all I was trying to get to.

6         A.      Well, of course.  How would they know not to

7    pay the bill?

8         Q.      Exactly.

9         A.      Good.

10        Q.      All right.  So in terms of this kind of

11   pricing out and billing, we've talked about residential,

12   we've talked about the real estate people, we talked about

13   the commercial/industrial, any --

14        A.      Just commercial/industrial services is all you

15   talked about.

16        Q.      All right.  So what's -- very well.  So what's

17   the other one?

18        A.      Contract jobs and bid process.

19        Q.      Okay.  And how is that different?  How would

20   you describe that?

21        A.      That's what my brother, myself and my nephew

22   do most of the time, is quoting jobs.  You go and you get

23   blueprints for projects that are in the area that you're --

24   you either know about, hear about or either general

25   contractors that you work with on a regular basis call you

1  and tell you they would like you to bid this job or that

2  job, you quote it, amongst a lot of other people, you see if

3  you can come in and -- with a good number and be awarded the

4  bid.  And then if so, then there's a contract process.

5  Contracts come in, I know she has read some as well, Angela

6  did read some.

7      Q.      She, Ms. Ramsey, has read some what?

8      A.      Contracts to see if it was standard procedure

9  and see if the scope of work matched up from what we had

10 typed up to afford the job.  That wasn't her role often, but

11 I think she had a hand in doing some from time to time.

12     Q.      Okay.  All right.  Let's get back to this

13 contracting job.  And I understand that's probably the

14 largest part of your business?

15     A.      Very much so.

16     Q.      And would you agree that probably typically,

17 these are typically larger jobs?

18     A.      They can be anywhere from 30,000 to three

19 million.

20     Q.      All right.  And on these larger-type jobs as

21 you described it, you or somebody else would go out, price

22 it out and figure out the numbers?

23     A.      Well, we'd go out.  The drawings would come.

24 They were calculated in the office.

25     Q.      Okay.  Fair enough.  What was Ms. Ramsey's

1   role or how did her -- I mean once you came up with -- well,

2   let me back up.

3               How was her role different with the

4   contracting jobs?  I understand the process may be

5   different, but how is her role different?

6        A.      Her role was different as far as job costs,

7   the way it was acquired on the templates once she would

8   enter it in the computer, because you didn't, obviously, use

9   the high hourly rate, you would only use the employee's

10  hourly rate of each employee that was on the job, plus a

11  percentage and a burden factor on that for overhead, to

12  absorb the overhead, and then raw cost of materials and then

13  truck trips, which she would have to determine according to

14  which man it was, because she would know whether that man

15  had a company truck or not to whether she could put it on

16  there.  Then she would sometimes have to calculate how much

17  that truck trip was.  If it was outside of the, basically,

18  80 to 90-mile radius, then we would actually use a per-mile

19  figure.

20       Q.      So she was --

21       A.      Or she could put that on the job template.

22       Q.      All right.  So this job template, is this

23  something y'all have used -- for how long have you used the

24  job template like that?

25       A.      Since the early 2000s, I know.

1       Q.      Okay.  So it's just a template that would have

2   existed before she got there?

3       A.      Yeah.

4       Q.      Exists after she left?

5       A.      As far as I know, yeah.  I think they've

6   tweaked it and restructured it some while she was there to

7   improve it.

8       Q.      But so she's told on some random job who and

9   how many people are going to work on it?

10      A.      We never know.  It just depends on what's

11  needed.

12      Q.      Well, I understand.

13      A.      I mean that fluctuates.

14      Q.      I understand.  But say if some random job, you

15  figured out we're going to need three techs and a lead man?

16      A.      No.  No, that all -- that all depends on the -

17  - are you talking about how the job was quoted?

18      Q.      Exactly.

19      A.      Okay.  How it was quoted is, is each -- each -

20  - each item, each piece of material has an associated man-

21  hour to it.  So once you figure out how much material is

22  needed, there is a -- there is an estimator, an electrical

23  estimating book by Means Company, RS Means Company, that has

24  associated labor units that go with that material, just like

25  if you get your water pump replaced on your car, there's

1    book hours telling how long that takes.  And that's how the

2    labor is calculated on contract jobs.

3         Q.     Okay.  So for X job, look in the book, figure

4    out what the --

5         A.     Uh-huh (affirmative).

6         Q.     -- man hours it should take --

7         A.     Uh-huh (affirmative).

8         Q.     -- or will be billed for, --

9         A.     Right.

10        Q.     -- and then Ms. Ramsey, would she then --

11   she'd take that information and enter it into the template,

12   right?

13        A.     Right.

14        Q.     And then look to see --

15        A.     She wouldn't take it from the book, no.

16   That's how the estimate was created to get the job.

17        Q.     Okay.

18        A.     She would only take the -- she would take the

19   man hours from when the time tickets were turned in on the

20   job.

21        Q.     So she wasn't involved in the -- the estimate

22   side at all?

23        A.     Not in the estimate, the bid process on the

24   large contract jobs, no, she was not, not on those.  Only

25   the property management jobs and some of the residential did

1    she calculate some of that stuff.

2        Q.      Okay.  Very well.  I misunderstood that.  So

3    she's not involved at all in the quoting, it's just she gets

4    involved once the work at least starts to be done and bills

5    start to --

6        A.      Correct.  She helps us track the job.  She

7    would help us track the job to where we could see where we

8    were percentage-wise --

9        Q.      What does that mean, track the job?

10       A.      Well, track the job, if the job's 25 percent

11   complete out on site, then as her -- as Rebecca's

12   calculations -- well, not calculations, her information that

13   she has put on her job cost template would tell us by

14   looking at it, if you have a $200,000 job and you were 25

15   percent along the way, obviously, you ought to have about

16   $50,000 in it, so therefore, you needed to look at the job

17   template and you could see whether you had X number of

18   dollars in labor and X number of dollars in material,

19   whether we were tracking along the way correctly to where

20   when we reached a hundred percent we would be at a hundred

21   percent dollar-wise or whether we would be over.

22       Q.      Okay.  And I guess that's what I was confused

23   with.  When would she first enter information into the job

24   template, what phase of the process?

25       A.      From the beginning of contract when she would

1    put the contract amount down, that would be entered on there

2    first.  We have this job, here's the contract amount.

3          Q.     So you would hand her some or somebody would

4    hand her some and say we got the job, here's the quote?

5          A.     Somebody would, yeah.  That was the customer

6    when they sent the contract.

7          Q.     Okay.  Somehow somebody handed her, here it

8    is, we got the contract, good deal.

9          A.     When the contract would come, they would read

10   it, they would -- they would make sure that it matched the

11   quote, and if it did, then she entered it on the computer,

12   as I said, with a PO, the contract amount, who the customer

13   was.

14         Q.     Okay.

15         A.     Okay.

16         Q.     So she would take the information from the

17   contract/the quote, --

18         A.     Right.

19         Q.     -- put it in the form on the template, --

20         A.     Uh-huh (affirmative).

21         Q.     -- and that information would basically be?

22         A.     Yeah, because she worked hand in hand with --

23   with -- with the -- with us as the estimators and the

24   project managers and the service and the guys more than

25   anybody in the building and the rest of the girls.

1        Q.        And her job at that point was to enter the

2   information accurately from the quote into the computer?

3        A.        Yeah.

4        Q.        And then as the work -- and you said there's a

5   tracking portion in there as to what percentage of stuff

6   gets done?

7        A.        Yeah.

8        Q.        All right.  And how does she know what

9   percentage has gotten done?

10       A.        She would pick up the phone and call them and

11   say hey, you know, are you 25 percent or 50 percent done

12   with this project, and she would only usually do that when I

13   asked her to.

14       Q.        Okay.

15       A.        Because I would say Rebecca, I'm trying to see

16   where I'm at with this job, would you call such in such and

17   ask him what his gut feeling is on his percentage of

18   completion, because we knew and she knew because of her

19   ticket she had entered, how much material had already came

20   in the warehouse for it, because they always handled by

21   their miscellaneous material, conduit, wire, etcetera.  We

22   had the light fixtures and the switch gear in the office,

23   and that was a big -- big chunk of the job.  So she already

24   knew that because she had received it.

25       Q.        Okay.  And finish up her role here.  I mean at

1    the end of the -- what did she do next with these

2    contracting jobs?  Would she enter information into the

3    template as it was completed?

4          A.        Yeah.

5          Q.        And then at the end --

6          A.        Well, I mean, she was asked along the way to

7    possibly pull it up to let us know where we stand.  She

8    would actually pull it all together when Angela would ask

9    her to --

10         Q.        To report it?

11         A.        -- for billing or for a draw, and on the size

12   of the project.  And sometimes we had to produce a schedule

13   of values to where we could bust it up for the bank because,

14   you know, the bank would only give draws based on that

15   percentage of the project and what point.

16         Q.        And what level of -- and then at some point

17   the -- well, I guess it is -- we know at some point the

18   customer gets the information as to what they should pay?

19         A.        You know, they were invoiced either totals or

20   draws.

21         Q.        Okay.  Did she do that, Ms. Ramsey?

22         A.        She did some, yes.

23         Q.        All right.  When you say some, I'm not sure

24   what you mean by that.

25         A.        She did most all the service and everything.

1  She did some -- helped with some of the small contract

2  billing.  But the main large contract billing was done by

3  Angela, which she assisted Angela at.

4      Q.      Okay.  All right.  So in all of -- well, in

5  this contracting jobs thing, how much discretion did she

6  have in what information she put into the computer?  I mean

7  was there --

8      A.      Nobody has discretion on it.  It's point-

9  blank.  It's cut and dry.  It comes in on a piece of paper.

10     Q.      All right.  What percentage of the company's

11 business do you think is this contracting jobs, these larger

12 contracting jobs as you described them?

13     A.      I would say probably somewhere between 50 to

14 60 percent of the business.

15     Q.      Okay.  And I guess the same question with your

16 real estate, did she have any real estate companies -- let

17 me back up.

18             The commercial/industrial services, I mean did

19 she have any discretion as to what numbers to put into the

20 computer?  She didn't, did she?

21     A.      Yes, she did, commercial/industrial, time and

22 material work.

23     Q.      Okay.  But she couldn't --

24     A.      That's different than contract jobs.

25     Q.      Well, I understand it's different things that

1   went in there, the numbers that went in there, the rates

2   that went in there are different, but could she deviate,

3   could she change her rates?

4        A.     She could be anywhere within a window that we

5   had discussed.  She could -- she could vary that.

6        Q.     And what was that window?

7        A.     The window was a lot of times anywhere from 35

8   to 55 an hour.  There was a window there.

9        Q.     Okay.  And would that vary on -- would that  -

10  - how did that -- how was --

11       A.     How much repeat business these people may have

12  gave us, which she would know, not me.

13       Q.     Okay.  And you're saying that she changed that

14  in the commercial/industrial services?

15       A.     She can.  She could.

16       Q.     Did she?

17       A.     She has from time to time, yes, and that was

18  fine.

19       Q.     But you don't know how many times?

20       A.     It wasn't a problem.

21       Q.     But you don't know how many times?

22       A.     Probably 50 percent of the time.  Our rates

23  are not solid, okay.  We do what we have to do, and it's

24  based on volume.  She knew the volume.  She took the calls.

25  She's seen the computer.  She knew what she had.  She could

1  bury that, and I was okay with it, as long as it wasn't

2  below a certain amount.  The only thing that was ever locked

3  in a hundred percent, like I say, was a contract job on the

4  modular business that we do in Conyers.  We do about another

5  25 percent of our business is modular buildings.

