IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

REBECCA RAMSEY,                    )
                                   )
        Plaintiff,                 )
                                   )   CIVIL ACTION FILE
vs.                                )   NO: 1:13-CV-03808-WSD
                                   )
WALLACE ELECTRIC COMPANY,          )
and PHILLIP WALLACE, SR.,          )
                                   )
        Defendants.                )


        The continuation of the 30(b)(6) deposition of

PHILLIP HOWARD WALLACE, SR., ON BEHALF OF WALLACE ELECTRIC

COMPANY, taken pursuant to notice for discovery, cross-

examination and all purposes under the Federal Rules of

Civil Procedure; all formalities waived, excluding the

reading and signing of the deposition; before Susan E.

McKoy, Court Reporter in and for the State of Georgia;

commencing at 2:10 p.m., on Friday, May 23, 2014, at 2200

Keys Ferry Court, McDonough, Georgia.



                        Susan E. McKoy, CCR
                        12659 Itaska Walk
                        Milton, Georgia  30004
                        (404) 388-3840 (cell)
                        susanmckoy5@gmail.com

```
 1                 A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF:

 3         DELONG CALDWELL BRIDGERS & FITZPATRICK, LLC
           BY: CHARLES R. BRIDGERS, ATTORNEY AT LAW
 4         3100 Centennial Tower
           101 Marietta Street
 5         Atlanta, Georgia  30303
           (404) 979-3150
 6         (404) 979-3170 (Facsimile)
           charlesbridgers@dcbflegal.com
 7

 8   ON BEHALF OF THE DEFENDANTS:

 9         SMITH, WELCH, WEBB & WHITE, LLC
           BY: WILLIAM A. WHITE, ATTORNEY AT LAW
10         2200 Keys Ferry Court
           Post Office Box 10
11         McDonough, Georgia  30253-0010
           (770) 957-3937
12         (770) 957-9165 (Facsimile)
           wwhite@smithwelchlaw.com
13

14   ALSO PRESENT:

15         Rebecca Ramsey

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2                                              Page

3    Cross-examination by Mr. Bridgers . . . . .  4

4                   E X H I B I T S

5    Exhibit        Description        Page marked/identified

6          (No exhibits were marked for identification.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
                        Transcript codes
22
          --       interruption/change in thought
23        ...      incomplete thought
          (sic)    denotes word/phrase that may be strange or
24                 incorrect, has been typed verbatim
          (ph)     phonetically spelled
25        (unintelligible) not capable of being understood

```
 1                    P R O C E E D I N G S

 2                                         2:10 p.m.

 3              (Witness previously sworn.)

 4              MR. BRIDGERS:  This will be the second

 5         volume of the deposition of Wallace Electric

 6         Company taken pursuant to notice under the Rule

 7         30(b)(6) of the Federal Rules of Civil

 8         Procedure.

 9              Mr. Wallace, good afternoon again.

10              THE WITNESS:  How are you doing?

11              MR. BRIDGERS:  I continue to be Charles

12         Bridgers, I continue to ask you questions today.

13         You understand that you've already been sworn

14         and this is just a continuation where we had to

15         pause for everyone's schedule from last time?

16              THE WITNESS:  That is correct.

17              MR. BRIDGERS:  Very well.

18    Whereupon,

19              PHILLIP HOWARD WALLACE, SR.

20    was called as a witness herein and, having been previously

21    duly sworn, testified as follows:

22                   CROSS-EXAMINATION

23    BY MR. BRIDGERS:

24         Q.     The transcript for your first deposition has

25    been prepared.  Have you had a chance to review it?
```

1        A.        No.

2        Q.        Is there anything that you recall saying at

3   the last deposition that you think you ought to clarify or

4   change?

5        A.        No.

6        Q.        What I'd like to do is kind of turn our

7   attention back to the 30(b)(6) notice and we'll just kind of

8   start working on through that, but ask some follow up

9   questions.  We can get out of here at a reasonable time.

10            We've talked about topic 21, let me turn our

11   attention to topic 22.  And what I can do, we don't have the

12   loose exhibits, but if you would like to follow along with

13   the topics, it's here under Exhibit 1.  Your choice

14   obviously, but instead of having loose exhibits, we have

15   them bound up at this point.

16            Mr. Wallace, on a daily or weekly basis, how

17   much time would you spend in the same room with Ms. Ramsey?

18        A.        In the same room?

19        Q.        Yes, sir.

20        A.        In the same room --

21        Q.        Or in the same office or within sight?

22        A.        Within sight.  Well, I guess I would walk back

23   and forth past her office door at least 25 times a day going

24   from the CAD operators office back to my own.  And then in

25   and out of her office whether I was seeing her or Angela

1    either one, five or six times a day.

2         Q.       Okay.  25 times a day, that would be every 15

3    minutes, about?

4         A.       I have long days, so, you know, it may be as

5    much as 30 minutes.

6         Q.       I just don't know the outlook, can you see

7    into a door, can you see through a window?

8         A.       Yeah, when I'd come down the hall, you're

9    walking straight towards where she would sit and then I

10   would turn to have to go to my office and all, plus our

11   business is you're not sitting at a desk.  Our business

12   you're up and involved a lot and so was she, from one end of

13   the building to the other, back and forth, from one end of

14   the office to the other, doing her job as well as me doing

15   mine.

16        Q.       In those five or six times that you might have

17   gone into her office on a daily basis to see either her or

18   Angela, did you say?

19        A.       Yeah.

20        Q.       I mean, how long did you stay?  Were you in

21   there an hour a day, 15 minutes a days?

22        A.       It varied.  I may be in there anywhere from a

23   minute to 20/30 minutes depending on what all we were having

24   to discuss on a job cost or a breakdown of -- of, you know,

25   where all the invoices and time was gathered, you know,

1   where she had pulled a job together for me to make sure

2   everything was pulled together to do cost checks or

3   whatever, I mean.

4       Q.      How many days a week were you in the office?

5       A.      How many days a week were I -- was I in the

6   office?

7       Q.      I just don't know if you're out typically, out

8   of the office, in the office --

9       A.      No, I'm there every day.

10      Q.      Okay.  And so you're saying that your time

11  could vary between a few minutes and an hour or so a day

12  with her?

13      A.      Each visit or a day?

14      Q.      How about a day?

15      A.      A day?  It could be anywhere from three to

16  four hours a day, just depended on what we were working on.

17      Q.      Well, on average, can you give me even an

18  estimate?

19      A.      Not really.  Not really, I mean, I couldn't --

20  there's no average to that.

21              MR. BRIDGERS:  Turning our attention to

22          topics 23 through 29, I'm understanding that the

23          Defendant is not contesting jurisdiction under

24          the act; is that a fair statement?

25              MR. WHITE:  That's fair.

1          MR. BRIDGERS:  All right.  That takes

2     out a whole lot.

3          THE WITNESS:  I don't know what that

4     means, so that's fine.

5  BY MR. BRIDGERS:  (Resuming)

6     Q.      Turning our attention to topic number 30, any

7  exemption you claim altered the company's obligation to pay

8  either a minimum wage or overtime premium.  This is pretty

9  much all about overtime.  So I understand the company's

10  position is that it is claiming the administrative

11  exemption; is that true?

12          MR. WHITE:  Yes.

13  BY THE WITNESS:  (Resuming)

14     A.      Yes.

15          MR. BRIDGERS:  Yeah, I mean obviously.

16     Is the company going to be claiming an executive

17     exemption?

18          MR. WHITE:  No.

19          MR. BRIDGERS:  Thank you.  And that

20     short circuits us a lot as well.  I appreciate

21     that.

22  BY MR. BRIDGERS:  (Resuming)

23     Q.      I want to go over a couple of areas and

24  looking basically at topics number 31 and 33 of this topic

25  list.  And that's the duties of the Plaintiff related to

1    management and general business operations.  I see you're

2    following along, but also the duties of the Plaintiff in the

3    following functional areas.  I'm going to ask you about a

4    couple of those areas.

5         A.       I'll let you ask me since I can't read most of

6    this the way it's worded, so.

7         Q.       No, absolutely I'm going to ask you.  I'm just

8    going to let you know we're on topic 31 and 33.  And I'm

9    going to try to keep it limited to only that so I understand

10   what's at issue from the request to admit.

11             What were Ms. Ramsey's responsibilities as to

12   budgeting for Wallace Electric?

13        A.       As for budgeting?

14        Q.       Yes, sir.

15        A.       I guess that would be what we had talked about

16   once before.

17        Q.       Which was?

18        A.       On the property management companies were --

19   budgets were established for what the cost would be for

20   repairs in any of the stores that we had property management

21   companies calling us on.

22        Q.       So is the budget you're referring to then the

23   budgets for certain jobs?

24        A.       Yes.

25        Q.       All right.  Did Ms. Ramsey prepare a budget

1    for Wallace Electric?

2           A.       No one prepares budgets for Wallace Electric.

3    I don't really understand that question.

4           Q.       And when you say budgets for a particular job,

5    tell me about that in a little bit more detail if you would?

6           A.       Well, I would prepare budgets for my jobs,

7    whether it be budget for a future job coming up that you did

8    not have hard information on so that you could prepare a

9    hard quote.  That was my job as well as the other project

10   managers, and she was primarily doing what she needed to on

11   service as far as budgets, like I say, for property