6        Q.     Okay.  Have you told me about that yet?

7        A.     No.  You hadn't asked.

8        Q.     Well, then tell me what her role is in the

9  modular buildings?

10        A.     I don't know that she would have a whole lot

11  of a role in that, other than payroll.  And she might have

12  assisted in some billing and insurance.  She definitely had

13  a big part in them, because she handled all the health

14  insurance.  All that was dealt with by her, and new-hire

15  packets, all of those things were dealt with with that.

16        Q.     Okay.  That was -- okay.  That's not anything

17  particular to the modular buildings, is what I'm

18  understanding?

19        A.     What now?

20        Q.     That's not anything particular to the modular

21  building.  She didn't have much of a role in that particular

22  --

23        A.     Well, there is a particular way of handling

24  the way the billing was done, and I know she had her hand

25  in that from time to time, yes.

1      Q.      Okay.

2      A.      That's a whole separate way things are handled

3   for that end of the business, because those buildings go all

4   over the country and some outside the country.

5      Q.      And again, backup then and tell me what she

6   did particularly with the modular buildings?

7      A.      Per diems.

8      Q.      Okay.  And per diem means a certain rate per

9   day, right?

10      A.      Per diem, for rate per day per man, plus for

11   mile.

12      Q.      And so she would calculate that?

13      A.      Uh-huh (affirmative).

14      Q.      And she would calculate that using the numbers

15   that the typical company --

16      A.      The standard numbers, yeah, no differently

17   than I would.

18              MR. BRIDGERS:  Let's take a quick break

19         and see where we are.

20              (Whereupon, a brief recess was taken.)

21   BY MR. BRIDGERS:  (Resuming)

22      Q.      All right.  Let's get back to it.  We've taken

23   a short lunch break and are back at Topic Number 9.  I just

24   want ask one or two follow-up questions and move onto the

25   next job duty.

1           Mr. Wallace, after the bills -- let's just --

2    the bills that would go out to the customers, --

3        A.      Uh-huh (affirmative).

4        Q.      -- do you review each bill that goes out?

5        A.      Actually, three of us do.

6        Q.      Which three people?

7        A.      Well, Rebecca would as she would pull it

8    together, because we have to make sure we got the

9    description of work, the story, we would call it, on the

10   ticket correctly.  And then I would check it out, check it

11   over, whatever, and I would review it as well, make any

12   corrections I felt like needed to be or rewording I felt

13   like needed to be done.  Then it would go back to them to

14   either correct or to either go ahead and push it forward to

15   invoice it.

16       Q.      Okay.  So you would review then each bill that

17   went out, initial it or whatever and send it back if it was

18   okay?

19       A.      Right.

20       Q.      And make your changes if it wasn't?

21       A.      Yeah, mostly on verbiage, and like I say, the

22   description of work.  The pricing, they handled that.  Very

23   seldom would that be an issue.  It was always usually the

24   description.  It's how you word something where the customer

25   will pay you or not.

1      Q.      Okay.  And that would be for all of your types

2  of customers?

3      A.      Other than contract jobs.  Contract jobs,

4  there is no description.  You draw what you can draw and

5  that's it.

6      Q.      Because you've already, basically, you've done

7  that pre --

8      A.      Right.

9      Q.      -- pre-bill, basically?

10      A.      Right.

11      Q.      All right.  You had referenced in your

12  testimony that there was certain ranges of rates for

13  different customers.

14      A.      Uh-huh (affirmative).

15      Q.      Is it accurate that various people had rates

16  for their own customers, there's a different rate for maybe

17  your customer versus a rate for a different person's

18  customer?

19      A.      Yeah, but that's not so much as it is a

20  different person as it is a different type of customer.

21      Q.      Okay.

22      A.      Industrial customers, you can get more than

23  you can on commercial.  And actually, residential customers

24  are actually somewhat a little bit higher than commercial.

25      Q.      And in terms of those rates, you had said that

1  Ms. Ramsey had the authority to modify those rates?

2      A.      She knew more about the rates for the property

3  management companies than I do, because I mean if it was --

4  and I can't even remember the name of half of them because

5  of these management companies from out of state that may

6  have a management contract with, you know, whatever shoe

7  store here or shoe store there or a Dollar General or

8  whatever it is.  Certain ones had different rates because I

9  was always asking her, I don't know what their rate is, what

10  is their rate, because it's a negotiated rate.  They would

11  send us paperwork saying that this is what they pay, are you

12  interested in doing this work.  In the beginning we'd say,

13  you know, yes or no, and if it was yes, then they would put

14  us on their list of contractors.  Well, that person, like I

15  say, they may pay 55 an hour plus material, this customer

16  may pay 45 an hour plus material, some of them provided

17  their own material, you know, like I say, the rates vary.

18      Q.      Certainly the rates varied and the rates would

19  be -- you or one of your supervisors would -- or you would

20  have -- you approved -- let me start that question again.

21          Would you approve each of those different

22  types of rates?

23      A.      Those I would.  The ones that we had to deal

24  with from local people that we've done a lot of volume with

25  before, as long as she was within a range and had to, you

1  know, negotiate that if she needed to, from 35 or $40 an

2  hour up to $55 an hour.  As long as the job came out, we

3  were okay with it because it was just a customer

4  relationship-type thing.

5       Q.       All right.  And let me limit my questions now

6  to just those type of customers where you were saying that

7  she had the ability to adjust the rate.

8       A.       Right.

9       Q.       Let's just talk about that for a second.  How

10  often would she do that in a given month, say?

11      A.       No more than she had to, obviously, no more

12  than I would probably, you know.

13      Q.       But I mean I'm trying to figure out if that's

14  a thing that you are testifying that she did once or twice a

15  month, once or twice a week, or do you know?

16      A.       I guess you'd be better to ask her that

17  question, but I guess I would probably say, and it's a

18  guess, I mean, you know, once or twice every few months,

19  three or four months.  It would have been no more than

20  myself or my brother would have throughout the course of

21  time.

22      Q.       Okay.  And if she -- and --

23      A.       Usually, only when you got somebody

24  disgruntled about a bill would you adjust it.

25      Q.       Okay.  So that would -- and you said it was a

1   guess, but you think more likely than not, it was once every

2   couple of months; is that what you're saying?

3        A.        It would be more than that, about a couple or

4   three times a month, two or three times over the course of

5   maybe two or three months.

6        Q.        Okay.  And then assuming she was talking to

7   the customer and came up with the different rate, --

8        A.        Uh-huh (affirmative).

9        Q.        -- would she then clear that with you or

10  somebody else before she made the final call?

11       A.        If she could get a hold of me, otherwise, no,

12  she would roll with it as long as it was within a window of

13  what we had pre-discussed.

14       Q.        Okay.  So of those, I think you said two or

15  three over two or three months, whatever you said, --

16       A.        Yeah.

17       Q.        -- of those, most of the time she would be

18  able to get a hold of you and get it approved?

19       A.        50 percent of the time, possibly.

20       Q.        Okay.  So we're talking then, assuming it was

21  four times over --

22       A.        I don't know how many times it was, but she

23  had the liberty to do so and she was free to do so.

24       Q.        I understand.  But by your testimony, that

25  even if she did so, would probably -- and did not clear it

Page 122

1    with you first, just did it on her own, --

2         A.        Uh-huh (affirmative).

3         Q.        -- that might be something that happened once

4    a month?

5         A.        I couldn't tell you.

6         Q.        Well, I mean I'm just trying to --

7         A.        I've already answered you while ago; two or

8    three times, two or three months.  It varied, okay?

9         Q.        I understand.

10        A.        You cannot -- you can't lock me into that

11   because that's -- I can't -- I can't tell you that.

12        Q.        Okay.

13        A.        I mean this isn't a car sales place.  I mean

14   this is not a hamburger restaurant.  You know, it's a whole

15   different line of work, okay?  This varies.  Our business

16   varies, types of work varies, rates vary, everything varies,

17   judgment calls vary.

18        Q.        Judgment calls vary?

19        A.        That's right, judgment calls on how things

20   should be handled, which man should go to a job, what the

21   rates are.

22        Q.        Well, which man should go to a job, it's not

23   in her job description what so -- I mean that's not part of

24   her duty at all, is it?

25        A.        If we had a qualified one out there, she would

1   go back to the board and look.  I'd say look at that list on

2   the wall right there, if she did get a hold of me and she

3   needed somebody to catch a service call on a certain part of

4   town, I'd say go back there, read to me which people are on

5   that list that Bo put on the wall, where their -- what jobs

6   they're on.  She would read it to me and I'd say well, now

7   that job's in the northeast corner.  I said I know David

8   McCullum is up there working, how about seeing if he's got

9   time to run by and catch it, something like that.  So she

10  would handle it that way.

11         Q.      Okay.  Let's move onto a different -- now, I

12  was trying to keep up with your list earlier.  You talked

13  about communicating with customers, pricing jobs, billing

14  jobs, dealing with customers and contractors.

15         A.      Uh-huh (affirmative).

16         Q.      We kind of talked about that some already.

17  And then you said another level of duties was pricing and

18  billing jobs.  Sorry.  I said that already.  Did she have

19  any duties in taking care of payroll?

20         A.      We've talked about that all morning.  Yes,

21  sir.

22         Q.      All right.  I'm just trying to get us going.

23         A.      She would gather the time, she would enter it,

24  she had to make sure it all matched up and she would turn it

25  into Debbie, Debbie would send it to the payroll service,

1    the paychecks would be processed, they would come back and

2    be handed out to employees.

3         Q.      Okay.  So now, let's go through it a little

4    bit more slowly.  She gathered the information from who?

5         A.      Out of the basket where the men turned their

6    time in.

7         Q.      Okay.  And they turned in a sheet with their

8    hours on it; is that the deal, date, hours, Charles worked

9    May 2nd for five hours?

10        A.      Yeah, individual man turns in an individual

11   sheet for the week.  Those individual sheets were then

12   matched up to the lead-man sheets to confirm that the lead

13   man signed off and said that they did work that much -- many

14   hours and that it wasn't faked, whatever you want to say.

15   That was her job to confirm that.

16        Q.      All right.  Let me stop you there.  She looks

17   at workers sheet, looks at the -- I'm sorry.  I'm annoying

18   you.

19        A.      Well, I mean, it doesn't matter to me.

20   Evidently, you just are really slow about getting this.  So

21   she has the lead-man sheet.

22        Q.      Okay.

23        A.      She matches the individual sheets up to it,

24   checks them off --

25        Q.      To make sure the two numbers are the same?

1      A.      Absolutely.

2      Q.      Okay.

3      A.      Then enters it to the PO on the job.

4      Q.      If the number's the same she puts it right in?

5      A.      Right.  If it's not, she was calling the

6  employees to verify timing, we didn't want her to a lot of

7  times because it's not going to force the guys to do their

8  job, but she had to from time to time to keep the process

9  moving, which I understood that.

10     Q.      Would she first try to call the lead man --

11     A.      I don't know.  You'd have to ask her.

12     Q.      -- to figure out what -- okay.  So you don't

13  know?

14     A.      Not all the time, I don't.  I mean I know she

15  tried to call the lead man sometime.  She's tried to call

16  the individual guys sometimes, but most of the time she

17  didn't have any individual guys' phone numbers to call

18  because they don't have company phones.  Only the lead men

19  have company phones.