12   management companies.  She had --  She knew what she needed

13   as far as what rates to use within a certain window like we

14   discussed before.  And what certain window of percentages to

15   mark up on material when the customer would tell her what

16   part numbers that she would call in and get prices on from

17   suppliers.  And that's the only budgeting that any of us

18   would do.

19          Q.       Okay.  Let's go back to this, this idea of

20   this window of rates.  Can you give me some more detail

21   about what windows that you claim that she had, what she

22   could vary those rates from?

23          A.       Yeah, I mean, it's the same thing I said

24   before.  You have a window from $30/$35 bucks an hour

25   depending on who the customer is up to sometimes as much as,

1   you know, $55/$65 an hour.  It just depended on who it was.

2      Q.      And it's your testimony that she could make a

3   decision on her own to charge 100 percent more, I mean, 30

4   to 60?

5      A.      She knew what she needed to do in what areas

6   and what extent to do it.  I mean, obviously if you had a

7   job that -- an industrial customer, it was a higher rate and

8   she would usually let it, you know, vary from 48 to 55.  And

9   then with these property management companies, each one of

10  those had their own negotiated rate which she knew, not me.

11     Q.      Okay.  So with the property management there

12  was a negotiated rate, right?  I mean that's the rate that

13  she could charge was what was negotiated by the company,

14  correct?

15     A.      Somewhat, yes.

16     Q.      Well, tell me when that did not apply to a

17  property management?

18     A.      When that would not apply with a property

19  management company was depending on the distance that we

20  would have to travel to that job, it would vary.

21     Q.      Well, as I understand what you're saying, it

22  was a negotiated rate, can she change what the company has

23  negotiated?

24     A.      Yeah, she could change it to quote it, sure

25  could, for the budget.  Doesn't mean you're going to get the

1    job.  You can change it all day long.  She can't change it

2    to bill them.  We can change it to quote it.  You asked for

3    a budget, that's what budget means, okay?  Budget means

4    you're preparing a cost to give to someone to see if it's

5    accepted or not.  That's how you establish your budget for

6    the job.  Now, you either meet the budget or you don't meet

7    the budget.

8          Q.    So otherwise --

9          A.    Get your questions right.

10         Q.    Otherwise known as a quote?

11         A.    No.  It's a budget quote.

12         Q.    It's a budget quote.  Very well.

13         A.    There you go.  In the construction world, we

14   have certain lingo, so I was using ours.  I don't know which

15   ones you were using.

16         Q.    All right.  You said she had the ability to

17   vary a rate between 48 and $52; is that what you said?

18         A.    No, that's not what I said.

19         Q.    All right.

20         A.    48, 55, 65.

21         Q.    And what were those for?

22         A.    Anywhere from your typical service work to

23   industrial customers and residential as far as that's

24   concerned.

25         Q.    So there's different rates for the different

1  types of customers, right?

2       A.      Whatever you felt like that you could possibly

3  get.  And she knows how that works and she knew how that

4  worked as well as the rest of us in there that quoted things

5  and gave numbers out.  Some of the other people never gave

6  numbers out.  Rebecca got quite good at it after a while and

7  she knew how to feel the customers out in what area.  I

8  mean, if you've got somebody questioning you constantly

9  about, well, how much is this, how much is that, how much is

10  this, well, obviously they're not going to want to pay very

11  much, so you keep your rate down.  People that don't

12  question it that much, we try and go ahead and get our

13  premium rate which is basically what keeps us in business.

14       Q.      So you said she had this discretion to quote a

15  rate between 48 and $65 dollars for your primary customers?

16       A.      For the most part, yeah.  Other than the --

17  Other than the long-term commercial customers where we have

18  a lot of hard, good work with.  And then you have to keep it

19  down more so around the -- the job costs with just ten

20  percent.  Which is $28.50 plus your ten percent.

21       Q.      And then this 48 to 65 range, --

22       A.      Uh-huh (affirmative).

23       Q.      -- explain it to me one more time.  48 was for

24  who?  What type of customer generally would get $48?

25       A.      Southern Federal Credit Union, Great Dane

Page 14

1    Trucking.

2         Q.      What type of customers were those, not

3    necessarily the names?

4         A.      Just standard commercial customers.

5         Q.      Standard commercial?

6         A.      Yeah.

7         Q.      Okay.  How about the $55 rate?

8         A.      I'm trying to remember.  She knew more of that

9    than I did.  I'd have to look back at the sheet.  The 55 was

10   industrial and I think we actually charged some of the

11   residential out at that much, but I can't swear to that.

12   Don't --  Can't guarantee you that.

13        Q.      How about $65?

14        A.      That was definitely some of my brother's

15   industrial customers there.

16        Q.      Okay.  And are these rates that she would have

17   received input from you as to what to charge the customer?

18        A.      It was discussed openly.

19        Q.      Okay.  And then she just --

20        A.      She would help us establish that because, you

21   know, any time you got anybody that pays by credit card,

22   this, that and the other, where there's an additional fee

23   charged back to the company because of the way they paid,

24   well, therefore that knocks the profit away from your --

25   your business, so therefore you have to charge them a little

1   bit more to compensate for it, or however much paperwork

2   they have to go through to gather, that involves more of

3   their time, which involves more that you have to build into

4   the numbers.  So that's very -- she could fill me in on how

5   much labor she had to put into something to prepare

6   something because of the way it needed to be billed.  So

7   therefore that makes the rate a little more.  So her input

8   would help us establish that rate if that's what

9   you're asking.

10       Q.      How much time did she spend each week making a

11  distinction between what rates to charge people?

12       A.      I don't know.  You'd probably have to ask her

13  that question.  I'm sure that that was probably a, you know,

14  we may --

15       Q.      So you wouldn't --

16       A.      -- we go -- we may -- you go ahead ask it.