20     Q.      So most of the time she would call the lead

21  man to try to -- I mean if you're trying to make sure that

22  your worker is not over billing you, you're not going to ask

23  the worker, right, --

24     A.      Right.

25     Q.      -- you're going to talk to the boss, the

1   supervisor?

2          A.        Right.  And if that worker is not with that

3   lead man this week, the following week, since we hold back a

4   week on payroll, then she would have to call the other lead

5   man where he might be now, which she wouldn't know without

6   going and looking at the job sheet.

7          Q.        Okay.  So she figures out what the right

8   amount of time is from the lead men, --

9          A.        Okay.

10          Q.        -- and puts them in the computer, right?

11          A.        Yeah.

12          Q.        Can she change that number?

13          A.        Sure.

14          Q.        How?

15          A.        I guess by just delete and change.

16          Q.        Can she decide to pay -- say a guy works six

17   hours, can she decide to pay him for seven?

18          A.        She could if she wanted to, but that would be

19   illegal.

20          Q.        I mean but that would be against policy?

21          A.        Well, yeah.  It would be wrong.

22          Q.        Okay.  So her job is to put in there

23   accurately whatever the employee worked?

24          A.        Yes.

25          Q.        All right.  And then she'd put that

1    information in and then what, generate a payroll report?

2         A.      I would assume so.  I'm assuming so.  I know

3    she would enter it to the job for job cost purposes, after

4    that, after the pay was confirmed, you've seen the time

5    sheets get turned in just like they're on payroll sheets,

6    and then she would give those to Debbie, because she had

7    already confirmed them, so Debbie wouldn't have to question

8    any of it.  All she would do is take it and enter it

9    straight to the payroll service so a payroll check could be

10   processed.

11        Q.      Okay.  So in summary, Ms. Ramsey's job was to

12   take the number of hours that the person worked, make sure

13   it matched up to the company's other records, right?

14        A.      Uh-huh (affirmative).

15        Q.      Put it in the computer, type it in the

16   computer?

17        A.      Uh-huh (affirmative).

18        Q.      And then pass that information up to Debbie?

19        A.      Yeah.  That was one of the very small tasks

20   that she did on Mondays and Tuesdays, yes.

21        Q.      Okay.  When you say very small tasks, how many

22   hours a week did she -- did it take her?

23        A.      Probably, I would say since the majority of

24   the time didn't come until after 5:00 on Mondays and

25   throughout the day on Tuesdays, it might have trickled into

1   Wednesday morning a little bit, she might have had at the

2   most 12, 14 hours in it.

3          Q.     A week?

4          A.     Yeah.  It could be a little more, it could be

5   a little less, depending on whether we had 40 employees or

6   90 employees at the time.

7          Q.     Okay.  Let's go onto the -- and I think you

8   said at some point time and material turned in, make sure

9   it's posted to the job ledger.

10         A.     The same thing we just talked about.

11         Q.     Okay.  And did she also on the bigger projects

12  put that information into a particular book for the job, the

13  job book?

14         A.     Yeah, once it was -- once it was entered, I

15  know she put the material tickets over into it.  I'm not

16  sure about the time tickets, whether they were copied and

17  put in there or not, but I know the material was.

18         Q.     So those were the larger jobs, right?

19         A.     Uh-huh (affirmative).

20         Q.     And when we say put those in the books,

21  literally, what, just printed them out and stapled them into

22  the books?

23         A.     Copied them and punch holes in them and put

24  them in a 3-ring binder, like what you have right there.

25         Q.     Okay.  And it was her job to put all of the

1   time and material or at least all material into that, into

2   that book?

3        A.      Well, she may have had help from time to time.

4   I don't know.

5        Q.      Okay.  How about checking in materials?  You

6   mentioned that earlier.

7        A.      Uh-huh (affirmative).

8        Q.      What did she do?

9        A.      Well, a truck backed up, she would see what

10  they had, they would hand her the tickets, she would go line

11  item to line item, count the quantities, check it all off to

12  make sure it was there, label that pallet for what that PO

13  number is that that was associated to, and she would then

14  either just put the ticket in the basket if she had

15  something else she was doing or she would go ahead and carry

16  that to her desk and go ahead and enter it to the PO and

17  into the job it was charged out to.

18       Q.      Okay.  So this material comes in, does it

19  usually come in just job by job or sometimes you get

20  material from a bunch of jobs that need to be put in

21  different places?

22       A.      Usually job by job, but if the suppliers can't

23  consolidate deliveries, obviously, they do, they try to

24  bring them all at one time to save them a truck trip.

25       Q.      Okay.  So basically, she's checking the --

1    she's counting what's delivered, checking it off from the

2    list, and then if necessary moving them to, you know, pallet

3    -- this pallet here or that pallet over there; is that

4    right?

5        A.      Yeah.

6        Q.      Okay.  I mean and what kind of discretion did

7    she have in doing that?

8        A.      What do you mean discretion?

9        Q.      Could she do anything other than just check to

10   see what was -- the things were there?

11       A.      Yeah, sure.

12       Q.      What?

13       A.      She could check for damaged items.  Then she

14   would notify the guys if the stuff came in, especially if

15   somebody had told her ahead of time that morning that there

16   was a priority on a particular item, if you see it today,

17   how about giving me a buzz as quickly as possible.

18       Q.      Okay.

19       A.      FedEx or UPS, Freight Line or supplier,

20   whoever it may be.

21       Q.      Did she order any of the stuff?

22       A.      Do what now?

23       Q.      Did she order the stuff?

24       A.      Some of it she ordered, but not very much of

25   it.  But some of the stuff that I told you from property

1    management companies she did.

2         Q.      Okay.  How long did it take her to check

3    material in each week?

4         A.      Now, that varies.

5         Q.      Between what and what?

6         A.      Okay, between one hour and 40.

7         Q.      Okay.  So weeks she could spend up to 40 hours

8    --

9         A.      You could.

10        Q.      -- checking in material into y'all's shop?

11        A.      Yeah, you could.  It's possible.

12        Q.      I mean, but it happened, you say?

13        A.      I said it's possible.

14        Q.      Well, I'm trying to figure out if it ever

15   happened.

16        A.      Well, let's see.  Since I don't sit in that

17   building all day, I couldn't tell you that, sir.  She could.

18        Q.      Okay.  So you --

19        A.      I don't sit in the building all day.  I'm out

20   trying to get customers.

21        Q.      I understand.  So the company cannot tell me

22   one way or the other how long it took her to check in

23   materials each week?

24        A.      Well, if you want to base it on an average, --

25        Q.      Sure.

1        A.        -- we can do that.

2        Q.        Please.

3        A.        Okay.  We could base it on an average;

4   probably anywhere from, I would say, 12 to probably 30 hours

5   a week.  That's probably a good average there.  The nature

6   of our business varies a lot.  I don't know that you've ever

7   been involved in something like this.  You're asking a lot

8   of questions that are not possible.

9        Q.        And do you have any kind of written policy for

10  checking in material to see if it's on a list?

11       A.        Written policy?

12       Q.        Uh-huh (affirmative).

13       A.        Very well could.  I can't recall at this

14  point.

15       Q.        Well, if you do, I think that's covered by

16  discovery as well, so I would appreciate getting a copy of

17  that.

18       A.        Okay.

19       Q.        I mean, do y'all have any type of -- if

20  something was not on the truck that was on the list, what

21  would she do, just tell them --

22       A.        Well, she would go ahead and call the supplier

23  right then if it was a supply-house delivery.  If it was a

24  truck-line delivery or if it was a FedEx or a delivery from

25  UPS and she could not call them, she would simply zero it

1  out, have someone initial beside it, whoever delivered it,

2  and then they would go on about their way.  And she would

3  try and follow up with whoever it was ordered from to start

4  with that was not responsible for the delivery.  If they

5  were responsible for the delivery because it was a direct

6  delivery from the supply house, then she would call that

7  salesman, whether it be Scott Hayes, Jack Wilson, whoever it

8  might have been, and then she would say hey, this item is

9  missing, are you aware of that, and move on from there.

10         Q.      All right.  Let's go onto this insurance.

11  What did she do in the area of insurance?

12         A.      Debbie Wallace question.

13         Q.      Do you have -- so I'm understanding that

14  you're not -- okay.

15         A.      I'm not in Human Resources, no.

16         Q.      Okay.  So Debbie Wallace question?

17         A.      Right.

18         Q.      Well, actually, the next duty raised was Human

19  Resources.  What did Ms. Ramsey do in the Human Resources,

20  as part of her Human Resources duty as you have defined it?

21         A.      Dealing with the health insurance, was one

22  item.  And there were some other things that her and Debbie

23  did.  That's a Debbie Wallace question.

24         Q.      Okay.

25         A.      Go ahead.

1      Q.      Let's move onto the next to topic, which would

2  be permits.

3      A.      Entering time in again.

4      Q.      Let's move onto permits.

5      A.      All right.

6      Q.      What did Ms. Ramsey do as part of permitting?

7      A.      Well, when she acknowledged that we needed a

8  permit, whether it was by e-mail or by a contractor calling

9  her or whether one of us letting her know, she would get the

10  appropriate form from the appropriate -- from the correct

11  jurisdiction, whether it be County, City, State, whatever,

12  and she would come to whichever one of us was -- it was our

13  job if she didn't already have a scope of work that she

14  could read off of.  In order to fill the permit out herself,

15  she would have to come to us, find out exactly what the

16  scope of work is so that the -- so that the form could be

17  filled out correctly as far as what we were doing on the

18  job, and then she would have to calculate the total amount

19  of what was required and get a check from Debbie so that she

20  could mail it out, or whatever.  Sometimes you can pay by

21  credit card to get a permit.

22      Q.      Okay.  And I understand most of your jobs have

23  permits.

24      A.      Right.

25      Q.      The application form is just whatever

1   jurisdiction --

2           A.       Right.

3           Q.       -- the address happens to be in?  There's no -

4   -

5           A.       No, some of them just require an affidavit.

6           Q.       Okay.  So whatever form, there is a particular

7   form for a particular jurisdiction?

8           A.       Uh-huh (affirmative).

9           Q.       Right, there's no choice about that?

10          A.       Right.

11          Q.       And then she would come to get the scope of

12  work on the technical side from you --

13          A.       Yeah.

14          Q.       -- or one of your people?

15          A.       She needed to know how many lights we were

16  putting in, what size electrical service we were putting in,

17  unless she already knew that from the contract, which would

18  already have it broken down for her.

19          Q.       The contract that you had gone through when

20  you were -- one of your team had already done --

21          A.       Well, no, it came from the contractor and was

22  e-mailed to us.

23          Q.       Okay.  And so she would transfer that

24  information that either you gave her or the contract gave

25  her, she'd transfer that information onto the form?

1        A.      Uh-huh (affirmative).

2        Q.      Right?

3        A.      Right.

4        Q.      And then I understand the form's got perhaps

5   addresses and license numbers and things like that?

6        A.      Right.

7        Q.      And she would take that information, put that

8   into the form?

9        A.      Uh-huh (affirmative).

10       Q.      And when you say calculate the amount of

11  money, is that the --

12       A.      Right.  And if there was anything that she

13  wasn't clear on, she would call the permit office that was

14  associated with that permit and run through it with them and

15  to make sure that we didn't send out a check that was not

16  enough or too much, she would make sure that it was correct

17  for what was needed to obtain a permit.