17       Q.      So you wouldn't know is what you just said?

18       A.      No, I didn't say that.

19       Q.      All right.  Do you know on average how much

20  time she spent each week making the distinction between what

21  rates to charge these customers?

22       A.      That doesn't stay the same week to week.  We

23  may go six months and not have to establish that, then she

24  could work a whole week to establish that.

25       Q.      So it could go as far as --

1       A.      And then that customer's locked in from that

2  point on for quite some time.

3       Q.      Okay.  So this may not happen on a daily

4  basis, right?

5       A.      No, we're not Wal-Mart, sir.  We don't have a

6  different customer every day.

7       Q.      Doesn't happen on a weekly basis, does it?

8       A.      Yes, it does.  It can happen on a weekly

9  basis.

10      Q.      Okay.  So some weeks go by where it does not

11 happen, right?

12      A.      Uh-huh (affirmative).  Right.

13      Q.      So months go by where this does not happen,

14 right?

15      A.      It might.  It could.  It's possible.

16      Q.      And then perhaps it --

17      A.      I mean, it's possible for me to go that far

18 and I'm the owner.

19      Q.      Possible for you to go as much as six months?

20      A.      Absolutely.

21      Q.      Now, --

22      A.      So she was an equal to me as far as that's

23 concerned if that's what you're asking.

24      Q.      Okay.  Actually, perhaps I didn't understand

25 earlier, but generally these rates are established when the

1   customer first comes in?  Is that what I'm -- I didn't

2   understand that earlier.  Are you saying that generally

3   these rates are established and they pretty much -- when the

4   customer first comes into the company?

5        A.      Yes.

6        Q.      And those rates are pretty consistent out into

7   the future?

8        A.      Fairly consistent, yeah, depending on --

9   depending on the type work that it is.  And those rates are

10  established with what information that she would gather and

11  bring to me, and we would sit down and discuss what needed

12  to be done, how it needed to be done, what the procedure was

13  going to be, if it involved a lot of the inside work in the

14  office, the rates had to be more to compensate for that.

15       Q.      Are you saying, then, that these numbers were

16  chosen in consultation with you or that what companies got

17  what rates or were chosen?

18       A.      I don't understand the question.  Ask it

19  again.

20       Q.      So you were in consultation with her about

21  what rates the company is charged, right?

22       A.      Yes.

23       Q.      And did you speak with her and in consultation

24  with her about the rates that applied to each individual

25  customer?

1      A.      Sure.  Her and Angela both.

2      Q.      And we've been kind of talking this range from

3  the 48 to 65, these different types.

4      A.      Uh-huh (affirmative).

5      Q.      You'd said there was also a 30 to 35, was that

6  the property management group?

7      A.      No.  That's more the --  That's more the

8  charges on extras that were on hard bid jobs.

9      Q.      Charges for extras?  I'm not sure I understand

10  what you're saying.

11      A.      Change orders for hard big jobs.

12      Q.      Okay.

13      A.      Any time you quote a job like this building

14  right here, maybe two or 300,000, and then the customer

15  along the way wants to add things to it, you're not going to

16  hit them at 48 or 55 an hour, you can't.  You can't get away

17  with it because the reason why is because you're charging

18  the general contractor, then the general contractor is

19  putting his markup on it.  And it may end up at that fee by

20  the time it gets to the end user, but I can't get away with

21  it.

22      Q.      Okay.  So the $35 rate that you told us about

23  earlier is generally change orders, right?

24      A.      Can be.

25      Q.      More often than not?

1       A.      Can be change orders because that's what the

2  flat rate is typically on putting a quote together on a

3  building like this.  So that's the rate on a building like

4  this as well.

5       Q.      Okay.  So the typical rate of 30 to 35 would

6  be something that Ms. Ramsey would have known from the fact

7  that this was a change order or was something on a fixed

8  bid?

9       A.      And she knew it because she prepared all the

10 job costs together, which is the guys hourly or eight plus

11 30 percent plus $5 burden.  So she knew how that balanced

12 out and came out.

13      Q.      Okay.  And these were the standard rates that

14 the company charged?

15      A.      Pretty much, yeah.

16      Q.      We talked about purchasing at some point and

17 other detail, and Mrs. Wallace, your wife, told us about

18 some purchasing of office supplies, that sort of thing as

19 well.  In terms of at least the office, Ms. Ramsey's office

20 duties, do you believe that your wife would be in a better

21 position to understand what she did and did not do?

22      A.      Yeah, that's why I told you those were Debbie

23 Wallace questions last time.

24      Q.      Okay.  And she deferred to you for field

25 questions.

1      A.      Yeah.

2      Q.      So getting back to this idea of purchasing,

3  can you tell me what was the most significant role Ms.

4  Ramsey had in the functional area of purchasing?  We'll

5  stick with supplies now because we got the office stuff

6  covered earlier this morning.

7      A.      Okay.  Her purchasing would be more so on the

8  property management side like we talked about before when

9  she would be given a list, whether it'd been from the

10  customer or from one of the lead guys when they went out and

11  made a sight visit and said here, this is what I need, part

12  number this, that, and another, manufacturer number, name

13  brand this.  She would call the suppliers, they would give

14  her the prices, she would then turn around and put the

15  percentages on them she needed to and used the rates that we

16  had discussed before, and give the customer, you know, hey,

17  here's -- here's your price on this, that, and another.

18      Q.      And I think you told me that the markups on

19  the supplies were fixed?

20      A.      Well, depending on the customer and depending

21  on -- yeah, I mean, it would vary anywhere from ten percent

22  to 50 percent.

23      Q.      But that would all be decided depending on who

24  the customer was?

25      A.      And what the volume was.  If there was larger

1    volume, she knew not to mark it up as much, and depending on

2    what type part it was too.

3          Q.     Now, how would she know that?

4          A.     She knew that panel boards, transformers and

5    things of that nature that had larger costs to them,

6    individual costs to them, some circuit breakers that were