18       Q.      And I don't know this.  Does that check vary

19  on what type of scope of work is or --

20       A.      Scope of work, or some of them are based on

21  the value of the job.

22       Q.      All right.  And she would get that value.

23  Assuming it's on the value of the job, she would get that

24  value from you or one of your supervisors or the contractor?

25  She'd get that information from somewhere else?

1      A.      Yes.

2      Q.      She would transfer that information to the

3  form?

4      A.      Right.

5      Q.      Look up to see whatever the check is?

6      A.      Right.

7      Q.      Call the permitting if it wasn't clear?

8      A.      Uh-huh (affirmative).

9      Q.      And then order a check from somebody in the

10  office?

11      A.      To the best of my knowledge.  She knew more

12  about it than anybody in the building.

13      Q.      Okay.  And then she would -- I understand

14  sometimes she would mail the form off or e-mail it, just get

15  it to the office?

16      A.      However it needed to get there.

17      Q.      All right.  Anything else that she did with

18  the permits?

19      A.      Well, once she got the permit, then she had to

20  make sure because some other ones that needed them to be

21  posted on the job.  She would have to make sure she got a

22  copy of it and make sure she got it to the lead man, whether

23  she pinned it on the board and notified them that they

24  needed to pick it up and post it on the job site the next

25  day in the window or whatever, she would have to do that as

1    far as the permit is concerned.  And from that point on, it

2    was the inspection process.

3         Q.      Okay.  Now, let's talk about the inspection

4    process.  What did she do with inspectors?

5         A.      A lot as far as being able to communicate with

6    them, coordinate them, get them on the site when they needed

7    be for a walkover, underground cover or a ceiling cover,

8    final inspections or just simply walk-through's before the

9    job starts if it was a remodel, whatever, to make sure that

10   what our vision of what we were going to do was exactly what

11   he was going to expect before work started.  She would

12   coordinate all that with us and call the guys or myself or

13   whoever was needed.

14        Q.      Okay.  So you or one of your lead men would

15   say that they needed to have the inspector come out?

16        A.      Uh-huh (affirmative).

17        Q.      Right?

18        A.      Right.

19        Q.      And then how would she know which inspector,

20   or she would just call the jurisdiction of wherever it was?

21        A.      She would have to see what jurisdiction it

22   was.  And they associate it by address.

23        Q.      Okay.  So --

24        A.      Because sometimes she would do the same thing

25   on coordinating power company engineers to meet at the same

1    time, sometimes BellSouth engineers.

2         Q.      Okay.  We'll, hit that in just a second.

3    Let's just stick with inspectors for a second.

4         A.      Okay.

5         Q.      You or one of your lead men would say we need

6    an inspector, right?

7         A.      Well, we just need an inspection.

8         Q.      Inspection.  She would know from the address

9    which office to call?

10        A.      Well, no, she had already obtained a permit.

11   So she knew what office to call because she had already had

12   a permit.  So she'd call in an inspection according to that

13   permit number.

14        Q.      All right.  So she just looked at the form,

15   knew who to call?

16        A.      I'm assuming.

17        Q.      And then what would be her role then, she'd

18   just tell the inspector, she'd just schedule the inspector

19   to come out?

20        A.      And some of it's automated.  She would just

21   have to punch in the information to where if there was an

22   inspection, and it may happen between morning to noon the

23   next day, it may be two days from now.  Some of them have to

24   have 48-hours' notice.  I mean everybody's different.

25        Q.      And then whatever she got back, she'd just

1   pass that information back to the job site, to the lead man

2   or to you?

3          A.      Uh-huh (affirmative).

4          Q.      And then that would be the --

5          A.      Right.

6          Q.      -- the end --

7          A.      Whether someone was required to be on the site

8   or not or, you know, things of that nature.

9          Q.      The specifics, and then the inspection --

10         A.      Right.

11         Q.      -- would theoretically happen?  Okay.  Same

12  thing with some of the -- you said Georgia Power, BellSouth,

13  that's sort of those other contractors.

14         A.      Right, meet with the engineers to try to

15  coordinate transformers or phone lines, where they had an

16  underground burial that we were going to have to hit --

17         Q.      Okay.

18         A.      -- and connect to.

19         Q.      But she would be told by you or one of your

20  leads that they need something technical with Georgia Power,

21  BellSouth or whoever it is?

22         A.      I'd just tell you to please figure out who the

23  engineer is for what area and try to set up a meeting with

24  me and call me and tell me what you come up with.

25         Q.      Okay.  So you would say I need to -- I need to

1   have something with a transformer in this particular

2   address, you know, go find me an engineer?

3          A.      Yeah, just find whoever handles that area and

4   let me know.

5          Q.      And so she would call whoever, which ever

6   agency, make her way through the phone tree or whatever?

7          A.      Right.

8          Q.      And then once she found the right person,

9   relay that you needed to speak with that person?

10         A.      Right, and have that person either call me or

11  get the number where I could call them.

12         Q.      Okay.  And coordinate that transfer of

13  information?

14         A.      Right.

15         Q.      Is that the extent of her involvement with

16  that?

17         A.      No.

18         Q.      Okay.  What else?

19         A.      When it comes to the tail end of that, then

20  she would have to make sure that -- that was just the first

21  stages, when a transformer was needed or if phones were

22  needed.  Then towards the tail end of the project, then that

23  -- she would follow up to make sure that we had everything

24  in place for the power company to come out and set a

25  transformer, this, that and the other, help coordinate

1  sometimes on the meter application process, as far as making

2  sure that, you know, she notified the contractor and say

3  hey, y'all need to go ahead and apply for a temporary

4  permanent power because, you know, you want to go ahead and

5  get power on the building.  We can't give you permanent

6  power, we can give you what they call temporary permanent

7  power, which is a letter from us that states that for 90

8  days we're saying that, you know, everything is good and

9  it's worthy of power, they can go ahead and apply power to

10  the building, and if everything's not set up permanent by

11  the customer after 90 days, then they'll come back out and

12  they'll turn it off.

13        Q.      Okay.  So you or the lead man will tell her

14  it's time to set up permanent temporary power --

15        A.      Right.  And then she would handle it from

16  there.  She would give them whatever forms necessary.

17        Q.      Give them, who?

18        A.      That she would have to answer.

19        Q.      I mean give the form to the power company in

20  that situation?

21        A.      Or to the contractor if they're the one that

22  had to apply for it or to the customer if they had to apply

23  for it, she had to find which forms, whether it's for

24  (unintelligible) EMC or for Georgia Power.

25        Q.      Okay.  So her role was to find out which was

1    the correct form to implement that need?  Am I right?

2         A.       She would have to find the right power

3    company.

4         Q.       Based on the address?

5         A.       And the power company it's in, after

6    communicating with her, would let her know what needed to be

7    done from this point on for the people to obtain power.

8         Q.       Okay.  So from the address, she would figure

9    out which company to call?

10        A.       Uh-huh (affirmative).

11        Q.       Right?

12        A.       Uh-huh (affirmative).

13        Q.       And then she would call that company and say

14   what do you need to turn on the power?

15        A.       Uh-huh (affirmative).

16        Q.       And they would say we need this form?

17        A.       Right, which most of the time the inspection

18   department would have to give them, but the customer would

19   still have to apply for meters, because just because the

20   inspection department gave a cut-in number to turn the power

21   on, they would turn it on, but obviously, you won't get it

22   unless a meter's installed.  And that's up to the customer

23   or the general contractor to acquire a meter.

24        Q.       Okay.  And she would pass the forms back and

25   forth to the right people?

1     A.      If need to be, yes, but for the most part then

2  we tried to dump that back into the customer's hands.

3  That's their responsibility because they're the ones paying

4  the bill.

5     Q.      Okay.  But Ms. Ramsey would never decide, say,

6  that it was time to turn the power on or exactly when that -

7  - you know, when the customer needed -- I mean, she would be

8  told by you or one of your lead people that now was the time

9  to turn the power on, right?  She did --

10     A.      On most commercial projects, yeah.  There's

11  some residential's that we had to do, and just have power

12  turned back on because the new rules were in the last two or

13  three years, if a -- if a home stayed vacant for so many

14  months, they no longer would leave the meter there and just

15  turn the power off.  They would pull the meter, and you

16  could not get a new meter unless an inspection and a walk-

17  through was done.  And that would be something that she

18  handled a lot of times with these property management people

19  on the real estate companies on the residential side.

20     Q.      Okay.  So the property management people would

21  call --

22     A.      It was just kind of different, is what I'm

23  saying, yes, sir.

24     Q.      Different forms, but basically, she's passing

25  forms back and forth --

1          A.        Right.

2          Q.        -- to meet the requirements of the power

3     company to get the power turned on?

4          A.        Right.

5          Q.        All right.  You had said she had

6     responsibilities for receivables, but I wasn't sure if you

7     meant the same thing as when the truck comes.

8          A.        Not receiving money, receiving materials.

9          Q.        Okay.  And that's what you've already talked

10    about, right, truck, the supplies come?

11         A.        A bunch, yeah.

12         Q.        And you said that she had a responsibility for

13    refunds and returns.  And that's what you've already talked

14    about as well, right, if there's something that looks

15    damaged or if there is only one and there should be two, she

16    would let somebody know?

17         A.        Or if there was an overage.  Or if there was

18    ten of something bought and they only needed eight, she

19    would see to it that had got returned and credited back to

20    the job template.

21         Q.        Okay.  You said that she assisted Debbie and

22    Angela.  Did she assist with doing different types of work

23    than what you've already testified to?

24         A.        Yes.  If her end was caught up for whatever

25    reason, because it was slow that week or that month or

1  whatever, and she had extra time on her hands and we got

2  swamped in another area, whether it would be tax time or

3  whether it be new insurance enrollment because we were

4  changing companies and all the employees needed to fill out

5  new forms, every individual and things of that nature, you

6  know, she would assist in that quite a good bit.

7       Q.     Well, all right.  Going back to my question,

8  though, when she assisted Debbie and Angela, was she doing

9  different types of work?

10      A.     I just said that.  Yeah.

11      Q.     No, you kind of said her own work, or at least

12 I perceived?

13      A.     No.

14      Q.     I'm sorry.  Then tell me again, what did she

15 do different --

16      A.     Tax time, tax time.

17      Q.     Taxes?

18      A.     Yeah.

19      Q.     Okay.

20      A.     Tax time when you have to make sure all the W-

21 2s go out and everything.  At tax time, they would need

22 assistance over in the other end of the corner of the

23 office.

24      Q.     All right.  Well, what did she do to assist in

25 tax time?

1        A.        That's a Debbie Wallace question.

2        Q.        But at least from your own person knowledge,

3    you saw her, what, mail out W-2s and things like that?

4        A.        No.  I just know that they were swamped doing

5    taxes, and that's what I was told.  So I stayed out of their

6    way.

7        Q.        Probably wise.  All right.  I'll ask Debbie

8    about that.  Any other major duties of importance that Ms.

9    Ramsey did that you don't think you've testified about?

10       A.        I can't think of any off -- right off the bat.

11   There's probably several that I've missed, but I can't think

12   of any at this time.

13       Q.        Okay.  Well, if you come up with one when

14   we're talking, let me know, and I understand a few of them I

15   need to talk to Ms. Wallace about.

16       A.        All right.

17       Q.        All these things, all these duties, everything

18   that you've mentioned, is there any type of a policy or

19   procedure manual that sets out any of these duties?