7    maybe two or $3,000 a piece, you can't very well put 50

8    percent on those.  You might go ten percent on it and not

9    get questioned, but you're not going to put 50 percent on

10   it.  A 25 cent item, you can put 50 percent on.

11         Q.     Okay.  So that was something that she was

12   taught to do as to what the company could -- I don't want to

13   say get away with, --

14         A.     Right.

15         Q.     -- but what the company was able to charge its

16   customers?

17         A.     Right.  Since she had electrical background

18   from her dad being in the business, she was more versatile

19   at being able to do that kind of stuff than anybody.  She

20   basically was the only girl in the office that was involved

21   in all of that kind of stuff with the -- with us project

22   managers.

23         Q.     And did she run those charges by the project

24   managers before they were --

25         A.     No.

1        Q.       -- purchased?

2        A.       No.

3        Q.       At any time?

4        A.       At any time?  Maybe once or twice, you know,

5    if she felt like she needed to.  Other than that, she knew

6    what to do.  She ran with it.

7        Q.       Okay.  How much of her day or week was taken

8    up by making these decisions about purchasing?

9        A.       Well, I mean, you know, that varies too.

10   That's a --  That's a -- how many times have you had a flat

11   tire, I mean, you know what I'm saying.  I --

12       Q.       Well, I'm just trying to --

13       A.       How do you -- you can't nail some of these

14   things down.  I mean, you know, like I say, we're not a bag

15   boy at a grocery store here, so.

16       Q.       Well, in a given month, how many hours do you

17   think she spent making decisions about purchasing?

18       A.       Probably 25/30 percent of it anyway, at least.

19       Q.       25 to 30 percent of her entire day --

20       A.       You asked and that's what I'm telling you.

21       Q.       -- or week?

22       A.       Yes, sir.  That's what I feel like.  Best I

23   can tell you.

24       Q.       Well, and what's that based on?

25       A.       Based on as many times as I seen those type

Page 23

1    tickets pass through my desk of what I knew she had to

2    quote.  Those tickets would cross my desk when it come time

3    for billing.

4         Q.      What were her duties in the areas of safety

5    and health?

6         A.      Safety was preparing the MSDS catalogs, I

7    know, and OSHA books, I believe, for Scott Tatum, if I'm not

8    mistaken.  I know she was involved in it some.  And as far

9    as any other areas would have been Debbie's areas with

10   insurance if that's the same thing you're asking.

11        Q.      What does putting an MSDS catalog together

12   entail?

13        A.      That's your sheets on chemicals.

14        Q.      Material Safety Data Sheet?

15        A.      Right.

16        Q.      What does that entail, making a catalog?

17        A.      It entails having to retrieve the safety data

18   sheets from each product, whether it be from the internet or

19   from a supplier, gather it together on every material that's

20   going to a specific job and putting it together in a three-

21   ring binder.

22        Q.      Okay.  So that was pulling information off the

23   internet per product and putting it in a binder?

24        A.      Right.  Or from a supplier.  She would have to

25   call and request it.

1      Q.      And what was that OSHA thing you mentioned?

2      A.      As far as any OSHA sheets that she would have

3   to put together and OSHA reports that my safety director,

4   Scott Tatum, would need.

5      Q.      I'm not sure what that is.  What do you mean

6   OSHA sheets or reports?  You mean --

7      A.      Well, you're supposed to --

8      Q.      -- after accidents, pre stuff?

9      A.      No.  You're supposed to build a catalog where

10  you have periodic safety meetings and all.  And those were

11  sheets that were gathered and put together in a catalog.

12  Like I say, I'm pretty sure she was involved in those at

13  some point or another.

14     Q.      Where would she have gathered those from?

15     A.      From the internet or from the OSHA book itself

16  or something that Scott Tatum may have brought in and handed

17  to her and saying I need, you know, so many copies of this

18  prepared in a book where I can get these guys to sign off on

19  it or something like that.  You know, I mean, that's out of

20  my area.  I can't answer it 100 percent.

21     Q.      Okay.  Would you defer to your wife in terms

22  of what she did for personnel management?

23     A.      Yes.

24     Q.      Would you defer to your wife as to what she

25  did for taxes?

1      A.      Yes.

2      Q.      Would you defer to your wife as to what she

3   did for finance, accounting, and auditing?

4      A.      Yes.

5      Q.      Would you defer to your wife as to what she

6   did for insurance?

7      A.      Yes.

8      Q.      Okay.  Let's turn our attention then to topic

9   number 34.  Any exercise of discretion and independent

10   judgment with respect to matters of significance.  During

11   the time Ms. Ramsey was at Wallace Electric, can you tell me

12   what the very most significant judgment she made was that

13   effected the company?

14      A.      Yeah.

15      Q.      Which ones?

16      A.      The same questions you asked me last time

17   because we had -- we went through this one ten times last

18   time.  There is no most significant one.  There's a long

19   laundry list which I gave you last time.

20      Q.      You're going to stand by all that?

21      A.      Sure.  I can even add to it.

22      Q.      Please.

23      A.      Okay.  One of them being when we had jobs with

24   liquidated damages where we could be charged up to $500 a

25   day if we did not complete something on time and the power

1   be turned on successfully because of paperwork having to be

2   done.  All that laid critically on her as far as making sure

3   final inspections were done, making sure all meter

4   information was called in correctly, everything was

5   coordinated.  Because we'd had several car dealership that

6   the company would be back charged $500 a day if we were not

7   100 percent completed with final inspection and certificate

8   of occupancy.  Now, that laid on her responsibility to get

9   everything called in properly, okay?  And she is the one

10  that did that.  She was the only one in that building that

11  handled that kind of stuff.

12          Q.      Well, handled what, calling the inspector?

13          A.      Coordinating all of what I just mentioned.

14          Q.      But tell me what discretion did she exercise

15  in that?  What decisions did she make about when to call an

16  inspector?

17          A.      What decisions did she make?

18          Q.      Right.  What decisions did she make?