20       A.        No.  I guess probably not that I can recollect

21   on any of these duties.  I mean we have a -- we have a small

22   company handbook that basically is for the field workers to

23   go by.  Like I said, before the office has always been -- it

24   was a small family business, and just as we've grown we've

25   tried to do our best to separate in areas and try to get the

1  right task in the right areas, but as far as having anything

2  written, I guess I don't know.

3      Q.      And the employee handbook for the service

4  people, would that have any -- well, is it supposed to cover

5  Ms. Ramsey?

6      A.      No.

7      Q.      You're not sure?

8      A.      No.

9      Q.      Okay.  Something completely different?

10     A.      Because it's put out by the -- it's put out by

11  the Independent Electrical Contractors Association.  It's a

12  generic book.

13     Q.      Okay.  And in addition -- so the answer is

14  that there really is no policy and procedure manual setting

15  out any of these procedures?

16     A.      No, other than some few things we -- no, other

17  than that, no.  No, other than vacations and holidays and

18  how all that stuff's structured, no, not as far as the work.

19     Q.      And actually, that brings up another question.

20  Is there an employee handbook that covers Ms. Ramsey for

21  things like vacation, holidays, that sort of thing?

22     A.      There was a sheet that I believe she signed,

23  as well as a bunch of stuff when they come in the door that

24  shows what they are.  If not, you know, then it was just

25  verbally told to her as she come in the door, what those

1    days were and what the paid holidays are, which the paid

2    holidays sometimes -- of course, the holiday itself is

3    always there, but if it's the day before or the day after,

4    all that varies depending on what our contractors are doing,

5    and we just follow their suit.

6         Q.     Okay.  I don't think I've seen that.  Is there

7    any type -- oh, never mind.  Of all these duties, what is

8    the most significant decision or choice Ms. Ramsey ever made

9    for Wallace Electric?  What decision or choice between

10   possible courses of action was the most significant decision

11   she ever made for the company?

12        A.     I cannot prioritize one.  There's three or

13   four on the list.

14        Q.     Give me three significant decisions or four.

15   Well, let me ask the question again.  Please tell me three

16   or four of the most significant choices Ms. Ramsey ever made

17   on behalf of the company.

18        A.     Well, there's a lot of critical decisions as

19   far as trying to coordinate final power being applied to a

20   building at -- to make sure that all paperwork and final

21   inspections were happening and get a building's power turned

22   on at a certain deadline.  When everybody was thrashing away

23   to make it happen, she was -- her -- that was very important

24   for the company to either make it or not.

25        Q.     Okay.  Well, we'll stick with that one a

1    second.  What choices did she make during the process of

2    getting final and power in the inspection?

3         A.     Well, she knows more than I would on that, but

4    if it's not handled right, it doesn't happen.

5         Q.     I understand it's not handled right.

6         A.     So there were choices to be made --

7         Q.     Tell me what choices were to be made.

8         A.     I just told you, she'd have to answer that

9    more than I would.

10        Q.     Okay.  But you said there are.  Now, I'm

11   asking you, what are the choices that she made --

12        A.     First of all, who you call.  Second of all, if

13   they have the right form, okay?

14        Q.     Okay.

15        A.     Third of all, do they have the customer's

16   information, okay.  Then to make sure that the field is

17   ready and is in place before this happens.

18        Q.     And she --

19        A.     All of that would have to work hand in hand.

20   She was a big part of that --

21        Q.     Okay.

22        A.     -- to the point still, nobody's replaced her

23   at this point.

24        Q.     All right.  So we've got final power

25   inspections.

1       A.      Uh-huh (affirmative).

2       Q.      You said there were three or four --

3       A.      Uh-huh (affirmative).

4       Q.      -- choices that she made that had the most

5  significant impact on the company.  What's another choice

6  she made?

7       A.      Sometimes when she couldn't get a hold of us,

8  who she sent to a job on a service call, whether it was the

9  right -- right choice of person or not.

10      Q.      Typically, she would talk to you or one of

11  your lead men, right?

12      A.      If she could get a hold of me or Bo.

13      Q.      And if she couldn't, then she would have a

14  choice of who to send?

15      A.      Yeah.

16      Q.      All right.  And she would choose from what

17  options?

18      A.      Well, she had been there long enough to know

19  that there were certain ones capable of doing certain things

20  because of what they had done in the past, and those would

21  be the ones she'd select from.  If it was out in the Conyers

22  area, she'd usually call Kevin, because that's where I have

23  a guy that stays in the modular business out there.

24      Q.      Okay.  So at times she would choose between

25  which service person would be appropriate to a call?

1     A.     Right.

2     Q.     But the vast majority of the time, she would

3  get that information from you or from Bo or one of your

4  people?

5     A.     Yeah.

6     Q.     Okay.  All right.  Let's go on.  What other,

7  what would be the next most significant choice that she made

8  for the company?

9     A.     Verifying the insurance to make sure that the

10  bills that we were paying insurance-wise were the actual

11  people that were on the insurance, which was quite a --

12  quite a task to do.

13     Q.     Okay.  So I understand you mostly are pointing

14  to Ms. Wallace on this, but generally, she would look to

15  make sure that the people that should on the bill were?

16     A.     Right.  In other words, if you had a guy that

17  was terminated two weeks ago, are we still paying for his

18  insurance benefits or not.  That's money going out the door.

19  Or if he's on the insurance and he's not on the list, then

20  he's not insured and he thinks he is.

21     Q.     Right.  You would agree with me that she could

22  not decide, she didn't really have any discretion as to who

23  got insurance or who didn't?

24     A.     Neither did I.  Obama took care of that.

25     Q.     Perhaps.  But basically, somebody either was

1  qualified for insurance because they'd been there long

2  enough, --

3       A.      The rule is 90 days, yeah.

4       Q.      -- and then if they wanted to pay for it?

5       A.      Well, I mean, we had to pay for a certain

6  percentage of it regardless.

7       Q.      Certainly.  I didn't mean to be flippant about

8  it, but basically, it sounds like the decisions then were

9  was the person there long enough and did they want

10  insurance, that's the choices she made, right?

11      A.      As far as the decision on insurance, yeah.

12      Q.      Okay.  And I'll ask Ms. Wallace the rest of

13  it.  But how about the next significant choices that she

14  made on behalf of the company?

15      A.      Going back to some of the rates that we used.

16  Obviously, that means you either make money or you don't.

17      Q.      And just to make sure I'm on the right track,

18  most of the time she was given the rates, she just needed to

19  accurately put them into the job, right?

20      A.      Into the right areas, right.

21      Q.      And then you've testified that at a point she

22  might have deviated a little bit?

23      A.      She might have had to adjust it, yeah.

24      Q.      All right.  Okay.  What other most significant

25  choices did she make on behalf of the company?

1      A.      Well, let's see.  We may have covered most of

2   the ones that -- on a day to day that would affect things,

3   to the best of my knowledge right there.

4      Q.      Okay.  Would you agree that these are

5   probably, what we've talked about, these three or four are

6   the most significant choices that she did make on behalf of

7   the company?

8      A.      Probably close to it, yeah.  There may be some

9   I've forgotten.

10      Q.      Was anybody in the office paid less than Ms.

11   Ramsey?

12      A.      Melissa.

13      Q.      How much was Melissa paid?

14      A.      I couldn't tell you.

15      Q.      How do you know she was paid less?

16      A.      Because she was part-time.

17      Q.      All right.  So there was one part-time person

18   that was paid less than Ms. Ramsey; is that true?

19      A.      Yes.

20      Q.      Okay.  And to your knowledge, no one else was

21   paid less than she was in the office?

22      A.      To my knowledge, nobody else was as far as the

23   girls are concerned.

24      Q.      How did their pay compare to just generally?

25      A.      Actually, I think Chuck Turner may have made

1    less than her.

2         Q.      Who is Chuck Turner?

3         A.      He's the one that we hired to do AutoCAD and

4    to start doing the receivables in the back, which she

5    trained him to do.

6         Q.      Okay.  When you said she trained him, how long

7    did that take?

8         A.      She was still doing -- she was still working

9    at it from the -- up to the time she left, because there's

10   something new to learn about how everything's handled every

11   day.

12        Q.      Okay.  So she would be sitting, what, he --

13   he'd be doing something and come ask questions?

14        A.      Well, there were always -- delivery people was

15   always used to coming up and getting her.  Finally, they

16   started coming and getting him.  If he didn't know how to do

17   something, if something new came along that she hadn't

18   explained to him or showed him yet, then he would ask

19   questions and she'd show him.

20        Q.      Were people out in the field paid less than

21   she was?

22        A.      Yes.

23        Q.      Were the electricians generally paid more?

24        A.      Generally, not all of them.  There were a few

25   of them that were breaking the threshold of being what I

1   guess you'd really call an electrician.

2        Q.       Have you changed the way that the women in the

3   office are paid since she's left?

4        A.       Yeah, we did, because we're starting to vary

5   hours.

6        Q.       Okay.  Well, just tell me, how did you change?

7        A.       How did I change it?  We're varying hours

8   somewhat from time to time now, so to do that and to be

9   fairly about everything because sometimes they may work less

10  than 40, sometimes they'll work up to 45, we've changed it

11  to an hourly basis.

12       Q.       Okay.  So everybody in the office is now paid

13  on an hourly basis?

14       A.       No.

15       Q.       Who is not?

16       A.       Let's see.  Debbie is not and Phyllis is not.

17       Q.       Remind me, what is Phyllis' job again?

18       A.       She is the -- she handles collections.

19       Q.       Is she full-time?

20       A.       Yes.

21       Q.       So Debbie and Phyllis remain on salary?

22       A.       Uh-huh (affirmative).  They work the most

23  amount of hours.

24       Q.       Okay.  Is that one of the reasons they're on

25  salary is because they work the most amount of hours?

1          A.        No, they just do.  It comes and goes.  It

2   varies so much.

3          Q.        Yes.

4          A.        They would like to have a stable income, so

5   therefore, they're on salary.

6          Q.        Who replaced Ms. Ramsey in doing her job?

7          A.        Again, what was that?

8          Q.        Who replaced Ms. Ramsey in doing her job?

9          A.        Who replaced her?

10         Q.        Yes, sir.

11         A.        Susan Harrington didn't last but a few weeks

12   after the fact or a month or so after the fact, then she

13   left.  She wasn't capable of doing the job.  And then we

14   hired a new girl that hasn't been there but a few weeks now.

15   Her name is Linda, and I don't know her last name at this

16   point.

17         Q.        And there was the man who now is checking in

18   things, whose name --

19         A.        Chuck.

20         Q.        Okay.  Chuck and Linda are both now paid

21   hourly?

22         A.        No.  Linda is hourly, Chuck is salary.

23         Q.        Okay.  All right.  Let me move from Number 9,

24   going to Topic Number 10, work rules applicable to the

25   Plaintiff.  Do you want to take a look at the specific right

1    there?  I think we've established that there is no employee

2    handbook for Ms. Ramsey, correct?

3         A.    No.  I wouldn't write one for one specific

4    person.

5         Q.    Well, for somebody in her position, somebody -

6    - the non -- the non-field people --

7         A.    No.  We're not at that level.

8         Q.    I see.

9         A.    Like I say, all the girls have the rules to go

10   by, which Debbie could talk to you about.

11        Q.    I'm sorry.  All the girls have?

12        A.    Have the certain rules and guidelines that

13   they go by that Debbie has set forth for them.

14        Q.    Okay.  And that's what I'm trying to figure

15   out.  But those are written down, right?  It's a Debbie

16   question?