19          A.      I have no idea.  You'll have to ask her.  She

20  handled it all.

21          Q.      Okay.  But that's what I'm trying to get to.

22  She handled the job duty, but as I understood your testimony

23  from last time, she was told by the on-site people it's time

24  for an inspection.

25          A.      We need an inspection so therefore it was her

1    discretion to gather the correct information needed,

2    depending on what power company it was, what inspection

3    department it was, what county or city government or state

4    government it was to make all this go smoothly.  She had

5    been down that road before.  She knew the exercise, she knew

6    what to happen.

7           Q.      Okay.  So from --

8           A.      You're not familiar with this stuff.  I can

9    tell.

10          Q.      Perhaps not, but...  So she would then get the

11   instructions to get an inspection done, and based on kind of

12   the address and the people who were at issue, she'd know who

13   to call, right?

14          A.      Yeah, I would get instructions first, she

15   would get instructions, we would all get instructions.

16   Everybody's instructed in life somewhere along the line to

17   do something.  Nobody makes it up.  So, yes, we all get

18   instructions.

19          Q.      And then she would call the right jurisdiction

20   and schedule an appointment, right?

21          A.      I think so.  I believe so, yeah.

22          Q.      All right.

23          A.      Okay.

24          Q.      Anything else?  I mean, you said you had this

25   new thing you wanted to raise about the inspections and

1    getting the power turned on and --

2         A.      Well, it's about the liquidated damages.  I

3    failed to mention that last time of how important that was

4    because we're back charged anywhere from $100 a day, $500 a

5    day, depending on whether this -- whether everything clicks

6    like it's supposed to.  We have deadlines to meet.

7         Q.      But what I'm trying to understand, though, is

8    the liquidated damages, is there anything that she's got a

9    specific impact on?

10        A.      Absolutely.  If everything didn't go right, if

11   she just decided to clock out and go home that day, or

12   whatever you want to say, or -- or drop the ball on

13   something like that, it would effect the financial well-

14   being of the company.  I mean, absolutely.

15        Q.      So when you're talking about liquidated

16   damages, we're really talking about her role in getting the

17   inspections done; is that what you're saying?

18        A.      Because there were liquidated damages on that

19   one particular job, yes.

20        Q.      Okay.  So liquidated damages are a result or

21   could be a result if she didn't get the --

22        A.      If somebody --

23        Q.      -- inspection done on time?

24        A.      -- didn't do their job properly, yes.

25        Q.      All right.  And here you're talking

1    specifically about not getting the inspections done so that

2    the power can get turned on, right?

3        A.      Any coordination that had to be done between

4    all of them, including the fire marshals, everything right

5    there at the end.

6        Q.      And what did she do with the fire marshal?

7        A.      There's times she had to run to the permit

8    department to handle things.  What she did with the fire

9    marshal is to make sure that we had the -- if we had a

10   subcontractor that did the fire alarm system for the

11   building, we'd have to make sure that the fire alarm

12   certificate letter was signed and stamped by the certified

13   person and was sent in.

14       Q.      Would she decide that you needed to get that

15   report done or that would just be part of the job, right?

16       A.      Yeah.  I mean, we don't decide that.  The

17   government decides that.

18       Q.      So her role is to get the form filled out,

19   right?

20       A.      Her job was -- part of the job was to retrieve

21   it and any other information that needed to be submitted

22   upon the final.

23       Q.      The final permitting?

24       A.      Final C.O.

25       Q.      Well, let me turn our attention to topic 35

1    then.  Any exercise of discretion and independent judgment

2    going on about implementing or actually formulating policies

3    in management operating procedures.  Did Ms. Ramsey

4    formulate any policies for the company?

5         A.     Any policies?  I can't say that she formulated

6    any policies other than, you know, well, policy -- the word

7    policy could be a gray area.  Procedures, yes, as far as she

8    would help -- several of the girls would get together as far

9    as Debbie, Phyllis, Rebecca and Angela would get together to

10   try and make a better streamline system of how information

11   is gathered between time, material, everything involved in

12   what made that front operation click, and could make the

13   decisions of how we might want to alter it to make it a

14   better...

15        Q.     What was the most significant alteration she

16   decided on to make it better?

17        A.     That's a Debbie question there I would say.

18        Q.     I mean, you raised it.  Do you know of any

19   examples?

20        A.     I didn't raise it, you raised it.  You asked

21   the question and I gave you an answer that I knew that they

22   were involved in trying to streamline payroll and things of

23   that nature and job cost systems.  The rest of it would be a

24   Debbie question.

25        Q.     What was the most significant assignment --

1    never mind.

2           A.      Yeah.  They're all significant, so.

3           Q.      What was the most significant financial

4    decision Ms. Ramsey ever made for the company?  Not that

5    effected finances, but the most significant financial

6    decision?

7           A.      I don't know.  I'd have to go back and read my

8    deposition from last time because I went through all of it

9    then.

10          Q.      Go ahead and answer the question, sir.  What

11   was the most significant --

12                  MR. WHITE:  Hold on a second.  Hold on.

13          I object to the repeated asked and answered

14          questions.  It's not a redo of the deposition,

15          it's supposed to be a continuation of the

16          deposition.  And I know you've got a list, but

17          your lists are duplicative.  In addition to

18          that, I object to you asking a question and

19          getting and then rephrasing his answer into

20          another question.  I mean, if I have to, I guess

21          we'll call the seven hours on the corporate

22          deposition because we've surely gotten past

23          that.  But, you know, I'm trying to be patient,

24          but it's -- these questions have definitely been