17        A.    You'd have to ask Debbie.

18        Q.    Ask Debbie.  Very well.  Do you know --

19        A.    Every time you write one down, another

20   employee wants to change it.  So, you know, I got in the

21   habit of not writing it down too often.

22        Q.    And just tell me if I need to ask Debbie about

23   this:  But do you have any specific rules about taking or

24   not taking lunch?

25        A.    Yes.

1      Q.     And what is that?

2      A.     You must take your lunch, and you need to take

3  it at the designated time that you were supposed to take it,

4  and no eating at your desk and your set work hours.

5      Q.     Okay.  How long has the no eating desk -- did

6  Ms. Ramsey eat at the desk?

7      A.     Yes.

8      Q.     How long has the no eating at the desk rule

9  been in effect?

10     A.     A couple of years now.

11     Q.     And has Ms. Ramsey ever been disciplined or

12  written up for eating at her desk?

13     A.     No.  We try not to pound on people for that.

14  We tell them that we'd rather they didn't, and we'd

15  appreciate it if they didn't.  And if they continued to do

16  it anyway, we don't press it.  We have been pretty lenient

17  around there about people taking time off and everything

18  else and not effecting their pay over it.

19     Q.     Does Wallace Electric have any specific rules

20  about employees working or not working more than 40 or 45

21  hours in a given week?

22     A.     We've always stated that we didn't want the

23  girls to work past 45.

24     Q.     Okay.  But if they work past 45, it was your

25  position that they did not need to be paid?

1        A.        Well, to define worked past 45, they were

2    there 45 hours.  Now, they had liberty to get up, move about

3    the building.  Rebecca was not a smoker.  Some would go

4    outside and smoke, go sit in the break room and eat

5    something in the mornings, things of that nature, handle

6    personal phone calls throughout the day, be on the computer

7    on websites and looking up their personal things, doing

8    things like that throughout the day, so if you looked at

9    hours worked and they clocked in and out hours worked, it

10   was probably less than 40.

11       Q.        So is it Wallace Electric's position that they

12   did not have to be compensated for the time they were

13   sitting at their desk looking at the website or looking at

14   the web?

15       A.        That they should not be compensated for that?

16       Q.        Uh-huh (affirmative).  Should they be paid for

17   that or not?

18       A.        I wouldn't think they should be looking at

19   personal things during -- while they were on the clock, no.

20       Q.        Okay.  So if they're looking at personal

21   things while on the clock, you would not think that they

22   should be compensated?

23       A.        Well, you wouldn't think that they should be

24   compensated for it, but they were, because they agreed to

25   work a set amount of hours for a set amount of pay when they

Page 161

1    came in the door.  And that's the hours they worked.  They

2    worked less a lot of times, but never anymore.  And if they

3    worked any more than that, they were compensated additional

4    for that.

5         Q.     And that was those extra checks you talked

6    about earlier?

7         A.     Yeah.

8         Q.     And if they -- do you know personally, I'll

9    ask Ms. Wallace, as you asked me to, but do you know

10   personally of any other types of rules that applied to Ms.

11   Ramsey or the women in the office?

12        A.     That was pretty much the most part right

13   there.  And, of course, we always would ask if they could

14   give us as much time.  We always required if anybody was

15   requesting time off, we would like for the request to be put

16   in 30 days ahead of time if possible.  But obviously, none

17   of the women would ever abide by that for the most part

18   either, so.

19                     (Whereupon, Exhibit No. 6

20                     was marked for identification.)

21   BY MR. BRIDGERS:  (Resuming)

22        Q.     All right.  Let's turn our attention to Topic

23   11, the collection and existence of Defendant's record of

24   hours worked by Plaintiff.  Let me show you what's been

25   marked as Plaintiff's 6.  Can you tell me what those are,

1    what Plaintiff's 6 is?

2        A.        Time tickets.

3        Q.        Are those documents from Wallace Electric?

4        A.        Yeah.

5                  (Whereupon, Exhibit No. 10

6                  was marked for identification.)

7    BY MR. BRIDGERS:  (Resuming)

8        Q.        I can't remember a second ago if I said 7, but

9    that is not correct.  Let me show you what has been marked

10   as Plaintiff's 10.  Can you tell me what these are?

11       A.        The same thing, time tickets.

12       Q.        Okay.  While Ms. Ramsey was there, does

13   Wallace Electric have a clock system pay -- you know, like a

14   pay clock system?

15       A.        Not at that location.

16       Q.        Did it have it in other locations?

17       A.        Yes.

18       Q.        Where?

19       A.        Conyers.

20       Q.        I'm sorry?

21       A.        Conyers.

22       Q.        And I didn't ask this.  What's in Conyers?

23       A.        That's where we do all our modular work.

24       Q.        How were the employees instructed to keep up

25   with their time, specifically Ms. Ramsey?

1        A.       Well, she was requested just to keep up with

2   her time just so that we could charge it out appropriately

3   if it ever went to anything other than just office work, was

4   the reason.  That was the whole purpose of this in the

5   beginning to even write it up, because she was salaried.

6   She was hired at a certain rate for a certain amount of

7   hours, a certain amount of times, which she agreed upon.

8   And Debbie would ask her, as well as the others, to write up

9   their time this way.  And the reason why is, because like I

10  say, if it was -- if she did any particular tasks that fell

11  under a time and material project that we may have been

12  working on therefore, we could go back, we could find that

13  time and have an associated PO number with the job name

14  wrote by it, then you could take that time and you could

15  charge it out to the job and put on to their template for

16  job costs.

17       Q.       Okay.  So the purpose of her beginning to keep

18  time records was in case they were to be billed out and sent

19  to the client?

20       A.       Yeah.  There's times when you can -- if you're

21  asked by a contractor to gather up, do this, do that, if she

22  was -- as long as she kept track record of it and was

23  turning it in that way, if we ever had to back up to gather

24  that, we would have it.  We would have it on paper.

25       Q.       Did you ever do that?

1      A.      I don't know whether she did or not, but I

2  mean we have in other instances where we've had to gather up

3  stuff for some jobs that we did for New Orleans and things

4  of that nature.

5      Q.      Do you know if she was told whether or not

6  just to put nine hours down if -- regardless of how long she

7  worked?

8      A.      That I do not know.  I know Debbie would have

9  never instructed her to do that.

10      Q.      How do you know Debbie would have never

11  instructed her to have done that?

12      A.      Because she would have wanted her to write

13  down exactly what she worked, whether it be eight and a half

14  that day, which Rebecca would always try and cut out a few

15  minutes early every day for the most part.  I'd never say

16  anything about it, but she was always out the door.  And

17  when she came in the door, she would came -- come in the

18  door just at the nick of time to beat the clock.  Of course,

19  it took her another five to ten minutes to get set in her

20  chair and actually start working in the mornings as well.

21  So if you really took all of that and counted it, it was

22  probably about eight and a half hours a day of work, but you

23  know.  You can -- but no, she would have never been

24  instructed just to put just straight nine from anybody like

25  myself or Debbie.

1        Q.      Let me ask you:  Did you ever look at these

2    time records during the time that she was working there?

3        A.      Did I, no.

4        Q.      Yes, sir, you personally?

5        A.      No.

6        Q.      Do you know of anybody --

7        A.      Other than when I would go through the guys'

8    records and everything, and I might skip across one or two

9    of hers, but you know.

10       Q.      Okay.  All right.  That's a good

11   clarification.  But generally, you personally did not review

12   any of her time records during the time she worked there,

13   right?

14       A.      No.  I've never even seen their paychecks,

15   because that was handled by the girls.

16       Q.      Okay.  And looking at these records, let's

17   see, one week, two week, three week, four week, five week,

18   six week, seven week, eight, nine, ten, 11, 12, 13, 14, 15,

19   16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 and

20   30, and I'll just stop there, exactly nine.  Do you believe

21   that over the course of the first 30 weeks she worked there,

22   each day she worked exactly nine hours?

23       A.      I don't believe it.  No.  I don't know why she

24   wrote it.

25       Q.      So these times cards are not accurate?

1      A.      They're not.  Is that what you're saying?

2      Q.      That's what you're saying apparently.  Is that

3   what you were saying, these time clocks are not -- these

4   time cards are not accurate, are they?

5      A.      Are they accurate, no, they're not, because

6   she worked less than that a lot of times.  And we do have

7   proof of that.

8      Q.      What proof is that?

9      A.      Well, ask her when she was out with her hand

10  and got paid anyway or when she was out sick and got paid

11  anyway or went to the doctor and got paid anyway.

12     Q.      Anything else?

13     A.      Or went to go visit with her family because

14  they were in town, and got paid anyway.

15     Q.      Okay.

16     A.      There was a lot of that, but always got a

17  paycheck.

18     Q.      Later on in these records, you saw yesterday,

19  she started keeping more exact --

20     A.      And actually started staying over a little bit

21  for -- and stopping working at the correct time, too.

22     Q.      Do you fault her for that?

23     A.      No.  She was actually doing what she was

24  supposed to do, finally.

25     Q.      Okay.  Looking at these -- well, let me ask

1   you this:  If she did all this poor stuff, why didn't you

2   fire her?

3          A.      Because I don't do that.  I don't do that.

4   I'm not that way.

5          Q.      Okay.

6          A.      I work with my employees.  And if she had ever

7   had a pay issue, all she had to do was come to me.  That's

8   all.  Never did.

9          Q.      So you believe the entire time she was not

10  working enough, she was not working when she should have

11  been working; is that what you're telling us?

12         A.      Her hours were not as they were designated.

13  She would give extra when needed, she did a good job.  She

14  did extra when she needed, needed to.  I mean she made up

15  for it in some ways, and then she was compensated for some

16  ways.

17         Q.      Okay.

18         A.      It all should be just fine, because it was

19  agreed upon.  But she was paid.

20         Q.      In these records later on as they started to

21  have more exact numbers, which you've seen, --

22         A.      Uh-huh (affirmative).

23         Q.      -- do you have any reason to doubt those

24  numbers?

25         A.      Give me the date you're referring to.

1      Q.      Any of them, all of them.

2      A.      Huh?

3      Q.      All of them.

4      A.      All of these?

5      Q.      Yes, sir.  If you'd take a look and look at

6   both nine -- excuse me -- seven and ten --

7               MR. WHITE:  Six and ten?

8               MR. BRIDGERS:  Yes, sir.  Thank you.

9   BY MR. BRIDGERS:  (Resuming)

10     Q.      Six and ten.

11     A.      What are you talking about, six and ten?

12     Q.      Exhibit 6.

13     A.      Okay, Exhibit 6.  You said --

14     Q.      Yes, sir.

15     A.      All right.

16     Q.      Towards the back.  And you can just -- like,

17   just in general, see how the documents start having more

18   exact, the hours were more exact?

19     A.      Well, she started writing overtime, which she

20   didn't get overtime.  That was part of her salary.

21     Q.      Yes, sir.  And we'll, you know, --

22     A.      So that was actually wrote up wrong, so.

23     Q.      Well, I guess I'm just pointing to the fact

24   that in general, she started to put more exact numbers down,

25   right?

1       A.      No, in general, she started coming in and

2  putting in the extra time, because then she wanted to start

3  writing more exact numbers down.  Her actual attendance

4  changed, as well as these cards.  That's why the cards

5  changed, because the attendance changed, okay?