25          asked and answered and I object to them.

1  BY MR. BRIDGERS:  (Resuming)

2       Q.     What was the most significant financial

3  decision Ms. Ramsey made for Wallace Electric?

4            MR. WHITE:  Objection.  Asked and

5       answered.

6            MR. BRIDGERS:  Go ahead and answer.

7            MR. WHITE:  You don't have to and I

8       instruct you not to answer.  We're not going to

9       answer anymore questions that have already been

10      answered.

11 BY MR. BRIDGERS:  (Resuming)

12      Q.     Can you recall any other times where Ms.

13 Ramsey deviated from the company's established policies and

14 procedures?

15           MR. WHITE:  Other than he's already

16      testified to?

17           MR. BRIDGERS:  Other than he's already

18      testified to.

19           MR. WHITE:  Okay.

20 BY THE WITNESS:  (Resuming)

21      A.     I'm sure there's others out there that she

22 made judgment calls on.  And her and I had multiple

23 discussions on what areas that she needed to stay within,

24 like I've told you before.  And, you know, as long as she

25 was within those parameters, I had no choice but to back her

1    in the matter because somebody in the front office had to

2    make those calls.  She was involved with the guys on a daily

3    basis, she knew the ins and outs on things that no other --

4    no other person in that front office knew.

5         Q.    Like what?

6         A.    Everything we've talked about.

7         Q.    Like what?

8         A.    Like rates.  Okay.  If you'll stop talking,

9    I'll answer it.

10              MR. WHITE:  Hold on a second.  Hold on a

11         second.  Don't --  Nothing other than what you

12         haven't already testified to.  If it's something

13         new, fine.  If you've already answered the

14         question --

15              THE WITNESS:  Yeah.  I have already

16         answered the question.

17   BY MR. BRIDGERS:  (Resuming)

18        Q.    All right.  So you're not going to answer it

19   now?

20        A.    Yeah.

21              MR. WHITE:  Object.  Asked and answered.

22   BY THE WITNESS:  (Resuming)

23        A.    It's been answered.

24        Q.    Did Ms. Ramsey ever meet with a supplier

25   outside of the office?

1      A.      Not to my knowledge.

2      Q.      All right.  We'll turn our attention to topic

3  number 46, the factual basis for the following affirmative

4  defenses listed in the Complaint: third and sixth.  Mr.

5  Wallace, what is the company's factual basis for the fact

6  that the Plaintiff's claims are barred by laches, payment,

7  release, waiver, consent, estoppel, misnomer, unclean hands

8  after acquired evidence?

9              MR. WHITE:  Objection to the extent that

10         it calls for a legal conclusion.  If you know,

11         you can answer.

12  BY THE WITNESS:  (Resuming)

13      A.      I don't.  I don't even know what he said.

14      Q.      So you have no idea what the factual basis

15  there is?

16              MR. WHITE:  Do you understand what he's

17         asking?

18              THE WITNESS:  I do not understand his

19         question.

20  BY MR. BRIDGERS:  (Resuming)

21      Q.      Well, then, what's the factual basis for these

22  listed defenses?

23      A.      I don't understand the question.

24      Q.      It is called for under the topic.  I don't

25  care about your legal understanding.

1       A.       Sir, I don't understand what you're saying.

2    Factual --

3       Q.       Tell me why does the company think that Ms.

4    Ramsey has consented to this?

5       A.       Consented to what?

6       Q.       I don't know.  That's what your position is.

7       A.       Well, you're asking the question.

8       Q.       That's what your position is.  It doesn't make

9    any sense to me either.  How about the sixth defense:

10   Plaintiff's claims are barred due to failure to mitigate

11   under the Avoidable Consequences Doctrine?  Can you tell me

12   what the company's factual basis for that defense is?

13                  MR. WHITE:  Do you know what he's

14           asking?

15                  THE WITNESS:  No, I have no clue what

16           he's asking.  He needs to put it in layman's

17           terms.

18   BY MR. BRIDGERS:  (Resuming)

19       Q.       Did you prepare anymore since we spoke last

20   time for this deposition today?

21       A.       Absolutely not.  I have no time to.  I have to

22   work.

23       Q.       Did you look at any other documents?

24       A.       No, sir.

25       Q.       Did you talk to anybody else?

1       A.      No, sir.

2       Q.      So how much time do you think you took to

3  prepare for this deposition here today and last time we got

4  together?

5       A.      Probably thirty seconds walking down the hall.

6       Q.      We'll move on to topic number 48.  The

7  identity of each person known or believed by you to have

8  information relevant to any claims or defenses.  And I guess

9  I just wanted to follow up and make sure that you -- have

10  you identified all witnesses that you're aware of to your

11  attorney?

12       A.      Probably not.

13       Q.      So who do you think might have other

14  information about this claim?

15       A.      Other information or confirming the same

16  information?

17       Q.      Any information.  The names of other people.

18       A.      Probably 50 percent of the employees of

19  Wallace Electric.

20       Q.      Okay.  So how many people would that be?

21       A.      Probably around 40 people.

22       Q.      Okay.  So is it your testimony that there are

23  approximately 40 more witnesses in this matter that you have

24  not informed your attorney of?

25       A.      It's a good possibility that knew her day to

Page 37

1    day duties if that's what you're asking.  Yes.

2         Q.      I'm just asking for people who might have

3    knowledge about the case.  Do you know of any --

4         A.      No, sir.  No, not knowledge about the case.  I

5    thought you meant knowledge about her duties.

6         Q.      Actually, that's probably a better way to say

7    it.

8         A.      Because knowledge of her duties, that's what I

9    thought we were here for, not of the case.

10        Q.      Okay.

11        A.      I'm not a lawyer.

12        Q.      Have you followed up on looking for that org

13   chart?

14        A.      Work chart as far as?

15        Q.      The organizational chart you mentioned in your

16   last deposition?

17        A.      Something that I scratched down on a scratch

18   pad?  No, I haven't thought anymore about it to be honest

19   with you.

20        Q.      So you've made no efforts to locate it,

21   correct?

22        A.      I had full intention to, it's just the thought

23   left me.  We're not a billion dollar corporation that has a

24   structural ladder like that that is lived by.

25        Q.      Similar question: you were going to look to