6       Q.      She began working more?

7       A.      She began coming in so that when she got down

8  -- when she actually sat at her desk it was actually the

9  start time, not running in the door right at start time.

10 She would stay until work time ended instead of walking out

11 the door when work time ended.

12      Q.      So am I understanding you to say --

13      A.      She started being more punctual and doing what

14 she was doing and actually pulling a little extra here,

15 there and another without even being requested to, and

16 that's where this extra time come from.

17      Q.      Okay.

18      A.      Okay.  She was never told to work further over

19 unless she was compensated.

20      Q.      Does the company have any reason to contradict

21 any of these more exact time records where she started

22 putting in more specific times when she works?

23      A.      Yes.

24      Q.      Tell me why.

25      A.      Because she wasn't requested to on each and

1    every occasion.  That was when she got there till the time

2    she left where she was told what her time was to start work

3    and end work.  If she stayed five or ten minutes over on her

4    own -- on her own discretion because she wanted to finish up

5    something that was on her desk, so be it.  There she was.

6    There you are.  She would have put the extra time down.

7         Q.     Okay.  So even though she was not asked to

8    stay that extra time, I understand --

9         A.     Occasionally, yeah.

10        Q.     -- that's what you're saying.  Do you believe

11   that these records are accurate for the times that she was

12   actually in the office and leaving the office?

13        A.     Somewhat, yes.  I'm not going to say they're a

14   hundred percent accurate, no.

15        Q.     And do you have anything specifically to say

16   why they're not a hundred percent accurate?

17        A.     Do I have any written information

18   specifically?

19        Q.     Any kind of evidence?

20        A.     Yes.

21        Q.     And it is?

22        A.     It's the physical evidence of several people

23   in the buildings testimony that if need to be could tell you

24   so.

25        Q.     Okay.  Great.  Tell me who they are and what

1   they're going to say.

2        A.        Gary Wallace, Bo Babb, Scott Tatum, Chuck

3   Turner.

4        Q.        Gary, Bo, Chuck, Scott.  Tell me what Gary's

5   going to say?

6        A.        Gary will know when she was there and when she

7   wasn't, the same as I would.

8        Q.        But you don't know.

9        A.        I do know.

10       Q.        Okay.  Then are these right or wrong?

11       A.        They're wrong.

12       Q.        And so tell me what you saw?

13       A.        What I saw?

14       Q.        Yeah.  Tell me what you saw that makes you

15   think they're wrong.

16       A.        An empty chair.

17       Q.        When?

18       A.        When her hand was hurt.

19       Q.        Okay.

20       A.        Okay.

21       Q.        She was out two days?

22       A.        No, it was more than two days.  She was in

23   there with her husband a couple of the days standing in

24   Debbie's office talking about her hand.  She was out more

25   than two days.

1       Q.      All right.  Any other times?

2       A.      Yeah, when she was out sick with no doctor's

3   excuse to back it up.

4       Q.      Y'all required doctor's excuses?

5       A.      It was requested, yeah.

6       Q.      Do you require it?

7       A.      Huh?

8       Q.      Do you require it?

9       A.      Do we require it?

10      Q.      Doctor's excuses.

11      A.      Yeah, we do.

12      Q.      Okay.  And she didn't turn hers in, right?

13      A.      Not to my knowledge, she didn't.

14      Q.      And why was she not fired?

15      A.      Because I don't handle it that way.  I told

16  you we're not going to be like that.  We don't work that

17  way.  We're human, okay?  Everybody makes mistakes.

18      Q.      All right.  Let's go back.  You said Gary, Bo,

19  Chuck and Scott.

20      A.      Yeah.

21      Q.      What do you think Gary -- Gary just knows when

22  she was there and when she wasn't?

23      A.      I stepped in his office and I'd say where's

24  she at?  I don't know.  I was wondering the same thing.  I

25  said well, I don't know either.  Then I would come to find

1    out later oh, she's off today.  Okay.  It would have been

2    nice if I had known.  I had something I needed her to do

3    today.  Well, you'll have to get with Angela or Phyllis to

4    see if they can handle that for you.

5         Q.     How about Bo, what's Bo going to say?

6         A.     Pretty much the same thing.

7         Q.     Chuck?

8         A.     The same thing.

9         Q.     Scott?

10        A.     The same thing.

11        Q.     Do you know if any of these people actually

12   have anything written down about this?

13        A.     I've probably got a picture in my other phone

14   that I got watching her eat her lunch at her desk, if you

15   want to know the truth about it.

16        Q.     Terrific.  I'd like to have that.

17        A.     Okay.  I can do that.

18        Q.     I think that was covered by discovery as well.

19        A.     I can do that.

20        Q.     Why did you keep a picture of her eating at

21   her desk?

22        A.     Because I figured this would come up later.

23        Q.     Why?

24        A.     She would take an hour lunch, and then she

25   would come back and take an additional hour eating her lunch

1  at her desk.  That's two hours a day.  She admitted 70

2  percent of the time yesterday in her deposition that she

3  did.  That's two hours a day lunch.

4          Q.      Why did you think it was going to come back to

5  this?

6          A.      Because we were served notice.

7          Q.      That would have been notice in the complaint?

8          A.      Yeah.

9          Q.      All right.  That would have been in the last

10 couple of days.  So you took pictures of her --

11         A.      Last couple of days?  She was there for a long

12 time after we were served.

13         Q.      Perhaps, whatever time it was.  So you took

14 these pictures after?

15         A.      I just snapped one.  I said wow, look at that.

16 I said --

17         Q.      And that's fine.  If it was after that, that

18 makes sense.  I understand.

19                 All right.  And just to follow this up, I

20 understand that generically, you don't think she worked as

21 many hours as she records here; is that accurate?

22         A.      Right.

23         Q.      But you don't have any specifics to contradict

24 any particular day or week?

25         A.      I don't, and what we did have may be gone now.

1        Q.        And what was that?

2        A.        That folder I was telling you about earlier.

3        Q.        The one that --

4        A.        Had write-ups in it, had specific notes on

5    every -- on a lot -- each employee has one.

6        Q.        What makes you think there was any information

7    about her time in there, the time that she worked?

8        A.        I'm just saying specific notes were made.

9        Q.        On her time or the time she worked?

10        A.        On performance, okay.  That includes time,

11    whether you get to work on time or not.  Is yours kept up

12    with?

13        Q.        I recall you saying performance and mistakes,

14    I just did not recall you saying that you kept notes about

15    her attendance.  That's why I'm asking.

16        A.        Well, performance would be part of that.

17        Q.        Okay.  But you believe there were --

18        A.        You can't perform if you're not there.

19        Q.        You do believe there were attendance notes, is

20    what you're saying?

21        A.        I'm saying it's possible.

22        Q.        You're not sure?

23        A.        No, I'm not sure.

24        Q.        Okay.  Let's go onto Topics 15 -- actually,

25    it's 13 and 15.  I'm going to combine something.  This is

1  the idea of if you contend the Plaintiff agreed upon a

2  salary for all hours to be worked in a given work week, the

3  scope of that agreement, how it was reached.  And you've

4  referenced before that Ms. Ramsey was told that she was to

5  work a certain number of hours for her salary?

6      A.      Right.

7      Q.      Is that accurate?

8      A.      Uh-huh (affirmative).

9      Q.      And that was 45 -- was that 45 hours for her

10 salary, is that what she was told?

11     A.      Right.

12     Q.      And she was told that in your initial -- when

13 she first got there?

14     A.      Right.  We said -- she said what's the

15 position, the position is to do this, this, this, this, and

16 here's how much it pays and here's what the hours are.

17     Q.      Okay.  And did that 45 -- was she always

18 expected to work 45 hours a week for her salary?

19     A.      No.

20     Q.      When did that change?

21     A.      Was she always expected to work 45 hours a

22 week for her salary?

23     Q.      Yeah.

24     A.      We just said that was the particular hours.

25 If she needed to take off for anything, that she would never

1    been docked for it or anything like that.

2        Q.      Okay.

3        A.      So, you know, when she worked less, she worked

4    -- there wasn't any money taken away.

5        Q.      Okay.

6        A.      I didn't ever -- would expect her to work any

7    more than that without being compensated extra, if that's

8    what you're asking.

9        Q.      Yes, pretty much.  I mean when she was

10   originally told your salary would expect 45 hours, --

11       A.      Right.

12       Q.      -- that stayed consistent the entire time she

13   was there, right?

14       A.      Right.  And that was pretty much structured

15   off of a girl that would make probably only 10 or $11 at 40

16   and then five hours on overtime, is how we come up with the

17   gross pay.  So they already had overtime wages kind of

18   calculated into it.

19       Q.      Who told you to do it that way?

20       A.      That's the way I figured it up myself.

21       Q.      Okay.  Did you have any advice on that from a

22   professional HR person, lawyer, that sort of thing?

23       A.      As far as structure and pay like that?

24       Q.      Yes, sir.

25       A.      No, I came up with it myself on paper of what

1  the going rate was for some of the businesses in the

2  neighborhood, otherwise, the rest of them wouldn't have been

3  making but 420 a week.

4      Q.      Okay.  Let's turn our attention then to Topic

5  14 regarding benefits.  I understand that Wallace offered

6  health insurance?

7      A.      Uh-huh (affirmative).

8      Q.      Any other benefits Ms. Ramsey was offered?

9      A.      Other than vacation pay and holidays, that's

10  all any of us get.

11      Q.      And how much did the company -- did Ms. Ramsey

12  -- what percentage of her health care costs?

13      A.      I couldn't answer that if it's -- whether it's

14  the same as the rest of the people that are there or whether

15  it was different.  I don't -- I don't remember.  All that

16  changed when the new insurance laws come out.  So I couldn't

17  tell you.  That's a Debbie question.  I can't answer that.

18      Q.      Okay.  Did y'all work a Saturday to Sunday

19  work week or a --

20      A.      Yeah.

21      Q.      -- Sunday to Monday?  How did you work --

22      A.      We worked from Monday to Sunday.

23      Q.      Monday to Sunday, thank you.  That's Topic 15.

24              Topic 17, discipline or criticism, Plaintiff's

25  work performance.  We covered some of this before.  As I

1  understand, there was never any formal write-ups or

2  discipline about her attendance.

3       A.      About attendance?

4       Q.      Yes, sir.

5       A.      No.

6       Q.      I understand there was really never any formal

7  write-ups or discipline regarding really anything.

8       A.      Field workers is usually the only -- that's

9  the only time we've ever had a problem with anybody for 35

10 years, is people in the field.  Okay.  Your office employees

11 pretty much had a lot of leniency to come and go as they

12 pleased, if they needed, if they had a doctor's appointment

13 or needed a day off, there's never been a problem.  I mean

14 I've never had this issue.  Anybody that's ever had an issue

15 has always come and said hey, Phil, I've got an issue, and

16 we'd handle it.

17      Q.      Okay.  Let's push on then to Topic 18.

18              MR. BRIDGERS:  Do you need a break or

19         anything?

20              THE WITNESS:  I'm fine.  Do you need

21         one?

22              MR. BRIDGERS:  Not yet.

23              THE WITNESS:  Okay.  Good.

24 BY MR. BRIDGERS:  (Resuming)

25      Q.      Topic 18, Defendant's reason, both subjective

1    and objective, for believing it had acted in good faith or

2    paid Plaintiff in compliance with the Fair Labor Standards

3    Act, including any investigation made by the Defendant in an

4    attempt to comply with the law.  Have you -- I mean you know

5    what the Fair Labor Standards Act is, right?