```
 1   see if the list of job duties you might have had might have

 2   been written down in Ms. Ramsey's interview?  Have you had a

 3   chance to look for that?

 4        A.      That was a Debbie question.  She had --

 5        Q.      I asked her.

 6        A.      -- all the interview -- huh?

 7        Q.      I asked her and she pointed to you.

 8        A.      Okay.  Well, then --

 9        Q.      Do you know of anything?  Do you know where it

10   might be?

11        A.      No.  I would have to look.  I didn't look

12   because she has her employee file, I don't.  And what other

13   file we had, you know, had gotten missing.

14                MR. BRIDGERS:  Okay.  Let's take a

15        couple minute break and let me look at my notes.

16                (Whereupon, a brief recess was taken.)

17   BY MR. BRIDGERS:  (Resuming)

18        Q.      I want to turn our attention to topics 53 and

19   54 regarding documents which may have been responsive, but

20   are no longer in existence.  And also retention policies.

21   Let me just ask you about these documents.  Would the

22   company have any documents that would show that would set

23   out Ms. Ramsey's discretion in making any of these choices?

24   Is there any type of policies, any type of procedures that

25   would be written down?
```

1       A.     I don't understand the question.

2       Q.     Are there any policies or procedures written

3 down for the discretion you said she exercised in bidding

4 out jobs?  Is there anything written down, any policies?

5       A.     There is no policy that exists in the company

6 for anyone on that.

7       Q.     Do any of these documents, any of these bid

8 sheets, do they show who prepared them or what level of

9 approval they went through?

10      A.     I know they used to indicate their name on

11 some of them when they would put them together.

12      Q.     Okay.  Did that happen or was that being used

13 when Ms. Ramsey still worked there?

14      A.     Yeah, she's -- that was implemented when she

15 worked there.

16      Q.     Okay.  So tell me what would that signature

17 indicate or would that just be --

18      A.     Well, I mean, and that was something that was

19 developed when she worked there between the ones that I

20 discussed that when they would prepare either a P.O. or they

21 would pull a job together, they had their name on it where

22 they had pulled it together to get all the financial

23 information together on it.  That was a system that they had

24 created to where they could go back and identify who had

25 pulled together what and prepared what.

1     Q.      Okay.  So --

2     A.      If that's what you're asking, I --

3     Q.      -- would that be on all P.O.'s while she was

4  there?

5     A.      I believe so.

6     Q.      So the purchase orders would have on there

7  whether or not Ms. Ramsey had any input in them; is that

8  what you're saying?  And we'd know that by the fact that her

9  initials were on them or her name?

10    A.      You asked two questions at once.  I'm sorry.

11  You asked two questions at once.  Ask it again where I can

12  help figure out which one you want an answer to.

13    Q.      Would the purchase orders of the company, if

14  they had Ms. Ramsey's signature on them or name, would that

15  indicate that she had input into that purchase order?

16    A.      Nobody has input into a purchase order, okay?

17    Q.      I thought you said the word P.O., is that

18  purchase order?

19    A.      No.

20    Q.      What is it?

21    A.      When she would pull together the billing

22  information or prepare a quote, she would have had to have

23  pulled that together, she would have indicated her name on

24  it.  Once the job is approved, then you would create a P.O.

25  number which she also would put her name on showing that she

Page 41

1    prepared the P.O.

2         Q.      Would that then be approved by who, by the

3    customer or by you?

4         A.      Well, once she called it in, if they approved

5    it -- if the customer approved it, she put it on the board

6    and the guys went and done the job.  It wasn't approved by

7    me.

8         Q.      Did you review invoices before they were sent

9    out?

10        A.      Do I --  Yeah, I sure do.  I approve them all.

11   I have to review them because I have to see if we're making

12   any money or not.

13               MR. BRIDGERS:  Okay.  All right.  I

14        think at this time I don't have any further

15        questions.  I'm going to go ahead and suspend

16        the deposition.  I don't believe it's been

17        completed yet because the witness was unprepared

18        and the witness has refused to answer question.

19        The witness also says there could be other

20        documents out there that he has not looked for.

21               THE WITNESS:  That's not true.

22               MR. BRIDGERS:  Well, you said the org

23        chart might be out there, but it went out of

24        your mind if I remember you saying correctly.

25               THE WITNESS:  I have --  Yeah, I sure

1      do.  They're still possibly out there, though.

2      It's not that they don't exist.

3              MR. BRIDGERS:  Absolutely.  I didn't

4      mean to imply that, but --

5              THE WITNESS:  Okay.

6              MR. BRIDGERS:  -- you haven't done

7      anything to find out.

8              THE WITNESS:  Okay.

9              MR. BRIDGERS:  So anyway, I'm going to

10     go ahead and suspend the deposition and we will

11     just see when we can --

12             THE WITNESS:  I mean, I can scratch it

13     back down on a piece of paper if you'd like for

14     me to.  That's what it's on now.

15             MR. WHITE:  Don't speculate or scratch

16     something down.  If the document exists we'll

17     turn it over to him.

18             THE WITNESS:  Okay.  I'll look for it.

19             MR. WHITE:  If it doesn't exist, it

20     doesn't exist.

21             MR. BRIDGERS:  All right.  We're done

22     for today.

23             (Whereupon, the above-entitled matter

24     was suspended at 3:13 p.m.)

25                      o0o

1               CERTIFICATE OF COURT REPORTER

2    STATE OF GEORGIA      )

3    COUNTY OF FULTON      )

4         I, Susan E. McKoy, Certified Court Reporter, B-1251,

5    hereby certify that the foregoing transcript of deposition

6    as stated in the caption consisting of page 2 through 42,

7    was taken down by me and then transcribed under my

8    supervision, and that the same is a true, correct, and

9    complete transcript of the evidence given by the witness,

10   PHILLIP HOWARD WALLACE, SR., who was first duly sworn by me.

11        I further certify that I am a disinterested party to

12   this action and that I am neither of kin or counsel to any

13   of the parties hereto.

14        This certification is expressly withdrawn and denied

15   upon the disassembly or photocopying of the foregoing

16   transcript, unless said disassembly or photocopying is done

17   by the undersigned certified court reporter and original

18   signature and seal is attached thereto.

19        IN WITNESS WHEREOF, I hereby affix my hand on this the

20   31st day of May, 2014.

21

22        SUSAN E. MCKOY

23        CERTIFIED COURT REPORTER, B-1251

24

25

Page 44

1                           DISCLOSURE

2    STATE OF GEORGIA       Deposition of PHILLIP H. WALLACE, SR.

3    COUNTY OF FULTON

4

5        Pursuant to Article 8.B of the Rules and Regulations

6    of the Board of Court Reporting of the Judicial Council of

7    Georgia, I make the following disclosure:

8        I am a Georgia Certified Court Reporter.  I am here as

9    an independent contractor.

10       I was contacted by the offices of DELONG CALDWELL

11   BRIDGERS & FITZPATRICK, LLC to provide court reporting

12   services for this deposition.  I will not be taking this

13   deposition under any contract that is prohibited by O.C.G.A.

14   15-14-37 (a) and (b).

15       I have no contract/agreement to provide reporting

16   services with any party to the case, any counsel in the

17   case, or any reporter or reporting agency from whom a

18   referral might have been made to cover this deposition.  I

19   will charge its usual and customary rates to all parties in

20   the case, and a financial discount will not be given to any

21   party to this litigation.

22

23
                         Susan E. McKoy
24                       Certified Court Reporter, B-1251

25

1    SM/sm/7/5/14

2                    E R R A T A S H E E T

3        I hereby certify that I have read the foregoing and
     within pages 2 through 42 and no changes are required:

4

5                          PHILLIP WALLACE, SR. - 30(b)(6)- Vol. 2

6

         Sworn to and subscribed before me this
7    day of                         , 2014.

8

                         NOTARY PUBLIC
9

         My commission expires

10                       *************

11

         I hereby certify that I have read the foregoing and
12   within pages 2 through 42 and I wish to make the following
     changes:

13
     Page:        Line:
14   Page:        Line:
     Page:        Line:
15   Page:        Line:
     Page:        Line:
16   Page:        Line:
     Page:        Line:
17   Page:        Line:
     Page:        Line:
18   Page:        Line:

19

                           PHILLIP WALLACE, SR. - 30(b)(6)- Vol. 2
20

21       Sworn to and subscribed before me this
     day of                         , 2014.

22

23                       NOTARY PUBLIC

24       My commission expires

25