6         A.     Yes.  And everything that I had read online

7    previously, we were complying with completely and I had

8    asked advice before.  From what I explained to them, they

9    said that I was -- sounded like I was in compliance.

10        Q.     Okay.  And just to go through, you understand

11   generally the Fair Labor Standards Act covers payment of

12   minimum wage and overtime, right?

13        A.     Right.

14        Q.     And you said you've done some research online?

15        A.     Right.

16        Q.     When did you first do that?

17        A.     Probably about -- the first time was probably

18   about ten years ago.

19        Q.     Okay.  And what brought that to your attention

20   ten years ago?

21        A.     Just different people that we were hiring from

22   time to time within the office and when I was discussing on

23   whether to change Bo Babb from hourly to salary.  That's

24   what made me initially start looking.

25        Q.     Okay.  And you said you went out and asked for

1    some advice?

2         A.      That was a lot later.

3         Q.      Okay.  And when?

4         A.      It's probably been a couple of years ago.

5         Q.      And who did you ask that advice of?

6         A.      That's when I called Will.

7         Q.      Just to be clear, Will, who?

8         A.      White.

9         Q.      Okay.  And that was a couple of years ago?

10        A.      Yeah, it was probably, I don't know, three or

11   four years ago.

12        Q.      And would that have been before Ms. Ramsey was

13   hired?

14        A.      Oh, yeah.

15        Q.      Okay.  What did you tell him?

16        A.      Well, I explained to him the tasks that each

17   individual did for the best I could, and he said that from

18   what I described to him it sounded like that we were just

19   fine.

20        Q.      Okay.  Did you provide him with any documents?

21        A.      No.

22        Q.      Anything written down?

23        A.      No.

24        Q.      How long was that -- was that a telephone

25   conversation?

```
 1        A.        It was a telephone conversation, if I remember

 2   right.

 3        Q.        It lasted five minutes, ten minutes?

 4        A.        No, no.  It probably went on for 20, 30

 5   minutes.

 6        Q.        Okay.  Would you have been billed for that?

 7        A.        Yes, sir.  Well, yeah, yeah, I would have.

 8   I'm pretty sure I would have.

 9        Q.        So a 20, 30-minute --

10                  THE WITNESS:  You might have done it for

11             free, did you?

12                  MR. WHITE:  I don't know.

13   BY THE WITNESS:  (Resuming)

14        A.        Do what now?

15        Q.        So a 20 to 30-minute call.  Who did you tell

16   him about, I mean just in general?  Did you tell him about

17   all your employees or a particular type of employee?

18        A.        I was just talking about general -- general

19   office and some of the guys in the office, the girls in the

20   office and things of that nature.  And we kind of touched on

21   a lot of areas there and all, because, you know, for the

22   most part, we had all been working anywhere -- used to

23   working for 60, 70 hours a week for salary.  That's what

24   myself and my brother had always worked.  And when we

25   started putting some of the other people on salary in there,
```

1    as far as the women was concerned, of course, they never

2    even touched near that many hours.  That was just us.

3         Q.      So you wouldn't have expected that, would you?

4         A.      No, no.  I wouldn't have expected that.

5         Q.      I'm sorry?

6         A.      No, I just wouldn't have expected to have

7    anybody to do.  I mean my wife came from a car dealership

8    before she came to us, and they were always used to working

9    anywhere to 55 to 70 hours a week on salary over there.

10        Q.      So when you talked about -- you did your --

11   you described what the guys and the girls in the office did

12   in this 20 or 30-minute phone conversation, right?

13        A.      Uh-huh (affirmative).

14        Q.      And then what was the response, as clear as

15   you can remember exactly?

16        A.      Well, if -- the response was that if they fell

17   under certain categories, which we were reading off to each

18   other at that point, the way the Labor Law read, that as

19   long as they fell into those categories, that we would be

20   fine.  I mean if there was -- if a person had liberty of

21   pricing and spending without each and every item being

22   okayed by someone else first, then they fell in the category

23   pretty much, and as well as anybody that may have other

24   people under them fell into that category too, so.

25        Q.      And this was before Ms. Ramsey came to work,

1   right?

2        A.      Yeah.

3        Q.      And did you have anything that documents that

4   conversation?  Did you receive any kind of letter or opinion

5   or memo or anything of --

6        A.      Debbie would, she probably can remember and

7   possibly even has something documented on there, because she

8   was involved in the conversation as well.

9        Q.      Okay.  Who else was involved in the

10  conversation?

11       A.      Just me, Debbie and Will.

12       Q.      And when you say involved, like y'all are

13  literally on the phone together?

14       A.      Yeah.  I think we had the speaker phone on.

15  It's been a long time ago.  I'm trying to remember.

16       Q.      Does the company intend to rely on that advice

17  in this lawsuit?

18       A.      Yeah.  As far as I know, it still stands

19  strong to be the truth.

20       Q.      Okay.  So the company --

21       A.      And I still don't see where we're in any error

22  in any way.

23       Q.      Is the company going to have Mr. White

24  testify?

25               MR. WHITE:  No.  No, I do not intend to

 1      testify.

 2   BY MR. BRIDGERS:  (Resuming)

 3      Q.      Was there anybody else in the law firm

 4   involved?

 5      A.      In that, no.

 6      Q.      In that conversation, yes, sir.

 7      A.      No, not in the conversation.  We called David

 8   Waldrop, which works here, one of the attorneys here,

 9   because he's been handling the other issues for us.  And I

10   said, you know, I got some questions.

11      Q.      And just to be sure, don't tell me much,

12   unless you're talking about -- did you have a conversation

13   with him about how to pay people?

14      A.      No.

15              MR. WHITE:  Object.  Just so you're

16          clear, the only -- the only thing attorney-

17          client-wise that you can talk about is about the

18          Fair Labor Standards Act.  We don't want to

19          waive our privilege on anything else.

20              THE WITNESS:  I understand.

21   BY THE WITNESS:  (Resuming)

22      A.      He told me that David was the guy I needed to

23   talk to.

24      Q.      Okay.  All right.  Other than that 20 or 30-

25   minute telephone conversation, did you do any -- and your

1   web research, did you do any other investigation as to how

2   Ms. Ramsey should be paid?

3       A.      This had nothing to do with Ms. Ramsey, but as

4   far as salaried people to be paid, yeah, I did more

5   research.

6       Q.      Tell me, like what?

7       A.      Well, I mean just because my -- my nephew had

8   had a small company once before his self, and he went

9   through the Fair Labor Act his self and read through it all,

10  and he even talked to a few people, and thought -- you know,

11  he told me, he said, you know, we should be in compliance

12  and without a problem doing this, this or this.  I mean, you

13  know, we just talked about it.  It wasn't having anything to

14  do with Rebecca, it was just about in general how the people

15  are worked.

16      Q.      And who's your nephew?

17      A.      Shannon Whiter.

18      Q.      The nephew that works with you?

19      A.      Yeah.

20      Q.      Okay.  All right.  Anything else, any other

21  investigation?

22      A.      No.  I mean, other than -- other than -- the

23  way I try and do things is I don't just jump into things

24  cold.  And try and investigate things best I can to make

25  sure that I'm doing things right before I start.  That's why

1   this has all been such a surprise.

2       Q.      Did you check with any government agency about

3   how to pay people on salary or not on salary?

4       A.      No.   It's pretty much written online right

5   there what's right and what's wrong, unless there's

6   loopholes I don't know about.

7       Q.      Turning our attention then to Topic 19,

8   factual basis for the company's claims its actions were not

9   willful, such as to extend the Statute of Limitations for

10  Plaintiff's claim for three years.   From understanding your

11  earlier testimony, is it even as of today, do you believe

12  that you paid Ms. Ramsey correctly?

13      A.      Yes, sir.

14      Q.      And even looking back today, you would not do

15  anything different than you've done?

16      A.      No.   I mean, like I say, I thought I was in

17  compliance the whole time and still feel like I am.

18      Q.      And the way she was paid was not a mistake in

19  any way, right, it's what you intended?

20      A.      Yeah.   It's what was discussed, it's what was

21  accepted by her, and that's what we did.

22              MR. BRIDGERS:   All right.   Let's just

23          take a short break.

24              (Whereupon, a brief recess was taken.)

25              (Whereupon, the above-entitled matter

1          was concluded at 3:05 p.m.)

2                              o0o

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF COURT REPORTER

2    STATE OF GEORGIA      )

3    COUNTY OF FULTON      )

4         I, Micah Smith, Certified Court Reporter, B-1266,

5    hereby certify that the foregoing transcript of deposition

6    as stated in the caption consisting of page 2 through 188,

7    was taken down by me and then transcribed under my

8    supervision, and that the same is a true, correct, and

9    complete transcript of the evidence given by the witness,

10   PHILLIP HOWARD WALLACE, SR., who was first duly sworn by me.

11        I further certify that I am a disinterested party to

12   this action and that I am neither of kin or counsel to any

13   of the parties hereto.

14        This certification is expressly withdrawn and denied

15   upon the disassembly or photocopying of the foregoing

16   transcript, unless said disassembly or photocopying is done

17   by the undersigned certified court reporter and original

18   signature and seal is attached thereto.

19        IN WITNESS WHEREOF, I hereby affix my hand on this the

20   14th day of May, 2014.

21

22        MICAH SMITH

23        CERTIFIED COURT REPORTER, B-1266

24

25

1                           DISCLOSURE

2   STATE OF GEORGIA        Deposition of PHILLIP H. WALLACE, SR.

3   COUNTY OF FULTON

4

5         Pursuant to Article 8.B of the Rules and Regulations

6   of the Board of Court Reporting of the Judicial Council of

7   Georgia, I make the following disclosure:

8         I am a Georgia Certified Court Reporter.  I am here as

9   an independent contractor.

10        I was contacted by the offices of DELONG CALDWELL

11  BRIDGERS & FITZPATRICK, LLC to provide court reporting

12  services for this deposition.  I will not be taking this

13  deposition under any contract that is prohibited by O.C.G.A.

14  15-14-37 (a) and (b).

15        I have no contract/agreement to provide reporting

16  services with any party to the case, any counsel in the

17  case, or any reporter or reporting agency from whom a

18  referral might have been made to cover this deposition.  I

19  will charge its usual and customary rates to all parties in

20  the case, and a financial discount will not be given to any

21  party to this litigation.

22

23

                      Micah Smith
24                    Certified Court Reporter, B-1266

25

```
 1    MS/t/sm/6/18/14

 2                    E R R A T A S H E E T

 3         I hereby certify that I have read the foregoing and
      within pages 2 through 188 and no changes are required:
 4

 5                         PHILLIP HOWARD WALLACE, SR. - 30(b)(6)

 6         Sworn to and subscribed before me this
      day of                          , 2014.
 7

 8                         NOTARY PUBLIC

 9         My commission expires

10                        * * * * * * * * * * * * *

11         I hereby certify that I have read the foregoing and
      within pages 2 through 188 and I wish to make the following
12    changes:

13    Page:        Line:
      Page:        Line:
14    Page:        Line:
      Page:        Line:
15    Page:        Line:
      Page:        Line:
16    Page:        Line:
      Page:        Line:
17    Page:        Line:
      Page:        Line:
18

19                         PHILLIP HOWARD WALLACE, SR. - 30(b)(6)

20         Sworn to and subscribed before me this
      day of                          , 2014.
21

22                         NOTARY PUBLIC

23         My commission expires

24

25
```